LEVI & KORSINSKY LLP
Adam C. McCall (SBN 302130)
445 South Figueroa Street, 31st Floor
Los Angeles, CA 90071
Telephone: (213) 985-7290
Facsimile: (202) 333-2121
Email: amccall@zlk.com

- and -

Nicholas I. Porritt (*to be admitted pro hac*)
1101 30th Street NW, Suite 115
Washington, D.C. 20001
Telephone: (202) 524-4290
Facsimile: (202) 333-2121
Email: nporritt@zlk.com

*Attorneys for Plaintiff*

UNITED STATED DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

| | |
|---|---|
| ROBERT CRAGO, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br>vs.<br><br>CHARLES SCHWAB & CO., INC., THE CHARLES SCHWAB CORPORATION, CHARLES SCHWAB, and WALTER W. BETTINGER II<br><br>Defendants. | Case No. 3:16-cv-3938<br><br><u>CLASS ACTION</u><br><br>COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS<br><br><u>DEMAND FOR JURY TRIAL</u> |

Plaintiff Robert Crago ("Plaintiff"), by his attorneys, except for his own acts, which are alleged on knowledge, alleges the following based upon the investigation of counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by The

1  Charles Schwab Corporation and Charles Schwab & Co., Inc. (collectively, "Schwab" or the
2  "Company"), as well as regulatory filings and reports, press releases and other public statements
3  issued by the Company, and various agreements between the Company and its clients. Plaintiff
4  believes that additional evidentiary support will exist for the allegations set forth herein after a
5  reasonable opportunity for discovery.

## NATURE OF THE ACTION

7  1.  This is a securities class action on behalf of all clients of Schwab between July 13,
8  2011 and July 13, 2016 who placed trade orders that were automatically routed to UBS Securities
9  LLC ("UBS"), in a manner inconsistent with the duty of best execution. Plaintiff brings his claims
10 pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange
11 Act"), 15 U.S.C. § 78j(b) and 78t, and Rule 10b-5, 17 C.F.R. § 240.10b-5 promulgated thereunder.

12 2.  At all times relevant to this Complaint, Schwab acted as, among other things, a
13 broker for its clients, routing their orders to various venues for execution.

14 3.  Brokers have various venues at their disposal to which orders can be routed. Such
15 venues include exchanges, regional exchanges, electronic communications networks ("ECNs"),
16 and third market makers (*i.e.*, dealers that buy and sell orders even if there is not a buyer or seller
17 immediately available for the other side of a transaction). A broker may also "internalize" a
18 client's order by filling the order with its own inventory.

19 4.  Brokers engaged in routing orders for their clients are under a duty of "best
20 execution." That is, brokers have a responsibility to execute orders in a matter that is most
21 beneficial to their clients, and are prohibited from taking actions which are not in their clients'
22 best interests. This duty requires that brokers fill the clients' orders to the extent possible at the
23 best price available.

24 5.  At all times relevant to this Complaint, Schwab was bound by a duty of best
25 execution. Moreover, at all time relevant to this Complaint, Schwab acknowledged and
26 represented to its clients that it was bound by a duty of best execution and that its practices
27 complied with its duty.

28

6. At all times relevant to this Complaint, Schwab acted as a broker, engaged in routing its client's orders to be executed. One such type of order, known as a "nonmarketable limit order," is an instruction from the client for the broker to deal in a certain number of securities at a specified price outside the current prevailing "ask" or "offer." "Market orders," on the other hand, are instructions to conduct transactions at the best available price. While clients can direct a broker to route nonmarketable limit orders and/or marketable orders to certain venues, over 98 percent of orders placed with Schwab are non-directed.

7. Rather than route its clients' trade orders after giving due consideration to its duty of best execution, Schwab routes substantially all of its clients' orders to UBS, pursuant to an order routing and execution services agreement it entered into with UBS (the "Equities Order Handling Agreement").

8. Pursuant to the Equities Order Handling Agreement, Schwab is legally required to route at least 95 percent of its orders in equity securities and listed options to UBS for order handling and execution, or it must pay a fee of as much as $58.5 million. In consideration for Schwab blindly routing its clients' orders, UBS agreed to execute equity orders without charging commissions and without pass-through of third-party charges. In addition to UBS offering free execution of Schwab's clients' trades, UBS offers liquidity rebates and payments for order flow.

9. Accordingly, from 2004 through the date of this filing, Schwab routed its clients' non-directed orders pursuant to the Equities Order Handling Agreement, without giving due consideration to its duty of best execution.

10. As a result of this order routing in dereliction of its duty, Schwab failed to provide best execution for its clients, causing them material harm in the form of economic loss due to their orders going unfilled, underfilled, filled at a suboptimal price, and/or filled in a manner which adversely affects the order's performance post-execution.

11. Plaintiffs hereby seek to recover on behalf of themselves and all similarly-situated clients of Schwab the value they lost on account of the self-interested practice of order routing described herein.

## JURISDICTION AND VENUE

12. The claims alleged herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) and 78t, and Rule 10b-5, 17 C.F.R. § 240.10b-5 promulgated thereunder.

13. The jurisdiction of this Court is based on Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. §§ 1331 and 1337.

14. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). Many of the acts alleged herein, including the dissemination to the investing public of the misleading statements and omissions at issue, occurred in substantial part in this District.

15. In connection with the acts, transactions, and conduct alleged herein, Defendants used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of national securities exchanges and markets.

## PARTIES

16. Plaintiff Robert Crago is a client of Schwab and has been continuously throughout the past five years (the "Class Period"). Plaintiff is an individual and a resident of the State of Colorado. As detailed in his certification (attached hereto as Exhibit A), Plaintiff purchased shares of U.S. based exchange-listed stocks in trades executed during the Class Period and, as a result thereof, suffered damages from Defendants' unlawful conduct.

17. Defendant Charles Schwab & Co., Inc. ("Schwab"), a subsidiary of The Charles Schwab Corporation ("CSC") that was incorporated in 1971, is a securities broker-dealer with over 325 domestic branch offices in 45 states, as well as a branch in each of the Commonwealth of Puerto Rico and London, England, and serves clients in Hong Kong through one of CSC's subsidiaries.

18. Defendant The Charles Schwab Corporation is a Delaware corporation that was incorporated in 1986 and engages, through its subsidiaries, in wealth management, securities

brokerage, banking, money management, and financial advisory services. As of December 31, 2015, CSC had $2.51 trillion in client assets, 9.8 million active brokerage accounts, 1.5 million corporate retirement plan participants, and 1.0 million banking accounts. CSC's principal executive offices are located at 211 Main Street, San Francisco, California.

19. Defendant Charles Schwab ("Charles Schwab") has been Chairman of the Board and a director of CSC since its incorporation in 1986. He also served as Chief Executive Officer of CSC from 1986 to 1997 and Co-Chief Executive Officer from 1998 until 2003. He was re-appointed Chief Executive Officer in 2004 and served in that role until 2008. Mr. Schwab is also Chairman of Schwab and Charles Schwab Bank ("Schwab Bank").

20. Defendant Walter W. Bettinger II ("Bettinger") has been President and Chief Executive Officer of CSC since 2008. He also serves on the Board of Directors of CSC, Schwab, and Schwab Bank. Prior to assuming his current role, Bettinger served as President and Chief Operating Officer of CSC from 2007 until 2008 and as Executive Vice President and President – Schwab Investor Services of CSC and Schwab from 2005 to 2007. He served as Executive Vice President and Chief Operating Officer – Individual Investor Enterprise of CSC and Schwab from 2004 until 2005, and Executive Vice President – Corporate Services of Schwab from 2002 until 2004. Bettinger joined Schwab in 1995.

## FURTHER SUBSTANTIVE ALLEGATIONS

### *Payments for Order Flow and Retail Attribution*

21. Broker-dealers are financial services firms that buy and sell stocks, bonds, and other assets both for their clients and their own accounts.

22. Certain broker-dealers hold shares of securities in their own inventory in order to create a market for both buyers and sellers of those securities. These broker-dealers, who risk the adverse effects of deleterious fluctuations in the prices of those securities in exchange for the benefit of creating a market for the securities, are known as "market makers."

23. Historically, market makers paid fees to regional intermediaries for their services in executing trades with other local firms on behalf of the market maker. In order to grow a

5

guaranteed supply of liquidity in their markets, market makers began offering payments to not only the intermediaries, but also retail firms, including brokers, in exchange for the retail firms routing their orders to the market makers. This practice, which expanded from off-exchange securities (over-the-counter or "OTC" securities) to exchange-traded securities, came to be known as "payment for order flow." Over time, different types of venues, including ECNs and exchanges, also began making payments for order flow.

24. Market makers—including Bernard "Bernie" Madoff, who in large part pioneered the practice of paying for order flow—traditionally profited off this system by realizing the "spread" on the underlying security; that is, by buying at the "bid" price and selling at the "ask" or "offer" price. For example, during the 1990s, Bernard Madoff Investment Securities—his broker-dealer operation—paid retail investors for order flow directed to a third market it had created. On this third market, Madoff's firm traded within the bid-ask spread, profiting off of the margins. It is estimated that in this manner Mr. Madoff diverted approximately ten percent of total trading volume away from the floor of the New York Stock Exchange ("NYSE").

25. Little has changed. Today, wholesale market makers still pay retail brokerages for order flow so that they can realize profits by exploiting the "dealer's turn," or the practice of buying at the bid price and selling at the offer. In other words, market makers incur up-front costs by paying to trade with retail stock investors, but nevertheless turn a hefty profit by matching buyers and sellers and pocketing the difference of the spread, without having to go to traditional exchanges.

26. Schwab, in its capacity as its clients' broker, receives payments for order flow from market-makers, such as UBS, to which the Company routes its clients' orders.

27. Another profitable aspect of paying for order flow from retail broker-dealers for venues is that retail brokers may "tag" their clients' order as retail. Venues pay brokers to mark its clients' orders as "retail," and in turn, venues charge hefty fees to its clients, commonly high frequency trades, for access to such information of its proprietary data feeds. The ordinary retail

6

customer, however, is unable to afford access to these feeds, and thus receives no compensation for her order being designated as "retail."

28. By marking which orders are placed by retail customers, brokers compromise the integrity of the order and make it easy for sophisticated traders with access to the proprietary data feeds to employ strategies which take advantage of "mom-and-pop" investors.

### *Schwab's Duty of Best Execution*

29. Broker-dealers have a duty to seek out best execution of their customers' orders. This duty derives from the duty of loyalty established in common law principles of agency, pursuant to which an agent is obligated to act in the best interests of the agent's principal at all times. In the context of transacting in securities, best execution requires that, when conducting a transaction on behalf of a client, a broker seek the terms most favorable to the client that can possibly be obtained given the present circumstances.

30. When securities are traded in different venues, best execution requires that, absent instruction otherwise from the client, a broker-dealer ensure that the client's order be routed to the best possible venue. A broker achieves best execution when it endeavors to obtain the best price available, execute the transaction in the shortest possible time frame, maximize the likelihood that the transaction is executed in its entirety, and, where possible, seek "price improvement"—the execution of a trade at a price better than the best current public quote.

31. NASD Rule 2320 provided that Schwab, as a broker-dealer, would "use reasonable diligence to ascertain the best market for the subject security and buy or sell in such market so that the resultant price to the customer is as favorable as possible under prevailing market conditions." The factors to be considered in determining reasonable diligence were "(A) the character of the market for the security, e.g., price, volatility, relative liquidity, and pressure on available communications; (B) the size and type of transaction; (C) the number of markets checked; (D) accessibility of the quotation; and (E) the terms and conditions of the order which result in the transaction, as communicated to" Schwab.

32. Financial Industry Regulatory Authority ("FINRA") Rule 5310, which superseded NASD Rule 2320 on May 31, 2012, incorporates all of that Rule's provisions concerning a broker-dealer's duty of best execution.

33. Schwab has continually acknowledged that it owes its clients a duty of best execution and further touts its adherence with its duty. Specifically, the "Compensation and Advice Disclosures" section of Schwab's website states:

> Schwab may receive remuneration such as liquidity or order flow rebates from a market venue to which orders are routed, ***but at all times is committed to best execution***.
>
> ***Schwab considers a number of factors in evaluating execution quality among market venues***, including execution price and opportunities for price improvement, market depth and order size, the trading characteristics of the security, speed and accuracy of executions, the availability of efficient and reliable order handling systems, liquidity and automatic execution guarantees, and service levels and the cost of executing orders at a particular market or firm. Price improvement occurs when an order is executed at a price more favorable than the displayed national best bid or offer. ***Schwab regularly monitors the execution quality provided by the various market venues to ensure orders are routed to markets and firms that have provided high-quality executions over time***.

(emphasis added.)

34. On Schwab's website, under its "Order Routing" section, it states that "[i]n arranging for the execution of Non-Directed Orders for equities and listed options, Schwab seeks out industry-leading execution services and access to the best-performing markets."

35. Had Schwab not promised and contracted to provide best execution of its clients' orders, Plaintiffs would have placed orders through broker-dealers who did promise to provide best execution.

### *Schwab's Order Routing Practices*

36. Despite Schwab's repeated representations that it follows a thoughtful, multi-factored process in routing its clients' equity orders, Schwab's routing decisions are predetermined and routed in accordance with the Equities Order Handling Agreement.

37. Since 2004 Schwab has routed its clients' orders pursuant to the various terms of the Equities Order Handling Agreement. Among the various terms, Schwab is required to route *all* its clients' order to UBS, for which UBS charges no commission.

38. When Schwab routes its clients' orders to UBS it first seeks to match trades within UBS' internal liquidity before searching other market makers, exchanges, and alternative trading systems.

39. Indeed, the Equities Order Handling Agreement provided for considerable liquidated damages to ensure Schwab's substantial performance with the agreement. Under the Equities Order Handling Agreement, should Schwab have routed anything less than 95 percent of its clients' non-directed orders in the first three years of the agreement, Schwab would be liable to pay UBS $58,500,000. If Schwab were to route anything less than 95 percent of its clients' non-directed orders in any year for the remaining term of the agreement it would be required to pay UBS as much as $44,375,000.

40. Rather than let the Equities Order Handling Agreement expire on October 31, 2012 as set forth by its terms, in November 2011, Schwab agreed to extend it, thereby ensuring that the Company would continue to route its Clients' orders without consideration of its duty of best execution for at least another two years.

41. Since January 30, 2001, the SEC has required, under Rule 11Ac1-6 (now Rule 606), that broker-dealers that route customer equity orders make public quarterly reports that identify the venues to which the orders are routed for execution. These reports must also disclose the rebate that a broker-dealer receives for adding liquidity to the venue. SEC Rule 606 exempts broker-dealers from identifying execution venues that receive less than 5% of non-directed orders, provided that 90% of non-directed orders are identified.

42. The 606 reports prepared by Schwab reveal that from 2004 through 2014 Schwab routed at least 95 percent of its clients' non-directed orders to UBS. Since 2015, Schwab has continued to mindlessly route at least half of its clients' order flow directly to UBS.

43. Schwab currently charges a commission on each order placed by its clients, varying from $8.95 per trade for orders entered online; $13.95 per trade for orders placed by phone; and $33.95 for orders placed through a Schwab representative.

44. In addition to the fees generated by the commission charged per trade, Schwab collects payments for order flow for nearly all of its clients' orders.

45. Rule 606, however, does not require Schwab disclose the total earnings it has received from its order routing practices.

46. Analysts have estimated that Schwab generated $100 million in revenue from payments for order flow in 2013.[1] The Company merely disclosed, however, in its annual report on Form 10-K filed with the SEC on March 22, 2013 (the "2012 10-K"), that: "In November 2012, the Company began receiving additional order flow rebates from market venues to which client orders are routed for execution. Order flow revenue increased by $23 million due to this revenue and the inclusion of a full year of optionsXpress' order flow revenue."

47. In the Company's annual report on Form 10-K filed with the SEC on February 24, 2016 (the "2015 10-K") it disclosed for the first time that "[o]rder flow revenue was $103 million during 2015 compared to $114 million during 2014."

*By Routing to UBS Schwab Failed to Satisfy its Duty of Best Execution for its Clients*

48. Despite Schwab's repeated claims that its routing practices satisfy its duty of best execution, they in fact demonstrate a clear disregard for Schwab's duties. Nearly all of Schwab's clients' orders are routed to the single venue with which Schwab entered into the Equities Order Handling Agreement.

49. As detailed above, FINRA Rule 5310 requires Schwab to consider a multitude of factors when making routing decisions. Specifically, Schwab must consider: "(A) the character of the market for the security (e.g., price, volatility, relative liquidity, and pressure on available communications); (B) the size and type of transaction; (C) the number of markets checked; (D)

---

[1] Bradley Hope, "Fallout From High frequency Trading Hits Brokerages," THE WALL STREET JOURNAL, April 6, 2014 (available online at http://on.wsj.com/XxJGtt (accessed July 12, 2016).

10

accessibility of the quotation; and (E) the terms and conditions of the order which result in the transaction, as communicated to the member and persons associated with the member."

50. These enumerated factors make clear that the duty of best execution entails a complex inquiry, and that no single venue is the "best" venue for all trades. Nevertheless, Schwab continually routed its clients' orders without considering these factors at all. Indeed, Schwab considered just one single factor, not enumerated by FINRA: the Equites Order Handling Agreement.

51. Accordingly, Schwab routed nearly all of its clients' order to UBS, pursuant to a preexisting agreement, without paying due consideration to its duty of best execution.

## CLASS DEFINITION AND ALLEGATIONS

52. Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(2) and/or (b)(3) of the Federal Rules of Civil Procedure ("Rule") for the purpose of asserting the claims alleged in this Complaint on a common basis. Plaintiff brings this action on behalf of himself and all members of the following class comprised of:

> **All clients of Schwab between July 13, 2011 and July 13, 2016 who placed orders that were automatically routed to UBS by Schwab pursuant to Equities Order Handling Agreement. Excluded from the Class are the officers, directors, and employees of Schwab. Also excluded are the judge to whom this case is assigned and any member of the judge's immediate family.**

53. Plaintiff reserves the right to modify or amend the definitions of the Class after discovery.

54. *Numerosity*. Rule 23(a)(1). The members of the Class are so numerous that their individual joinder is impracticable. Defendants has over 9.8 million client accounts. Plaintiff is informed and believes that the proposed Class contains at least hundreds of thousands of Defendants' clients who have been damaged by the Company's conduct as alleged herein. Record owners and other members of the Class may be identified from records maintained by Schwab and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

55. *Existence of Common Questions of Law and Fact. Rule 23(a)(2).* This action involves common questions of law and fact, which include, but are not limited to, the following:

a. whether the statements made by Defendants as part of their promises to provide, and assertions that they do provide, best execution of their clients' orders, discussed herein are true, or are reasonably likely to deceive, given the omissions of material fact described above;

b. whether the federal securities laws were violated by Defendants' acts as alleged herein;

c. whether statements made by the Defendants' officers, directors, and employees to the investing public during the Class Period misrepresented material facts about the business, operations and management of Defendants;

d. whether Plaintiff and the other members of Class are entitled to damages; and

e. whether Plaintiff and the Class are entitled to injunctive relief, restitution, other equitable relief, and/or other relief as may be proper.

56. *Typicality. Rule 23(a)(3).* All members of the Class have been subject to and affected by the same conduct and omissions by Defendants. The claims alleged herein are based on the same violations by Defendants that harmed Plaintiff and members of the Class. By placing orders in connection with which Defendants failed to act upon due consideration to its duty of best execution, all members of the Class were subjected to the same wrongful conduct. Plaintiff's claims are typical of the Class' claims and do not conflict with the interests of any other members of the Class. Defendants' unlawful, unfair, deceptive, and/or fraudulent actions and breaches of the duty of best execution concern the same business practices described herein irrespective of where they occurred or were experienced.

57. *Adequacy. Rule 23(a)(4).* Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained counsel experienced in complex consumer

1  class action litigation, and Plaintiff intends to prosecute this action vigorously. Plaintiff has no
2  interest adverse or antagonistic to those of the Class.

3        58.       *Injunctive and Declaratory Relief. Rule 23(b)(2).* Defendants' actions regarding the deceptions and omissions relating to its routing of client orders are uniform as to members of the Class. Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief as requested herein is appropriate respecting the Class as a whole.

7        59.       *Predominance and Superiority of Class Action. Rule 23(b)(3).* Questions of law or fact common to the Class predominate over any questions affecting only individual members and a class action is superior to other methods for the fast and efficient adjudication of this controversy, for at least the following reasons:

       a.       Absent a class action, members of the Class as a practical matter will be unable to obtain redress. Defendants' violations of their legal obligations will continue without remedy, additional clients will be harmed, and Defendants will continue to retain their ill-gotten gains;

       b.       It would be a substantial hardship for most individual members of the Class if they were forced to prosecute individual actions;

       c.       When the liability of Defendants has been adjudicated, the Court will be able to determine the claims of all members of the Class;

       d.       A class action will permit an orderly and expeditious administration of each Class member's claims and foster economies of time, effort, and expense;

       e.       A class action regarding the issues in this case does not create any problems of manageability;

       f.       Defendants have acted on grounds generally applicable to the members of the Class, making class-wide monetary relief appropriate;

       g.       By pursuing a uniform course of conduct of routing their clients without paying due consideration to its duty of best execution, Defendants failed to provide best execution as a matter of policy and practice to all members of the Class; and

h.      As a result of Defendants' order routing policy, each member of the Class suffered damages to an extent within the peculiar knowledge of the Defendants.

A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

### COUNT I
### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
### Against All Defendants

60.     Plaintiff repeats and realleges each allegation contained in the above paragraphs as if fully set forth herein.

61.     This Count is asserted against the Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

62.     During the Class Period, Defendants' senior managers engaged in a plan, scheme, conspiracy, and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts, and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes, and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive Defendants' clients, including Plaintiff and other Class members, as alleged herein; (ii) cause the Class members to engage in a broker-client relationship with Defendants which they otherwise would not have done; (iii) cause the Class members to place orders with Defendants which they otherwise would not have placed;

and (iv) deprive the Class members of the best execution of their orders. Furthermore, Defendants knew that by failing to provide them with best execution of their orders, each member of the Class would, and did, incur economic harm arising from their almost all of their orders being routed to just one venue. In furtherance of this unlawful scheme, plan and course of conduct, the Defendants' senior managers took the actions set forth herein.

63. Pursuant to the above plan, scheme, conspiracy and course of conduct, Defendants' senior managers participated directly or indirectly in the preparation and/or issuance of 606 Reports, testimony, press releases, and other statements and documents described above, including statements made to government entities, securities analysts, and the media that were designed to convince the public, in general, and Defendants' clients, in particular, that Defendants were providing best execution of their clients' orders when, in fact, they were not. Such 606 Reports, press releases, and other statements and documents were materially false and misleading in that they failed to disclose material information concerning Defendants' order routing practices and misrepresented the truth about same.

64. Defendants' senior managers had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants' officers, directors, and employees acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to them. Said acts and omissions of Defendants' senior managers were committed willfully or with reckless disregard for the truth. In addition, each of Defendants' senior managers knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

65. Information showing that Defendants' senior managers acted knowingly or with reckless disregard for the truth is peculiarly within their knowledge and control. The senior managers of Schwab had knowledge of the details of Schwab's order routing strategies and behavior.

66. Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Defendants' senior managers were able to and did, directly or indirectly, control the content of the statements of Schwab. Defendants had a duty to disseminate timely, accurate, and truthful information with respect to the Company's routing of its clients' orders. As a result of the dissemination of the aforementioned 606 Reports, testimony, press releases, and other statements, the Class members placed orders through Schwab with an expectation of best execution throughout the Class Period. In ignorance of the adverse facts concerning Defendants' failure to provide best execution, which were concealed by Defendants' senior managers, Plaintiff and the other members of the Class placed orders through Schwab and relied upon the 606 Reports, testimony, press releases, and other statements disseminated by Defendants' senior managers, and were damaged thereby. By reason of the conduct alleged herein, Defendants, through their senior managers, knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

67. As a direct and proximate result of the Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with Defendants' routing of their orders during the Class Period.

**COUNT II**
**Violation of Section 20(a) of the Exchange Act**
**Against Defendants Charles Schwab and Bettinger**

68. Plaintiff repeats and realleges each allegation contained in the above paragraphs as if fully set forth herein. This Count is asserted against Defendants Charles Schwab and Bettinger and is based upon Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) *et seq*.

69. During the class period, Defendants Charles Schwab and Bettinger participated in the operation and management of Schwab, and conducted and participated, directly and indirectly, in the conduct of Schwab's business affairs. By virtue of their positions as Chairman of the Board of Directors and Chief Executive Officer, respectively, Defendants Charles Schwab and Bettinger

16

1  knew that Schwab was pursuing a policy of routing orders pursuant to the Equities Order Handling
2  Agreement at the expense of achieving best execution of their clients' orders.

3        70.    Due to their positions at Schwab, Defendants Charles Schwab and Bettinger were
4  in a position of control and authority, and had a duty to ensure that the employees of the Company
5  routed the Company's clients' trades in a manner that comported with duty of best execution
6  owed to its clients. Throughout the class period, Defendants Charles Schwab and Bettinger
7  instead exercised their power and authority to cause Schwab to engage in the wrongful acts
8  complained of herein. Defendants Charles Schwab and Bettinger were "controlling persons" of
9  Schwab within the meaning of Section 20(a) of the Exchange Act, and in this capacity they
10 participated in the wrongful conduct alleged herein, which brought hundreds of millions of dollars
11 of revenue to the Company at the expense of its clients.

12       71.    By reason of the above conduct, Defendants Charles Schwab and Bettinger are
13 liable pursuant to Section 20(a) of the Exchange Act for Schwab's violation of the duty of best
14 execution which it owed to its clients.

## PRAYER FOR RELIEF

16 WHEREFORE, Plaintiff, on behalf of himself and the Class, requests entry of an order as follows:

17     A. Declaring this action to be a class action properly maintained pursuant to the Federal
18     Rules of Civil Procedure, certifying the Class with Plaintiff as Class Representative and
19     certifying Plaintiff's counsel as Class Counsel;

20     B. Directing Schwab to take all necessary actions to reform and improve its internal
21     procedures to protect the Company and its clients from recurrences of the damaging events
22     described herein;

23     C. Awarding Plaintiff the costs and disbursements of this action, including reasonable
24     allowance of fees and costs for Plaintiff's attorneys, experts, and accountants; and

25     D. Granting Plaintiff such other and further relief as the Court may deem just and proper
26     under the circumstances.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury.

Dated: July 13, 2016					LEVI & KORSINSKY LLP

							  /s/ Adam McCall
							Adam C. McCall (SBN 302130)
							445 South Figueroa Street, 31st Floor
							Los Angeles, CA 90071
							Telephone: (213) 985-7290
							Email: amccall@zlk.com

							 - and -

							Nicholas I. Porritt (*to be admitted pro hac*)
							1101 30th Street NW, Suite 115
							Washington, D.C. 20001
							Telephone: (202) 524-4290
							Email: nporritt@zlk.com

							*Attorneys for Plaintiff*