LIONEL Z. GLANCY (#134180)
  lglancy@glancylaw.com
ROBERT V. PRONGAY (#270796)
  rprongay@glancylaw.com
JOSHUA L. CROWELL (#295411)
  jcrowell@glancylaw.com
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:   (310) 201-9150
Facsimile:    (310) 201-9160

LAWRENCE P. EAGEL
  eagel@bespc.com
J. BRANDON WALKER
  walker@bespc.com
TODD H. HENDERSON
  henderson@bespc.com
BRAGAR EAGEL & SQUIRE, P.C.
885 Third Avenue, Suite 3040
New York, New York 10022
Telephone:   (212) 308-5858
Facsimile:    (212) 486-0462

*Attorneys for Lead Plaintiffs Robert Wolfson and
Frank Pino and Co-Lead Counsel for the Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| ROBERT CRAGO, Individually and on Behalf of All Others Similarly Situated,<br><br>            Plaintiff,<br><br>        v.<br><br>CHARLES SCHWAB & CO., INC., and THE CHARLES SCHWAB CORPORATION,<br><br>            Defendants. | Case No. 3:16-cv-03938-RS<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL**<br><br>The Hon. Richard G. Seeborg |

# TABLE OF CONTENTS

Page

I.      PRELIMINARY STATEMENT .................................................................................... 2

II.     JURISDICTION AND VENUE ................................................................................... 4

III.    PARTIES ................................................................................................................... 4

IV.     FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS ........................... 5

        A.      Schwab Is a Discount Stock Broker That Generates Revenue From Trade
                Commissions and Payments for Order Flow ............................................... 5

        B.      Schwab Had a Duty of Best Execution and Represented That It Was
                Committed to Obtaining the Best Execution Possible for Its Customers ................ 6

        C.      Schwab's Routing Practices Resulted in Systematic Violations of Its Duty
                of Best Execution ..................................................................................... 10

                1.      Schwab Entered Into an Agreement Requiring Schwab to Rout More
                        Than 95% of Non-Directed Orders to UBS ................................. 10

                2.      Schwab's Agreement With UBS Resulted in Extreme and Anomalous
                        Order Flow Inconsistent with Best Execution ............................... 13

                3.      Schwab's Routing of Substantially All of Its Non-Directed Order Flow
                        to UBS Created an Inherent Conflict of Interest .......................... 15

                4.      By Routing Substantially All of Its Non-Directed Order Flow to UBS,
                        Schwab Failed to Satisfy Its Duty of Best Execution to Its Clients ........... 19

V.      ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER ............................... 30

VI.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
        AND OMISSIONS .................................................................................................. 32

VII.    PRESUMPTION OF CLASS-WIDE RELIANCE ...................................................... 34

VIII.   LOSS CAUSATION AND DAMAGES ..................................................................... 34

IX.     INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS
        CAUTION DOCTRINE ........................................................................................... 35

X.      STATUTE OF LIMITATIONS ................................................................................. 36

XI.     CLASS ACTION ALLEGATIONS ........................................................................... 38

XII.    CLAIM FOR RELIEF ............................................................................................. 40

XIII.   PRAYER FOR RELIEF .......................................................................................... 42

XIV.    JURY DEMAND ..................................................................................................... 42

1    Lead Plaintiffs Robert Wolfson and Frank Pino ("Lead Plaintiffs"), individually and on behalf

2  of all other persons similarly situated, by their undersigned attorneys, for their Amended Class Action

3  Complaint against Defendants The Charles Schwab Corporation ("Schwab Corp.") and Charles

4  Schwab & Co., Inc. ("Schwab & Co.") (together, Schwab Corp. and Schwab & Co. are "Schwab" or

5  "Defendants"), allege the following based upon personal knowledge as to themselves and their own

6  acts and information and belief as to all other matters based upon the investigation of their counsel,

7  which included a review of Schwab's filings with the U.S. Securities and Exchange Commission

8  ("SEC"), as well as regulatory filings and reports, press releases, and other public statements issued by

9  and about Schwab, various agreements between Schwab and its clients, and other publicly available

10 reports and articles.  Lead Plaintiffs believe that additional evidentiary support will exist for the

11 allegations set forth herein after a reasonable opportunity for discovery.

12 **I.      PRELIMINARY STATEMENT**

13    1.      This is a securities class action on behalf of all clients of Schwab between July 13,

14 2011 and July 13, 2016 (the "Class Period") who placed trade orders that were routed to UBS

15 Securities LLC ("UBS"), in a manner inconsistent with Schwab's duty of best execution.  Lead

16 Plaintiffs bring their claims pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of

17 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) and 78t, and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5,

18 promulgated thereunder.

19    2.      Schwab is one of the largest retail broker-dealers in the world, routing its clients' trade

20 orders to various venues for execution.  All brokers are under a duty of "best execution," which means

21 that, as required by FINRA Rule 5310, Schwab must "use reasonable diligence to ascertain the best

22 market . . . so that the resultant price to the customer is as favorable as possible."  Similarly, in its

23 Order Execution Obligations Release, No. 34-37619A, the SEC states that the duty of best execution,

24 which is incorporated into the antifraud provisions of the federal securities laws, requires a broker "to

25 seek the most favorable terms reasonably available under the circumstances for a customer's

26 transactions."

27    3.      Throughout the Class Period, Schwab represented in public statements and documents

28 that it assiduously sought best execution for its clients.  For example, in the account agreement that all

AMENDED CLASS ACTION COMPLAINT
Case No. 3:16-cv-03938-RS

Schwab retail broker clients executed, Schwab represented that "[it] consider[ed] a number of factors in evaluating execution quality among markets and firms, including [*inter alia*] execution price and opportunities for price improvement [over the National Best Bid and Offer for the security in question]. . . ."  The agreement also represented that "Schwab regularly monitor[ed] the execution obtained to ensure orders are routed to market venues that have provided high-quality executions over time." In reliance on these representations and others, Lead Plaintiffs and other members of the Class placed numerous trade orders with Schwab.

4.     In fact, however, Schwab's trade routing practices were diametrically opposed to its representations of faithfully complying with its duty of best execution.  Instead of monitoring and evaluating execution quality among various trading venues and, based upon various factors, selecting the venues that obtained best execution for its clients, for most of the Class Period, Schwab mechanically routed upwards of 95% of its trade orders to a single venue – wholesale market maker UBS.  Schwab did so as required by an agreement with UBS that paid Schwab approximately $100 million per year.  In view of the 95% requirement, Schwab did not – and could not – consider execution price, opportunities for price improvement, or other best execution factors in its trade routing decisions.  In contrast, competing retail brokers that did not accept so-called payments for order flow routed its clients' orders to a diverse set of venues.

5.     Schwab's payment for order flow arrangement created a conflict of interest because UBS did not intend to execute orders on terms most favorable to Schwab's clients.  Once Schwab routed its clients' trade orders to UBS, UBS was able to profit off of Schwab's captive order flow by doing one of the following:  (1) internalizing the trade, *i.e.*, matching the order internally without necessarily providing best execution by re-routing to a different market venue with a better price; (2) placing the trade in the UBS dark pool, thereby exposed to predatory high-frequency traders; or (3) re-routing the trade in a manner allowing UBS to obtain an order flow rebate.  In return, Schwab clients were deprived of the most favorable price, instead receiving minimal – often subpenny – price improvement.  As Defendants own statements demonstrate, they were fully aware of this acute conflict of interest, yet Schwab still mindlessly routed 95% of its trade orders to UBS.

AMENDED CLASS ACTION COMPLAINT
Case No. 3:16-cv-03938-RS

6.      Schwab's systematic violations of its duty of best execution have caused substantial harm to Schwab's clients in the form of higher prices for purchase orders and lower prices for sell orders that could have been obtained in other trading venues, in addition to trades foregone altogether. On behalf of the entire Class, Lead Plaintiffs seek both damages and injunctive relief.

## II.     JURISDICTION AND VENUE

7.      The claims alleged herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and 78t, and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

8.      The jurisdiction of this Court is based on Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. §§ 1331 and 1337.

9.      Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Many of the acts alleged herein, including the dissemination to the investing public of the misleading statements and omissions at issue, occurred in substantial part in this District.

10.      In connection with the acts, transactions, and conduct alleged herein, Defendants used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of national securities exchanges and markets.

## III.     PARTIES

11.      Lead Plaintiffs Robert Wolfson and Frank Pino are clients of Schwab and have been continuously throughout the Class Period.  Lead Plaintiffs are individuals and residents of the States of New York and New Jersey, respectively.  As detailed in their certifications (ECF No. 27-1), Lead Plaintiffs purchased shares of U.S. based exchange-listed stocks in trades executed during the Class Period and, as a result thereof, suffered damages from Defendants' unlawful conduct.

12.      Defendant Schwab & Co. is a California corporation and a subsidiary of Schwab Corp., and was incorporated in 1971.  Schwab & Co. is a securities broker-dealer with over 325 domestic branch offices in 45 states, as well as a branch in each of the Commonwealth of Puerto Rico and London, England, and serves clients in Hong Kong through one of Schwab Corp.'s subsidiaries.

13.      Defendant Schwab Corp. is a Delaware corporation that was incorporated in 1986 and engages, through its subsidiaries, in wealth management, securities brokerage, banking, money

management, and financial advisory services.  Schwab Corp.'s principal executive offices are located at 211 Main Street, San Francisco, California.

## IV.    FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS

### A.    Schwab Is a Discount Stock Broker That Generates Revenue From Trade Commissions and Payments For Order Flow

14.    Schwab is one of the world's largest discount broker-dealers.  According to Schwab's 2014 and 2015 Forms 10-K, its "daily average revenue trades" (*i.e.*, the daily average number of client trades that generate trading revenue) was 282,700 in 2012; 295,000 in 2013; 298,200 in 2014; and 292,000 in 2015.  Schwab's trading revenue was $868 million in 2012, $913 million in 2013, $907 million in 2014, and $866 million in 2015.

15.    Broker-dealers are financial services firms that buy and sell stocks, bonds, and other assets both for their clients and their own accounts.  Certain broker-dealers hold shares of securities in their own inventory to create a market for both buyers and sellers of those securities.  These broker-dealers, who risk the adverse effects of deleterious fluctuations in the prices of those securities in exchange for the benefit of creating a market for the securities, are known as "market makers" or "wholesalers."

16.    Historically, market makers paid fees to regional intermediaries for their services in executing trades with other local firms on behalf of the market maker.  To grow a guaranteed supply of liquidity in their markets, market makers began offering payments to not only the intermediaries, but also retail firms, including brokers, in exchange for the retail firms routing their orders to the market makers.  This practice, which expanded from off-exchange securities (over-the-counter securities) to exchange-traded securities, came to be known as "payment for order flow" ("PFOF").  Over time, different types of trading venues, including exchanges, also began making payments for order flow.

17.    Market makers – including Bernard "Bernie" Madoff, who in large part pioneered the practice of paying for order flow – traditionally profited off this system by realizing the "spread" on the underlying security; that is, by buying at the "bid" price and selling at the "ask" or "offer" price.  For example, during the 1990s, Bernard Madoff Investment Securities – his broker-dealer operation –

paid retail investors for order flow directed to a third market it had created.  On this third market, Madoff's firm traded with the bid-ask spread, profiting off of the margins.  It is estimated that, in this manner, Mr. Madoff diverted approximately ten percent of total trading volume away from the floor of the New York Stock Exchange ("NYSE").

18.     Little has changed.  Today, wholesale market makers still pay retail brokerages for order flow so that they can realize profits by exploiting the "dealer's turn," or the practice of buying at the bid price and selling at the offer.  In other words, market makers incur up-front costs by paying to trade with retail stock investors, but nevertheless turn a hefty profit by matching buyers and sellers and pocketing the difference of the spread, without having to go to traditional exchanges.

19.     Schwab, in its capacity as its clients' broker, receives payments for order flow from market makers, such as UBS, to which Schwab routes virtually all of its clients' non-directed trade orders.  Non-directed orders are those orders in which the customers have not specified a specific venue, such as the NYSE, in which the trade should be executed.

**B.     Schwab Had a Duty of Best Execution and Represented That It Was Committed to Obtaining the Best Execution Possible for Its Customers**

20.     Broker-dealers have a duty to seek out best execution of their customers' orders.  This duty derives from the duty of loyalty established in common law principles of agency, pursuant to which an agent is obligated to act in the best interests of the agent's principal at all times.  In the context of transacting in securities, best execution requires that, when conducting a transaction on behalf of a client, a broker seek the terms most favorable to the client that can possibly be obtained given the present circumstances.

21.     When securities are traded in different venues, best execution requires that, absent instruction otherwise from the client, a broker-dealer ensure that the client's order be routed to the best possible venue.  A broker achieves best execution when it endeavors to obtain the best price available, execute the transaction in the shortest possible time frame, maximize the likelihood that the transaction is executed in its entirety, and, where possible, seek "price improvement" – the execution of a trade at a price better than the best current public quote.

AMENDED CLASS ACTION COMPLAINT
Case No. 3:16-cv-03938-RS

22.     National Association of Securities Dealers ("NASD") Rule 2320 provides that Schwab, as a broker-dealer, must "use reasonable diligence to ascertain the best market for the subject security and buy or sell in such market so that the *resultant price to the customer is as favorable as possible under prevailing market conditions*."   (Here, as elsewhere, emphasis is added unless otherwise noted).  The factors to be considered in determining reasonable diligence were "(A) the character of the market for the security, *e.g.*, price, volatility, relative liquidity, and pressure on available communications; (B) the size and type of transaction; (C) the number of markets checked; (D) accessibility of the quotation; and (E) the terms and conditions of the order which result in the transaction, as communicated to [Schwab]."

23.     Financial Industry Regulatory Authority ("FINRA") Rule 5310, which superseded NASD Rule 2320 on May 31, 2012, incorporates all of that Rule's provisions concerning a broker-dealer's duty of best execution.  FINRA elaborated upon the duty of best execution in its Regulatory Notice 15-46, Best Execution; Guidance on Best Execution Obligations in Equity, Options and Fixed Income Markets, dated November, 2015, stipulating that "an order routing inducement, such as receipt of payment for order flow, cannot be allowed to interfere with a broker-dealer's duty of best execution," and stating clearly that "firms should not allow access fees charged by particular venues to inappropriately affect their routing decisions, and, in general, a firm's routing decisions should not be unduly influenced by a particular venue's fee or rebate structure."

24.     Schwab claims to abide with the legally binding duty of best execution, which "has its roots in the common law agency obligations of undivided loyalty and reasonable care . . . . [T]he broker-dealer, absent instructions to the contrary, is expected to use reasonable efforts to maximize the economic benefit to the client in each transaction."[1]  The best execution duty is also regulated by the SEC and FINRA.[2]

---

[1] *Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 135 F.3d 266, 270 n.2 (3d Cir. 1998).

[2] *Final Rule:  Disclosure of Order Execution and Routing Practices*, 17 C.F.R. § 240 [Release No. 34-43590, File No. S7-16-00] (effective date January 30, 2001) ("Final Rule"), *available at* http://www.sec.gov/rules/final/34-43590.htm ("A broker-dealer must consider several factors affecting the quality of execution, including, for example, the opportunity for price improvement, the likelihood of execution (which is particularly important for customer limit orders), the speed of

AMENDED CLASS ACTION COMPLAINT
Case No. 3:16-cv-03938-RS

25.     According to Schwab's website, once a client places a trade through a Schwab account, "the work really begins. In order to provide **_exceptional execution_**, there are a number of factors to be considered, including:  execution price, opportunities for price improvement, market depth, order size, the type of security, speed, accuracy, and system availability".[3]  Schwab further claims that it works "diligently to meet and exceed" the best execution criteria established by the SEC in 2001,[4] and "to ensure we work toward our clients' best interests."[5]  Moreover, Schwab asserts:

> Because the trading environment is constantly changing, we regularly and rigorously monitor our order-routing and execution processes.  **_This discipline enables us to assist our clients in receiving the best execution possible._**  We are committed to ensuring that you always know and understand the factors that affect the quality of your order execution.
>
> *          *          *
>
> **_We regularly monitor the execution quality provided by different exchanges and liquidity providers_**.  In arranging for the execution of your orders, Schwab seeks out industry-leading execution services and access to the best-performing markets."[6]

26.     Schwab's best execution promise also resides in its agreement entered into with its clients.  Individual clients opening a brokerage account with Schwab complete and sign an application for a Schwab One Brokerage Account.  The application provides:

> [Y]our signature signifies and constitutes your agreement that this account and your relationship with Schwab will be governed by the Application Agreement and all incorporated agreements and disclosures, including, but not limited to, the Schwab One® Account Agreement and the *Charles Schwab Pricing Guide*, each as amended from time to time (the "Agreement and Disclosures").

---

execution, and the trading characteristics of the security, together with other non-price factors such as reliability and service."); FINRA Rule 5310, *Best Execution and Interpositioning*, *available at* http://finra.complinet.com/en/display/display_main.html?rbid=2403&element_ id=10455.

[3]  Charles Schwab, "*Understanding Execution and Order Routing*," http://www.schwab.com/public /schwab/nn/legal_compliance/important_notices/understanding_execution.html.

[4]  *See* Rule 11Ac1-5 and Rule 11Ac1-6 (renamed in 2005 under Regulation NMS to become Rule 605 and Rule 606), Final Rule, *available at* http://www.sec.gov/rules/final/34-43590.htm.

[5]  Charles Schwab, "*Understanding Execution and Order Routing*," http://www.schwab.com/public /schwab/nn/legal_compliance/important_notices/understanding_execution.html.

[6]  *Id.*

---

AMENDED CLASS ACTION COMPLAINT
Case No. 3:16-cv-03938-RS

27.     Likewise, organizations – including corporations, LLCs, non-incorporated organizations, partnerships, and sole proprietorships – opening a brokerage account with Schwab complete and sign an application for a Schwab One Organization Account, which provides substantially the same provision as above.

28.     By their terms, the Application Agreements for both individuals and organizations incorporate the Schwab One Account Agreement ("Account Agreement") (attached hereto as Exhibit A) and the *Charles Schwab Pricing Guide*.  In the Account Agreement under the heading "Order Routing and Execution," Schwab names UBS as one among several venues where orders may be routed, representing that "Schwab also routes orders directly to all major exchanges and alternative trading systems, including Electronic Communication Networks (ECNs)."  The Account Agreement also provides that Schwab considers a number of factors in evaluating the market centers or venues where its clients' trades are sent, and it further promises to "regularly monitor" execution quality "to ensure" "high-quality executions over time":

> Schwab routes equity and options orders for execution to UBS Securities LLC ("UBS") and other broker-dealers, who may act as market maker or manage execution of the orders in other market centers.  Schwab also routes orders directly to all major exchanges and alternative trading systems, including Electronic Communication Networks (ECNs).  ***Schwab considers a number of factors in evaluating execution quality among market centers***, including the execution price and opportunities for price improvement, market depth and order size, trading characteristics of the security, the speed and accuracy of executions, the availability of efficient and reliable order handling systems, liquidity and automatic execution guarantees, and service levels and the cost of executing orders at a particular market or firm.  Price improvement occurs when an order is executed at a price more favorable than the displayed national best bid or offer.  ***Schwab regularly monitors the execution quality provided by various market centers to ensure orders are routed to markets and firms that have provided high-quality executions over time.***

29.     The Account Agreement also provides that Schwab "***may***" receive PFOF – not that it actually does receive PFOF.  The Account Agreement says nothing about liquidity or maker rebates.  It also only obliquely references an "order routing agreement with UBS" as partial consideration for the sale of Schwab's capital markets business, but fails to explain that this agreement means that substantially all of Schwab's trades must be routed to UBS, to the exclusion of any actual consideration of best execution:

Schwab may receive remuneration, such as liquidity or order flow rebates, from a market center to which orders are routed.  In addition, part of the consideration received by The Charles Schwab Corporation for the sale of its capital markets business to UBS in 2004 related to an order routing agreement with UBS, which has been extended.  Quarterly information regarding the market centers to which we route orders and the remuneration received is available on our website at www.schwab.com or in written form upon request.  Information regarding the specific routing destination and execution time of your orders for up to a six-month period is also available upon request.

**C.      Schwab's Routing Practices Resulted in Systematic Violations of Its Duty of Best Execution**

      **1.      Schwab Entered Into an Agreement Requiring Schwab to Route More Than 95% of Non-Directed Orders to UBS**

30.      On August 31, 2004, UBS announced that it would acquire Charles Schwab SoundView Capital Markets, the capital markets division of Schwab Corp., for $265 million. Specifically, UBS purchased Schwab's institutional trading and market making operations.  Around the time that UBS completed the acquisition Schwab's capital markets division, the two companies entered into an Equities Order Handling Agreement dated October 29, 2004 (the "Handling Agreement").

31.      Despite Schwab's repeated representations that it followed a thoughtful, multi-factored process in routing its clients' equity orders, Schwab's routing decisions were predetermined and routed in accordance with the Handling Agreement.  From 2004 through the end of 2014, Schwab routed nearly all of its clients' orders pursuant to the Handling Agreement, which required Schwab to route *95%* of its clients' orders to UBS, for which UBS charges no commission and pays Schwab $100 million a year.

32.      Although the Handling Agreement provided that UBS would "use reasonable diligence to identify the best available market for [Schwab's clients'] Orders to fulfill the Execution Quality Service Levels set forth in Schedule A," this schedule not publicly disclosed.  Rather than making a determination of best execution based on the factors Schwab represented that it considered, the Handling Agreement provided that "Schwab shall assess routing and execution in accordance with the methodology set forth in Schedule A in conformance with its duty of best execution."  And even more troubling, Schwab significantly ceded its best execution determination to UBS, as the Handling

AMENDED CLASS ACTION COMPLAINT
Case No. 3:16-cv-03938-RS

Agreement required that three of the six representatives on the Execution Quality Committee would be from UBS.  In the Handling Agreement, UBS affirmatively disavows any duties whatsoever to Schwab's customers, stating specifically that "the accounts for which Orders are transmitted are 'customers' of Schwab . . . and not of [UBS]."  Thus, the Handling Agreement placed the duty of best execution on Schwab, even though it had effectively relinquished control over the execution of orders.

33.     The Handling Agreement provided for considerable liquidated damages to ensure Schwab's substantial performance with the Agreement.  Under the agreement, should Schwab have routed anything less than 95% of its clients' non-directed orders to UBS in any twelve-month period during the first three years of the Handling Agreement, Schwab would have been liable to pay UBS $58,500,000.  During the fourth year of the Handling Agreement, Schwab was liable for as much as $24,375,000 if it sent less than 95% of its non-directed customers' orders to UBS in the preceding twelve-month period.  During the seventh year of the Handling Agreement, Schwab was liable for as much as $9,750,000 if it sent less than 95% of its non-directed customer orders to UBS in the preceding twelve-month period.  During the eighth year of the Handling Agreement, Schwab was liable for as much as $4,875,000 if it sent less than 95% of its non-directed customer orders to UBS in the preceding twelve-month period.

34.     Rather than let the Handling Agreement expire on October 31, 2012, as set forth by its terms, in November 2011 Schwab agreed to extend it, thereby ensuring that Schwab would continue to route its Clients' orders without consideration of its duty of best execution for at least another two years.

35.     Since January 30, 2001, the SEC has required, under Rule 11Ac1-6 (now Rule 606), that broker-dealers that route customer equity orders make public quarterly reports that identify the venues to which the orders are routed for execution ("Rule 606 Reports").  These reports must also disclose the rebate that a broker-dealer receives for adding liquidity to the venue.  SEC Rule 606 exempts broker-dealers from identifying execution venues that receive less than 5% of non-directed orders, provided that 90% of non-directed orders are identified.

36.     The Rule 606 Reports prepared by Schwab reveal that, from 2004 through 2014, Schwab routed at least 95% of its clients' non-directed orders to UBS, even though Schwab had

AMENDED CLASS ACTION COMPLAINT
Case No. 3:16-cv-03938-RS

eleven registered stock exchanges and more than fifty "alternate trading systems" to which Class member orders could have been routed.

37.     The following table shows the percentage of non-directed trades for stocks trading on each of the below-listed exchanges that Schwab routed to UBS:

| Date | NYSE | Amex, or Regional Exchange | NASDAQ |
|------|------|----------------------------|--------|
| Q1 2012 | 99.7% | 99.9% | 99.9% |
| Q2 2012 | 98.7% | 98.7% | 93.8% |
| Q3 2012 | 99.4% | 99.6% | 99.9% |
| Q4 2012 | 99.1% | 99.5% | 99.9% |
| Q1 2013 | 99.2% | 99.7% | 99.9% |
| Q2 2013 | 97.8% | 96.5% | 97.4% |
| Q3 2013 | 94.7% | 93.8% | 94.6% |
| Q4 2013 | 93.2% | 96.5% | 94.5% |
| Q1 2014 | 93.5% | 93.9% | 94.0% |
| Q2 2014 | 94.5% | 95.7% | 94.4% |
| Q3 2014 | 93.7% | 96.0% | 94.5% |

38.     In the first quarter of 2015, Schwab routed 76% of non-directed trades to UBS. From the second quarter of 2015 through the first quarter of 2016, Schwab continued to route approximately half of its clients' order flow directly to UBS.

39.     The Rule 606 Reports did not disclose, however, the losses to Schwab customers that could have received better prices on their trades but were deprived of best execution due to the Handling Agreement.

40.     Schwab has collected payments for order flow for nearly all of its clients' orders. Rule 606, however, does not require that Schwab disclose the total earnings it has received from its order routing practices. And in the publicly available Handling Agreement, the section setting forth UBS's payments to Schwab in exchange for routing virtually all orders to UBS is redacted. Analysts have estimated that Schwab generated $100 million in revenue from payments for order flow in 2013.[7] Schwab disclosed in its annual report on Form 10-K filed with the SEC on March 22, 2013, that: "In

---

[7]  Bradley Hope, "*Fallout From High Frequency Trading Hits Brokerages,*" The Wall Street Journal, April 6, 2014, http://on.wsj.com/XxJGtt.

AMENDED CLASS ACTION COMPLAINT
Case No. 3:16-cv-03938-RS

November 2012, the Company began receiving additional order flow rebates from market venues to which client orders are routed for execution.  Order flow revenue increased by $23 million due to this revenue and the inclusion of a full year of optionsXpress' order flow revenue."

41.     In its annual report on Form 10-K filed with the SEC on February 24, 2016, Schwab disclosed for the first time that "[o]rder flow revenue was $103 million during 2015 compared to $114 million during 2014."  Thus, Schwab earned over $100 million a year from the payments for directing its customers' orders to UBS, a substantial incentive to avoid Schwab's best execution duties.

### 2.     Schwab's Agreement With UBS Resulted in Extreme and Anomalous Order Flow Inconsistent with Best Execution

42.     Kor Trading, on June 16, 2014, provided an analysis of the impact of PFOF on order routing, comparing various retail brokers.[8]  E*Trade, TD Ameritrade, and Schwab accept PFOF, whereas Interactive Brokers does not accept any such payments.   According to Kor Trading's analysis, as shown in the graphs below, all order flow to E*Trade, TD Ameritrade, and Schwab was routed to wholesalers, while Interactive Brokers routed directly to stock exchanges over 90% of the time.  But while E*Trade and TD Ameritrade routed orders to various wholesalers, Schwab routed virtually all orders to UBS.  Thus, even while E*Trade and TD Ameritrade were compromised by accepting payments for order flow, at least they sought best execution from various venues.  Schwab failed to even do that, blindly routing its captive retail investors to the clutches of a single wholesaler.

---

[8]   David Lauer, "*Broker Routing Conflicts: Payments and Best Execution*," June 16, 2014, http://kortrading.com/blog/broker-routing-conflicts-payments-and-best-execution.

AMENDED CLASS ACTION COMPLAINT





AMENDED CLASS ACTION COMPLAINT
Case No. 3:16-cv-03938-RS

43.    Referencing an academic study (*see infra* at note 14), Kor Trading stated that "while brokers favor venues that give them the highest payments for their order flow . . . those same venues have the inferior execution quality compared to venues that do not provide such levels of payment." As Kor Trading, concluded, "[I]t may also be true that by inhibiting competition with backroom, off-the-record handshake payment deals for retail order flow, discount brokers are not getting the best execution possible for their customers."

44.    A comparison to a similar discount retail broker, Fidelity, shows what complying with best execution looks like.  Toward the end of 2014, Fidelity stopped accepting payment for order flow. As the graph shows below,[9] Fidelity's order routing is consistent and diverse over a period of several quarters, in stark contrast to Schwab's extreme concentration of orders routed to UBS.



### 3.    Schwab's Routing of Substantially All of Its Non-Directed Order Flow to UBS Created an Inherent Conflict of Interest

45.    Once Schwab routes its clients' trade orders to UBS, UBS can then profit off of Schwab investors by doing one of the following:  (1) internalizing the trade, *i.e.*, matching the order internally without necessarily providing best execution by re-routing to a different market venue with a better price; (2) placing the trade in the UBS dark pool, thereby exposed to predatory high-frequency traders ("HFT"); or (3) re-routing the trade in a manner allowing UBS to obtain an order flow rebate.

---

[9]    David Lauer, "*Retail Brokers Show Dramatic Routing Differences*," Aug. 14, 2015, http://kortrading.com/blog/retail-brokers-show-dramatic-routing-differences.

46.     PFOF and internalization depend on the ability to avoid trading with informed traders – *i.e.*, those who know where the stock price is headed.  This is why internalizers pay for retail order flow from the likes of Schwab.  Retail investors are presumed to be uninformed traders or "dumb money" in that they are typically less aware of short-term price movements in a stock and not seeking to predict price movements in the next minute or hour.  This makes it easy for firms that can identify short-term price changes to profit from retail orders.  In addition, internalizers make money on the spread between retail investors' bids and offers.  Internalization is allowed under market regulations as long as the price matches or beats the displayed National Best Bid and Offer ("NBBO").

47.     The following example illustrates how a wholesaler like UBS can profit by internalizing trade orders.  Assume a wholesaler receives a market order to buy 100 shares of Apple stock and a market order to sell 100 shares of Apple stock.  If the NBBO for Apple stock is $100.00/$100.25, that means that the best quoted bid to buy Apple stock is $100.25 and the lowest quoted ask price to sell stock is $100.00.  The wholesaler can buy 100 shares of Apple stock at $100.00 while simultaneously selling the same 100 shares at $100.25, earning $25.00.

48.     In the above example, the wholesaler, as required, matched the NBBO for both the retail buyer and the retail seller, but these are not the best possible prices that the wholesaler could have given to them.  Instead, the wholesaler could have allowed the two orders to interact with one another at a price of $100.12.  In this scenario, both the buyer and the seller would have had a price improvement of approximately $0.12 per share.  So both sides would have been better off if they had been allowed to interact with each other, rather than deal with an intermediary, the internalizing wholesaler.  Thus, the wholesaler's profit-seeking is clearly in tension with the duty to obtain the best execution price for the retail broker's customers.

49.     In the United States, approximately 45 dark pools and as many as 200 internalizers compete with the thirteen public exchanges for order flow.  Top internalizers include UBS, KCG Holdings, Citadel, and Citigroup.

50.     These lucrative PFOF arrangements raise the obvious question:  Why are firms willing to pay retail brokers for stock orders if they are in turn executing those trades at the best possible

AMENDED CLASS ACTION COMPLAINT
Case No. 3:16-cv-03938-RS

1   prices?  As alleged below, in the case of Schwab, it is demonstrably not obtaining the best possible

2   prices for its customers.

3          51.     In a speech given on June 5, 2014, titled "Enhancing Our Equity Market Structure,"

4   SEC Chair Mary Jo White acknowledged the conflict of interest inherent in PFOF.  In that speech, she

5   said:

> A fourth area of concern is broker conflicts and how they are exacerbated or mitigated
> by different trading venues.  Most investors rightly rely on their brokers to navigate the
> dispersed market ecosystem on their behalf.  But monitoring the execution quality and
> costs of orders can be difficult for even the most sophisticated investors, given the
> number of trading venues and order types available to brokers.
>
> The cost to the broker for executing in different venues can vary widely.  Some venues
> make payments directly to brokers as a means to attract particular types of order flow.
> These payments include the liquidity rebates paid by exchanges that use a "maker-
> taker" fee structure.  They also include payments offered by off-exchange market
> makers to retail brokers for the marketable order flow of their customers.
>
> When fees and payments are not passed through from brokers to customers, they can
> create conflicts of interest and raise serious questions about whether such conflicts can
> be effectively managed.[10]

15         52.     Further, on May 11, 2015, SEC Commissioner Luis Aguilar issued a public statement

16  titled "U.S. Equity Market Structure:  Making Our Markets Work Better for Investors."[11]  In that

17  statement, he called for a careful examination of PFOF.  He observed that critics "contend that

18  incentives like the maker-taker pricing model and payment for order flow arrangements pose

19  irreconcilable conflicts of interest for broker-dealers that deprive investors of their right to best

20  execution."  Responding to the claim that PFOF results in lower costs to broker customers, Aguilar

21  stated while that may be true, "the Commission should look into whether customers could be made

22  better off."

23         53.     Importantly, in the same public statement, Mr. Aguilar also said the following:

> In addition, the justifications that underpin the payment for order flow regime should
> be put to the test.  For instance, brokers claim that retail customers benefit from the
> price improvement they receive when their orders are sold to OTC market makers.
> But there is evidence suggesting that retail investors could do better.  For example, one

---

27  [10]  Available at https://www.sec.gov/News/Speech/Detail/Speech/1370542004312.

28  [11]  Available at https://www.sec.gov/news/statement/us-equity-market-structure.html.

AMENDED CLASS ACTION COMPLAINT
Case No. 3:16-cv-03938-RS

> broker that sends approximately 95% of its customers' orders to exchanges claims that, for the past 8 years, it has consistently provided better price improvement than firms that sell their customers' orders to OTC market makers. Although the level of this price improvement varied, an independent assessment reveals that it has been as high as 53 cents per 100 shares, and has been at least 30 cents per 100 shares two-thirds of the time.

Mr. Aguilar thus believed that claiming minimal price improvement is inadequate. The amount of the price improvement matters for purposes of evaluating whether PFOF is compromising duty of best execution.

54. Finally, in the same statement, Mr. Aguilar called for enhanced disclosures from brokers regarding PFOF:

> Rule 606 should promptly be revised to require brokers to disclose to customers the total amount of payments for order flow the broker receives, as well as the average amount of price improvement customers receive on orders sold to OTC market makers. The rule should also be revised to require brokers to disclose the total execution costs of their clients' trades, so investors can see how payments for order flow and other factors affect their trading costs. For example, brokers should report not only direct costs, such as commissions and fees paid, but also all benefits that may have reduced those costs, such as price improvement, liquidity rebates, and payments for order flow.

55. In 2012, the United Kingdom's Financial Services Authority effectively banned PFOF, finding that the conflict of interest between a broker and its client under PFOF arrangements were unlikely to be compatible with the duty of best execution. The practice is also banned in Canada.

56. Recent studies demonstrate the conflict of interest posed by PFOF. One study by the CFA Institute, released in July 2016, found that the percentage of retail-sized trades executing at best quotes prices grew significantly after the United Kingdom banned PFOF.[12] (Unlike the United States, the United Kingdom does not require brokers to at least match NBBO.)

57. To assuage regulators about this conflict of interest, retail brokers and their wholesale partners provide retail investors with price improvement – *i.e.*, a lower price than the NBBO for a buy order or a higher price than the NBBO for a sell order. However, as alleged below, the price

---

[12] Sviatoslav Rosov, "*Payment for Order Flow: Internalisation, Retail Trading, Trade-Through Protection, and Implications for Market Structure,*" CFA Institute, Aug. 17, 2016, http://www.cfapubs.org/doi/sum/10.2469/ccb.v2016.n8.1.

1  improvement for Schwab's customers is minimal and nowhere near what a retail investor would get

2  under a true best execution.  This is why brokers such as Schwab focus only on the percentage of the

3  orders that receive price improvement rather than the amount of price improvement.

### 4. By Routing Substantially All of Its Non-Directed Order Flow to UBS, Schwab Failed to Satisfy Its Duty of Best Execution to Its Clients

58.  Despite Schwab's repeated claims that its routing practices satisfied its duty of best execution, its practices, in fact, demonstrated a clear disregard for Schwab's duties.  For years, nearly all of Schwab's clients' orders were routed to a single venue, pursuant to the Handling Agreement.

59.  As detailed above, FINRA Rule 5310 requires Schwab to consider several factors when determining whether it has "use[d] reasonable diligence to ascertain the best market . . . so that the resultant price to the customer is as favorable as possible."  Specifically, Schwab must consider: "(A) the character of the market for the security (*e.g.*, price, volatility, relative liquidity, and pressure on available communications); (B) the size and type of transaction; (C) the number of markets checked; (D) accessibility of the quotation; *and* (E) the terms and conditions of the order which result in the transaction, as communicated to the member and persons associated with the member."

60.  FINRA Rule 5310 does not enumerate PFOF as a factor to consider in whether a broker has used reasonable diligence to obtain best execution.  However, the Supplementary Material to Rule 5310 provides that:

> In reviewing and comparing the execution quality of its current order routing and execution arrangements to the execution quality of other markets, a member should consider the following factors:
>
> (1) price improvement opportunities (*i.e.*, the difference between the execution price and the best quotes prevailing at the time the order is received by the market);
>
> (2) differences in price disimprovement (*i.e.*, situations in which a customer receives a worse price at execution than the best quotes prevailing at the time the order is received by the market);
>
> (3) the likelihood of execution of limit orders;
>
> (4) the speed of execution;
>
> (5) the size of execution;
>
> (6) transaction costs;

(7) customer needs and expectations; *and*

(8) the existence of internalization or payment for order flow arrangements.

61.     These enumerated factors make clear that the duty of best execution entails a complex inquiry, and that no single venue is the "best" venue for all trades.  Nevertheless, Schwab mechanically routed upwards of 95% of its clients' orders without considering any of these factors at all, except for the eighth and last factor listed in the supplementary material to Rule 5310: its PFOF arrangement with UBS in the form of the Handling Agreement.  Meanwhile, as alleged below, Schwab's routing decision did not take into account, among other factors, maximizing "price improvement opportunities" for its customers.

62.     As a result, Class members were damaged by not receiving the best prices for their trades, a higher percentage of trades unfulfilled than if best execution duties had been followed, and delays in trades.  The Handling Agreement explicitly allows UBS to trade against Class member orders for its own account, thus allowing it to capture trading opportunities for itself and for its favored HFTs invited into UBS's dark pools to take advantage of Class members' orders.

63.     A recent academic study conducted by Robert Battalio, Shane A. Corwin, and Robert Jennings confirms that brokerages routing nonmarketable limit orders to an exchange "that offers the highest liquidity rebates is inconsistent with maximizing limit order execution."[13]  The study found that when brokers route orders based on higher liquidity rebates, their retail clients' nonmarketable limit orders filled slower and less often than similar orders on venues offering lower liquidity rebates.  Using realized spreads to provide an estimate of the gross revenue earned by liquidity providers (the nonmarketable limit orders), the Battalio et al. study found the lowest realized spreads occurred on the highest fee venues (highly correlated with the high rebate venues).  *In other words, when routed to maximize liquidity rebates, orders do not see the price improvement they otherwise would if routed to venues offering lower liquidity rebates*.  The study stated that there is "a strong negative relation between take fees and several measures of limit order execution quality. **Based on this evidence, we**

---

[13] Robert Battalio, Shane A. Corwin, and Robert Jennings, *Can Brokers Have it All? On the Relation between Make-Take Fees and Limit Order Execution Quality*, Mar. 31, 2015.

---

AMENDED CLASS ACTION COMPLAINT
Case No. 3:16-cv-03938-RS                                                                                         20

*conclude that the decision of some national brokerages to route all nonmarketable limit orders to a single exchange paying the highest rebate is not consistent with the broker's responsibility to obtain best execution for customers.*" *Id.* at 5.

          **a)**      **Schwab Systematically Failed to Obtain the Most Favorable Prices for Its Customers**

64.      In providing its definition of the duty of best execution, the SEC stated: "Some of the factors a broker must consider when seeking best execution of customers' orders include: *the opportunity to get a better price than what is currently quoted*, the speed of execution, and the likelihood that the trade will be executed."[14]

65.      Merely matching the NBBO does not establish that a broker obtained the best price for its customer. Because brokers virtually always at least match the NBBO, the question is whether the broker obtained the best possible price improvement. Schwab demonstrably failed to do so.

66.      Starting in 2015, under the auspices of the Financial Information Forum ("FIF"), certain wholesalers and retail brokers began making additional trade execution quality statistics. Among other things, participants began disclosing, for five ranges of order sizes, the following: (1) average order size; (2) price improvement percentage; (3) average savings per order; and (4) average execution speed. These disclosures separately reported on S&P 500 stocks and other exchange-listed stocks. Three retail brokers participated, namely Schwab, Fidelity, and Scottrade.

67.      The FIF statistics provide an incomplete picture, however. The data covers only market orders – *i.e.*, those that execute immediately – but not nonmarketable limit orders, which are not executed immediately but once a stock price reaches a certain threshold. At both Schwab and Fidelity, market orders account for approximately half of trading at NYSE companies.

68.      Schwab's FIF statistics show that a high percentage of its retail orders resulted in price improvement. But as explained above, merely matching or providing minimal improvement on the NBBO does not really establish that a broker has complied with its duty of best execution.

---

[14] *See* https://www.sec.gov/answers/bestex.htm.

69.     On the *amount* of price improvement, a comparison between Schwab and Fidelity is again instructive.  In 2014, Fidelity stopped taking payment for order flow, which showed in its 2015 FIF statistics.  As shown in an analysis conducted by Kor Trading,[15] and in the graph below, in the second quarter of 2015, for the most common of order sizes, those of 99 or fewer shares, Fidelity's price improvement on trades of S&P 500 stocks were over five times larger than those averaged by Scottrade's and over ten times larger than Schwab's.  Fidelity provided more than $0.0125 of price improvement per share, compared to the less than $0.0020 price improvement per share provided by Schwab.



70.     Further, in comparing Schwab and Fidelity, there is no tradeoff between the refusal to accept PFOF and better price improvement, on the one hand, and accepting PFOF and lower trading costs, on the other hand.  Fidelity's costs on regular stock trades are actually lower – $7.95 per trade versus $8.95 for Schwab.  Thus, the PFOF from UBS is flowing to Schwab's bottom line rather than being passed on to its customers in the form of lower trading costs.

71.     Further, in analyzing the FIF statistics, Kor Trading notes "the disparity of Price Improvement and Average Savings per Order given to Odd Lot trades.  Schwab averages just 68% Price Improvement with Odd Lot Trades in S&P 500 stocks while Round Lot trades from 100-9,999

---

[15]     David Lauer, "*Enhanced Retail Execution Statistics Are Out,*" July 14, 2015, http://kortrading.com/blog/enhanced-retail-execution-statistics-are-out.

shares averaged 85% in Price Improvements.  Worse yet, S&P 500 Odd Lots with Schwab averaged just $0.05 in savings per order compared to $4.33 for orders from 100-9,999 shares." As Kor Trading explains, Odd Lot orders generally encompass retail investors: "Odd Lots also comprise a significant share of overall transactions as retail investors typically invest by dollar amount, providing active S&P 500 stocks like AAPL, CMG, NFLX, PCLN, GOOG and MA with a high percentage of retail Odd Lot trades."

> b) **UBS Profited From Schwab's Captive Retail Order Flow at the Expense of Schwab's Customers**

72.     Schwab sent upwards of 95% of its non-directed order flow to UBS.  UBS thus had a very large captive retail order flow that it could trade and profit against by internalizing the trades. Because UBS was virtually assured this order flow, it did not have to be overly concerned about obtaining the best possible price – *i.e.*, price improvement – but could focus on profit-making.

73.     Internalizer firms have access to numerous faster data feeds than the consolidated public feed; these non-public data feeds provide more up-to-date prices.  This information gap means that a firm could claim that it got the best deal for a retail investor based on prices on the slower data feed, even as the firm knew that a better price existed on a faster data feed.

74.     Registered exchanges are required to provide the best bids and offers for every stock to the Security Information Processors ("SIP"), which aggregate and publish the data.  The SIPs were intended to be the consolidated live stream of every exchange's best quoted bids and offers that establish the NBBO for each stock.  Stock brokers are required by SEC regulation to execute the retail customer orders at the NBBO or better.

75.     Due to market fragmentation, however, the SIP feed is no longer truly representative of the live best quoted bids and offers.  Wholesalers and dark pools are not required to provide best quotes to the SIPs (though they do report post-transaction data to FINRA, meaning non-contemporaneous).  Almost 40% of all U.S. stock trades, including almost all orders from retail investors, now happen off the public exchanges, mostly with wholesaler internalizers or dark pools. This has contributed to an increase in trading for which there is no price transparency.

76.     Not all investors have equal access to trade and quote information.  Many of these nonpublic exchanges have direct feeds that they provide to paying subscribers, but not to the public. Moreover, some investors are able to use advanced technology and physical proximity to obtain SIP data more quickly than others, giving rise to profit-making opportunities at the expense of retail investors.  As explained below, traders with access to more recent prices can use various methods to profit from investors with slower access to prices.

77.     Using algorithmic code and rapid software and computers, an internalizer sifts through the retail order flow to identify unprofitable and profitable order.  The internalizer dumps the unprofitable orders to other venues and trades against the profitable ones.

78.     Experts have provided numerous examples of how retail investors are hurt by this practice.  Emmet Peppers of Interactive Brokers, which does not accept payment for order flow, provided two examples in an interview with the Alpha Architect blog on March 16, 2015:[16]

> For example at the end of 2013, Facebook was a very hot stock and trading in the mid 50s going into 2014.  Let's say you decided you wanted to own FB if the stock price dropped a bit.  On Jan 2nd you put in a buy limit order with your broker for 1000 shares and decided on a limit price of 51.85.  This is a strategy you often employ: to buy stocks as they drop instead of chasing them on their way up.  If FB would 'correct' by just a few points from its price on Jan 2nd 2014 [FB traded in a range between 54.19-55.22 that day] then you would get filled.  As your limit order waits patiently, a few weeks later on Jan 27th, FB opens at 54.73 but actually traded as low as 51.85 during the course of the day before going back up and closing the day at 53.55.

> Brokers who sell their customer order flow are unlikely to get any fill from the buyers of order flow until the stock actually trades below the limit price of the order they bought.  This can be for many reasons that can bring up a whole other conversation, one obvious reason is because the buyers of order flow use the limit price as a free 'option' to try and gain pennies or to profit in brief arbitrage opportunities.  In the above example, if you are with a broker who sells your order flow or internalizes it through some proprietary dark pool, then you may have unnecessarily missed out on buying up to 1000 shares of FB on what is now the 52 week low for FB stock as I write this.

*       *       *

---

[16]  Available at http://blog.alphaarchitect.com/2015/03/16/shedding-light-on-payment-for-order-flow-insights-from-emmet-peppers/#gs.miUjVFw.

What is actually a much more common occurrence is when someone puts in a limit order and then monitors the market as the price trades down towards their limit price. The stock price temporarily touches their limit price but then they see the market come right back up.  This innocent investor loses patience after a couple seconds and ends up moving their limit price higher to chase the stock for a slightly higher price.

79.     Nanex, a firm that offers streaming data on all market transactions and distributes the data in real-time to clients, has prepared a document titled "What Every Retail Investor Needs to Know."[17]  The document provides examples, by order type, of how an internalizer can profit off of retail orders routed its way.

**Market Orders**

In the case of a Market Order, an order to immediately buy or sell a stock at the best available price, a Wholesaler may decide to trade against a retail order if they can offset a position already in inventory or if they can immediately profit by trading against the retail customer using a stale price on the SIP (Securities Information Processor, a.k.a the consolidated feed) at a time when the Wholesaler knows that the actual market price has already changed, according to its faster direct market data feeds.

*       *       *

For example:  a retail Market order to buy 1000 shares arrives when the SIP shows the stock is trading at $9.99 bid, $10.00 offered (9.99 x 10.00).  The Wholesaler might decide to sell to the retail investor if he knows, according to his own faster version of market data, that the market for the stock is actually, or will soon be, trading lower at 9.98 x 9.99.

In that case, the Wholesaler might execute a short sell against the retail customer at a price of $9.9999, providing the customer with $0.0001 price improvement (relative to a stale SIP price of $10.00) on all 1000 shares.  The Wholesaler can then immediately cover his short by buying the 1000 shares in the open market at $9.99

***To the Retail Broker, it will appear that the investor received a total price improvement of $0.10 on a 1000 share order ($0.0001 x 1000).***

For the Wholesaler, after paying the Retail Broker $2.00 to execute the order based on a hypothetical $0.0020 per share PFOF arrangement, and paying maximum execution fees of no more than $.0030 per share to cover the short by buying shares in the open market, the Wholesaler made a $4.90 profit on the trade, in a stock with a penny spread.  Note that stocks with wider spreads increase the potential profit to the

---

[17]  Available at http://blog.themistrading.com/wp-content/uploads/2015/03/What-Every-Retail-Investor-Needs-to-Know.pdf.

AMENDED CLASS ACTION COMPLAINT
Case No. 3:16-cv-03938-RS

Wholesaler without any assurance of an increase in the amount of price improvement provided to the retail investor.

\* \* \*

*Alternatively, in this example, if the retail Buy order was simply executed at the $9.99 offer price shown by the direct feed, the retail investor would have saved a total of $10.00*, the Wholesaler would not have profited through the exclusive order routing arrangement, and the Retail Broker would have simply earned the trading commission.

\* \* \*

**Marketable Limit Orders**

A marketable Limit Order means a buy order that has a limit price equal to the National Best Offer or greater; or a sell order with a limit price equal to the National Best Bid or less.

For example:  the Wholesaler receives a retail order to buy 2000 shares at $10.03 or better (lower) when the SIP shows a total of 2000 shares offered at the best offer price of 10.01.

1.  Wholesaler buys 300 from one exchange at $10.01, and immediately, 1700 shares that were available on other exchanges disappear, causing the best offer price to move to $10.02.

2.  Wholesaler buys 400 at $10.02, and again, sell orders on other exchanges disappear, causing the best offer price to move to $10.03.

*3.  Wholesaler sells short remaining 1300 shares at $10.0290 to retail investor, providing a $0.0010 price improvement relative to the $10.03 SIP offer price at time of execution.*

4.  Within seconds, stock reverts back to $10.01 offered.

5.  Wholesaler covers short by buying 1300 shares at $10.01.

By quickly influencing the price of the stock, perhaps by less optimal routing, then directly filling the order at an execution price away from the original NBBO at time of Order Receipt, the Wholesaler profits from the $0.019 change on 1300 shares ($24.70), less any "price improvement" given to the retail investor, less the $4.00 Payment for Order flow paid to the Retail Broker (2000 shares x .0020 per share) and $6 in exchange fees (maximum SEC fee $0.0030 per share x 2000 shares).

\* \* \*

*Alternatively, in this example, if the retail buy order was simply executed against the available 2000 shares at $10.01 at the time of Order Receipt, the retail investor could have saved a total of $28.63*[.]

80.     In this way, after Schwab routed virtually all of its non-directed order flow to UBS, UBS employed the various methods described above to trade against the Schwab retail order flow that it internalized.   In return, Schwab customers received sub-penny price improvement and were deprived of the best execution they were entitled to.

          **c)     Schwab Exposed Its Customers to Dark Pools and High-Frequency Traders, Which Took Advantage of Schwab Investors**

81.     When Schwab routed its clients' orders to UBS, UBS placed many of the orders in its dark pools and only occasionally searched other alternative trading venues.   Dark pools are a non-public trading system consisting of an aggregation of orders of securities.   Schwab's customers' orders were relatively unsophisticated, and UBS made them available to HFTs.   HFTs execute many thousands of times the number of trades that an average retail investor makes.   HFTs use technology and computer algorithms to rapidly trade securities.   These trading programs allow the traders to opportunistically move in and out of positions in seconds or less, shaving off fractions of a cent in profit on every trade.   As a result, the HFTs, including UBS, were able to profit because they could exploit the information the orders from Schwab's customers provided to obtain better prices on the same securities and monitor the marketplace.

82.     Schwab was well aware that UBS had one of the largest dark pools in the country, UBS ATS.   Further, Schwab knew that UBS had a proprietary and highly sophisticated high frequency trading desk, whose bread and butter was to take advantage of the orders from Schwab's customers that were placed into the dark pools, along with other HFTs allowed into the dark pools.   Worse yet, Schwab was aware of the manipulation of HFTs in the dark pools, calling it in April, 2014 "a growing cancer" and a "scam" "designed to pick the pockets of legitimate market participants."

83.     The UBS ATS allowed participants' orders to interact with all of UBS's U.S. equities liquidity and other institutional agency algorithmic trading flow from UBS's "liquidity partners."   The huge retail order flow from Schwab allowed UBS ATS to offer added liquidity in the form of called uninformed investors or "dumb money," which in turn attracted HFTs.

84.     Indeed, on January 15, 2015, the SEC announced that UBS had agreed to pay more than $14.4 million, including a $12 million penalty and a disgorgement of $2.24 million, to settle

AMENDED CLASS ACTION COMPLAINT

charges of security violations related to the operation and marketing of UBS ATS. According to the SEC order,[18] UBS gave HFTs secret, illegal advantages in its dark pool over other investors who used the dark pool. Among other things, UBS developed particular order types and trading features that were designed almost exclusively for HFTs in the dark pool. The harmed investors included "many of the world's largest asset managers, broker-dealers, and institutional investors, who may place trades on behalf of all kinds of investors, including pension funds and *individuals with retail brokerage accounts*." The SEC's order stated that the illegal activity occurred "from at least May 2008 through March 2011."

85.     A profitable aspect of paying for order flow from retail broker-dealers for venues is that retail brokers may "tag" their clients' orders as retail. Venues pay brokers to mark their clients' orders as "retail" and then charge hefty fees to other traders using the venue (commonly HFTs) for viewer access to those tags on their proprietary data feeds. The ordinary retail customer, however, is unable to afford access to these feeds and thus receives no compensation for her order being designated as "retail."

86.     By marking which orders are placed by retail customers, brokers compromise the integrity of the order and make it easy for sophisticated traders with access to the proprietary data feeds to employ strategies which take advantage of "mom-and-pop" investors.

87.     Schwab sought to maximize their own profits without regard for the interests of Lead Plaintiffs or the Class by selling – in derogation of the best execution duty owed to Lead Plaintiffs and the Class – substantially all client trades to UBS, which used Schwab "dumb money" to feed HFT into its dark pools. Schwab meanwhile collected PFOF from UBS on marketable orders and liquidity rebates on nonmarketable limit orders. The effect of Schwab's failure to obtain best execution, and UBS's knowing participation in the routing arrangement, is that Schwab's clients failed to see the price improvement they would have obtained had their orders been routed in accordance with best execution.

---

[18]  Available at https://www.sec.gov/news/pressrelease/2015-7.html.

88.     Though Schwab routed almost all of its order flow to UBS, with the largest dark pool providing cover for HFT, Schwab's Chief Executive Officer ("CEO"), Walter Bettinger, and its Chairman, Charles R. Schwab, released a statement on April 3, 2014, subtitled "High-frequency trading is a **growing cancer** that needs to be addressed."  Referencing an editorial in *The Wall Street Journal* from July 2013, Mr. Bettinger reiterated that "**high-frequency trading has run amok** and is corrupting our capital market system by **creating an unleveled playing field for individual investors** and driving the wrong incentives for our commodity and equities exchanges."  The statement continued:

> High-frequency traders are **gaming the system**, **reaping billions** in the process and undermining investor confidence in the fairness of the markets.
>
> \*          \*          \*
>
> High-frequency trading pumped out over 300,000 trade inquiries each second last year, up from just 50,000 only seven years earlier.  Yet actual trade volume on the exchanges has remained relatively flat over that period.  It's an explosion of head-fake ephemeral orders – not to lock in real trades, **but to skim pennies off the public markets by the billions.  Trade orders from individual investors are now pawns in a bigger chess game**.
>
> \*          \*          \*
>
> High-frequency trading isn't providing more efficient, liquid markets; it is a **technological arms race designed to pick the pockets of legitimate market participants**.

89.     Schwab's statement applauded the efforts of New York Attorney General Eric Schneiderman and his intention to "'continue to shine a light on unseemly practices in the markets,' referring to the practices of high-frequency trading and **the support they receive from other parties** including the commodities and equities exchanges."  At the same time Schwab made this statement, however, it was providing "support" to the HFTs participating in UBS's dark pools, for which Schwab's order flow provides liquidity.  Defendants' statements were made before UBS revealed that it was under investigation by Mr. Schneiderman's office.

90.     Recognizing this tension, shortly after the issuance of Schwab's robust statement railing against HFT, Schwab quickly walked it back.  Mr. Bettinger downplayed Schwab's former stance on HFT as merely being an issue of what they saw as "**perceived** fairness in the equity markets.

I have to reemphasize the word I use there, perceived fairness – we don't win over a population of individual investors with technical and nuanced intellectual debates – *you are dealing with an issue of perception*." Mr. Bettinger continued: "Our view is that there is no reason for these efforts [to restore confidence] to get undermined by a *perception, and again I emphasize perception*, of unfairness in our equity markets." Mr. Bettinger also made clear that Schwab would *not* be taking any action in response to the PFOF issue, stating "we don't have any plans on changes with respect to our current approach and our prioritization in client best execution, or our process for payment for order flow."

91.     Schwab's striking rhetorical reversal from deriding HFT as a "cancer" "run amok" to merely an issue with the "perception of fairness" in the market did not go unnoticed. As an analyst from Sandler O'Neill & Partners reported under the headline "HFT Comments Simply Inconsistent," "We found [Schwab] CEO comments regarding HFT extremely INCONSISTENT," (emphasis in original) and provided a comparison chart of the two statements.

92.     Schwab recanted its statements regarding HFT because it knew that its clients were being victimized by HFTs in UBS's dark pool. Because Schwab routed their trades almost entirely to UBS, regardless of its best execution duty, Schwab's clients were targeted in UBS's dark pool by HFT manipulations and thus lost opportunities for price improvement, if their trades were executed at all.

## V.     ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER

93.     Numerous facts set forth above and summarized below give rise to the strong inference that Defendants intentionally or with deliberate recklessness engaged in the fraud set forth herein and made the materially false and misleading misstatements and omissions alleged in Section VI below.

94.     *First*, Defendants themselves made statements showing that they were acutely aware of the conflict between Schwab's duty of best execution and its PFOF and trade routing practices.

95.     On February 29, 2000, Mr. Schwab testified before the U.S. Senate Banking Committee about the evolution of financial markets. During his testimony, Mr. Schwab acknowledged the conflict of interest inherent in PFOF:

> Of course, there's a lot of concern that these rebates can pose a conflict for brokers. I worry too about payment for order flow. If you'll remember, Schwab took a strong stand a few years ago and tried to lead the way to eliminate the practice. Unfortunately, competition forced us to back off. However, to ensure that the potential conflict doesn't undermine our goal of getting best execution for customers, firms like

> ours go to extraordinary lengths to measure and compare execution quality among the various markets to ensure that orders are routed to markets that offer the best executions, regardless of whether they offer rebates.  Execution quality is what drives order routing decisions, and our customers would not have it any other way.

Mr. Schwab thus indicated that if his company were going to accept payments for order flow, then it must "go to extraordinary lengths to measure and compare execution quality among the various markets to ensure that orders are routed to markets that offer the best executions."  This testimony came before Schwab entered into the Handling Agreement with UBS in 2004, at which point Schwab set aside Mr. Schwab's admonition and began to rout 95% of its trades to UBS.

96.     Further, in April 2014, Mr. Bettinger made a statement falsely denying charges that Schwab was directing trade orders solely based on PFOF:

> [W]e do not route our clients [sic] trades based primarily on who is going to pay us the most.  We don't have sales people that go out and interact with market makers in trying to purely optimize PFOF.  Instead, what we've set up at Schwab is a highly professional committee of people from various areas within the firm who serve as an order routing committee and they make a decision on how to route trades based on a series of goals.

Mr. Bettinger thus acknowledged that it would be improper to route trade orders solely based on a PFOF arrangement.  Yet during that same year, pursuant to the Handling Agreement, Schwab consistently routed almost all of its trades to UBS.

97.     *Second*, Defendants made statements showing that they were fully aware that Schwab's customers would be harmed by being exposed to HFTs.  For example, in their joint statement on April 3, 2014, Mr. Bettinger and Mr. Schwab acknowledged that HFT was a "growing cancer" that has "creat[ed] an unleveled playing field for individual investors and driving the wrong incentives for our commodity and equities exchanges."  According to their statement, they knew that HFT was "skim[ming] pennies off the public markets by the billions" and "pick[ing] the pockets of legitimate market participants," such as retail investors.  Nonetheless, Schwab mindlessly routed almost all retail trade orders to UBS, which then placed a significant portion of those orders into its dark pool, where HFTs picked Schwab customers' pockets.

98.     In addition, Schwab's strong statement condemning HFT, quickly followed by the recantation of that statement, as alleged above, indicates Defendants' knowledge that Schwab's own

customers were being preyed upon by HFTs in UBS's dark pool as the result of routing virtually all non-directed orders to UBS.

99.     *Third*, Schwab's PFOF arrangement with UBS was a material source of profit for Schwab and had a major impact on its business as a retail broker-dealer.  As reported in its 2015 Form 10-K, Schwab's total order flow revenue was $103 million in 2015 (roughly 7.1% of net income) and $114 million in 2014 (roughly 8.6% of net income).  Given that upwards of 95% of Schwab's non-directed orders were routed to UBS in 2014, the overwhelming majority of that year's order flow revenue came from UBS.  Moreover, the Handling Agreement with UBS dictated how Schwab performed its core function as a retail broker – executing securities trades on behalf of its customers.  As a broker, Schwab's "bedrock obligation" is to provide best execution.[19]  In view of the magnitude of Schwab's PFOF arrangement with UBS, Defendants knew or ignored with deliberate recklessness that Schwab's order routing practices were completely inconsistent with representations that it was discharging its duty of best execution.

## VI.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

100.     As alleged above, Schwab made material misrepresentations regarding its trade routing practices and compliance with its duty of best execution.  These misrepresentations were contained on Schwab's website and in its Account Agreement.

101.     On its website, Schwab represented that: "In order to provide an ***exceptional execution***, there are a number of factors to be considered, including: execution price, opportunities for price improvement, market depth, order size, the type of security, speed, accuracy, and system availability."  Schwab further claimed that it worked "diligently to meet and exceed" the best execution criteria established by the SEC in 2001, and "to ensure we work toward our clients' best interests."

102.     Schwab's website also asserted that:

Because the trading environment is constantly changing, we regularly and rigorously monitor our order-routing and execution processes.  ***This discipline enables us to***

---

[19]  Norman S. Poser & James A. Fanto, *Broker-Dealer Law and Regulation* § 16.03[B] (4th ed. 2007).

*assist our clients in receiving the best execution possible.* We are committed to ensuring that you always know and understand the factors that affect the quality of your order execution.

* * *

*We regularly monitor the execution quality provided by different exchanges and liquidity providers*. In arranging for the execution of your orders, Schwab seeks out industry-leading execution services and access to the best-performing markets."

103.    The Application Agreement, which was executed by every Class member, made the following representations:

Schwab routes orders for execution to UBS Securities LLC (UBS) and other broker-dealers, who may act as market maker or manage execution of the orders in other market venues, and also routes orders directly to major exchanges. *Schwab considers a number of factors in evaluating execution quality among markets and firms*, including execution price and opportunities for price improvement, market depth and order size, the trading characteristics of the security, speed and accuracy of executions, the availability of efficient and reliable order handling systems, liquidity and automatic execution guarantees, and service levels and the cost of executing orders at a particular market or firm. Price improvement occurs when an order is executed at a price more favorable than the displayed national best bid or offer. *Schwab regularly monitors the execution obtained to ensure orders are routed to market venues that have provided high-quality executions over time.*

104.    The above statements were materially false or misleading, or omitted a material facts that were necessary to make the statements not misleading, for the following reasons:

a.    Schwab omitted to state that it was not actually considering the various factors "in evaluating execution quality among markets and firms." Instead, Schwab mechanically routed upwards of 95% of its clients' non-directed orders to UBS based on a single factor: Schwab's PFOF arrangement with UBS in the form of the Handling Agreement. Schwab's routing decisions did not take into account, among other factors, maximizing "price improvement opportunities" for its customers.

b.    Even assuming that Schwab "regularly monitor[ed] the execution quality" provided by various market centers, Schwab omitted to state that it did not "ensure [that] orders [were] routed to market venues that have provided high-quality executions over time." Through the end of 2014, Schwab consistently routed 95% of non-directed orders to UBS, regardless of the execution quality provided by other venues.

AMENDED CLASS ACTION COMPLAINT
Case No. 3:16-cv-03938-RS

1            c.      Schwab omitted to state that it was not actually engaging in the proper multi-

2    factor inquiry into whether it was "us[ing] reasonable diligence to ascertain the best market for the

3    subject security . . . so that the resultant price to the customer is as favorable as possible," as required

4    by Rule 5310.  These enumerated factors make clear that the duty of best execution entails a complex

5    inquiry, and that no single venue is the "best" venue for all trades.  The extreme concentration of

6    Schwab's non-directed orders with UBS was diametrically opposed to its best execution obligations

7    pursuant to Rule 5310 and its fiduciary duties.

8    **VII.    PRESUMPTION OF CLASS-WIDE RELIANCE**

9          105.    All Class members executed an Account Agreement with Schwab.  In each Account

10   Agreement, Schwab represented that: (1) "Schwab considers a number of factors in evaluating

11   execution quality among markets and firms, including execution price and opportunities for price

12   improvement. . ."; and (2)  "Schwab regularly monitors the execution quality obtained to ensure

13   orders are routed to market venues that have provided high-quality executions over time."  Therefore,

14   all Class members relied on these representations, especially given that these representations were

15   confirming Schwab's obligation, pursuant to FINRA rules and fiduciary duty, to provide best

16   execution.

17         106.    Had Schwab not promised to provide best execution of its customers' orders, or if

18   Schwab had disclosed its true trade routing practices and the resulting harm to customers, Lead

19   Plaintiffs would have placed orders through other broker-dealers who promised to and did provide

20   best execution.

21         107.    In addition, Lead Plaintiffs and all members of the Class are entitled to a presumption

22   of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the

23   claims asserted herein are predicated in part upon material omissions of fact that Defendants had a

24   duty to disclose.

25   **VIII.   LOSS CAUSATION AND DAMAGES**

26         108.    During the Class Period, as detailed herein, Schwab engaged in a scheme to deceive its

27   customers.  Schwab was engaged in a course of conduct that operated as a fraud or deceit by

28   misrepresenting its trade order routing practices and failing to disclose that it was not complying with

AMENDED CLASS ACTION COMPLAINT
Case No. 3:16-cv-03938-RS

1   its duty of best execution.  These materially misleading statements and omissions caused losses to

2   Lead Plaintiffs and the Class when Schwab executed their non-directed trade orders while failing to

3   comply with its duty of best execution, resulting in the failure to achieve the most favorable prices –

4   *i.e.*, inadequate price improvement.

5       109.    Schwab routed at least 95% of non-directed trade orders to UBS, a wholesale

6   internalizer that, employing the methods alleged herein, systematically traded against retail investors

7   resulting in foregone price improvement for those retail investors.  As set forth in Lead Plaintiffs'

8   certifications, Schwab executed a large number of trade orders for Lead Plaintiffs during the Class

9   Period.  ECF No. 27-1 (combined, Lead Plaintiffs had 722 Schwab transactions in 2011; 1,664 in

10  2012; 1,241 in 2013; 978 in 2014; and 611 in 2015).  On information and belief, Lead Plaintiffs were

11  damaged by Schwab's materially misleading statements and omissions, in conjunction with its trade

12  order routing practices that deprived them of the best execution of their orders.

13      110.    While the Class members' damages are substantial, quantification would require

14  discovery.  In addition, only through a Court order directing Schwab to adhere to its best execution

15  duties can the harm caused to its customers be ameliorated.

16  **IX.  INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS**
17  **        CAUTION DOCTRINE**

18      111.    The statutory safe harbor and the bespeaks caution doctrine applicable to forward-
19  looking statements under the Private Securities Litigation Reform Act of 1995 do not apply to the
20  misrepresentations and omissions alleged in this Complaint.

21      112.    None of Defendants' historic or present-tense statements alleged herein was a forward-
22  looking statement because none was an assumption underlying or relating to any plan, projection, or
23  statement of future economic performance, as they were not stated to be such assumptions underlying
24  or relating to any projection or statement of future economic performance when made, nor were any of
25  the projections or forecasts made by Defendants expressly related to, or stated to be dependent on,
26  those historic or present-tense statements when made.

27      113.    To the extent that any of the materially false or misleading statements alleged herein, or

28  any portions thereof, can be construed as forward-looking, these statements were not accompanied by

1    meaningful cautionary language identifying important facts that could cause actual results to differ

2    materially from those in the statements. As set forth above in detail, given the then-existing facts

3    contradicting Defendants' statements, the generalized risk disclosures made by Defendants were not

4    sufficient to insulate Defendants from liability for their materially false and misleading statements.

5           114.     Defendants are also liable for any false or misleading forward-looking statement

6    alleged herein, or portion thereof, because at the time each forward-looking statement was made, the

7    speaker knew the forward-looking statement was false or misleading, or the forward-looking

8    statement was authorized and approved by an executive officer of Schwab who knew that the forward-

9    looking statement was false.

10   **X.        STATUTE OF LIMITATIONS**

11         115.     For claims brought under Section 10(b) of the Exchange Act, the applicable statute of

12   limitations is two years.  28 U.S.C. § 1658(b).  The limitations periods begins to run when the plaintiff

13   has discovered, or in the exercise of reasonable diligence could have discovered, the facts that

14   constitute the violation.

15         116.     Before and throughout the Class Period, Schwab acknowledged that it received

16   payments for order flow, but at the same time, Schwab falsely asserted that it provided the "best

17   execution possible" to its customers.   In the Account Agreement, Schwab represented that:

18   (1) "Schwab considers a number of factors in evaluating execution quality among markets and firms,

19   including execution price and opportunities for price improvement. . ."; and (2)  "Schwab regularly

20   monitors the execution quality obtained to ensure orders are routed to market venues that have

21   provided high-quality executions over time."

22         117.     In addition, Schwab falsely claimed that it passed on its PFOF savings to its customers.

23   For example, during testimony before the Senate Banking Committee on February 9, 2000,

24   Mr. Schwab reassured its customers by touting the supposed benefits of PFOF:

25             It's also important to point out that the rebates we receive from payment for order flow
               help lower our costs, and we pass these savings back to customers. Firms like ours use
26            cost savings and rebates and even trading profits from executing customer orders to
               expand the menu of services we offer customers and to lower the prices we charge
27            them. For example, new rebates and cost savings on various exchanges recently
               enabled us to lower commissions for active traders.
28

AMENDED CLASS ACTION COMPLAINT
Case No. 3:16-cv-03938-RS

1    Schwab maintained this stance throughout the Class Period.

2        118.    As alleged above, in April 2014, Mr. Bettinger denied charges that Schwab was

3    directing trade orders solely based on PFOF and reiterated that Schwab monitors its clients' order flow

4    to ensure best execution:

> [W]e do not route our clients [sic] trades based primarily on who is going to pay us the
> most.  We don't have sales people that go out and interact with market makers in
> trying to purely optimize PFOF.  Instead, what we've set up at Schwab is a highly
> professional committee of people from various areas within the firm who serve as an
> order routing committee and they make a decision on how to route trades based on a
> series of goals.

9        119.    The Rule 606 Reports that Schwab filed with the SEC periodically disclosed the

10   percentage of Schwab's orders that were being routed to UBS, but these reports provided an

11   incomplete picture and did not show how Schwab customers were being harmed.  For example,

12   Schwab customers could not even begin to learn about the inadequate amount of price improvement

13   they were getting until after the second quarter of 2015, with the disclosure of the FIF statistics.

14   These disclosures finally allowed price improvement comparisons with competing brokers, such as

15   Fidelity, that did not accept PFOF.  Further, the Battalio paper, which empirically demonstrated that

16   "the decision of some national brokerages to route all nonmarketable limit orders to a single exchange

17   paying the highest rebate is not consistent with the broker's responsibility to obtain best execution" for

18   customer orders was published on March 31, 2015.  *Supra* at note 14.  And the CFA Institute study,

19   which empirically demonstrated that the United Kingdom's banning of PFOF resulted in improved

20   execution, was published in August 2016.  *Supra* at note 13.

21       120.    A putative class action concerning substantially the same facts, events, statements,

22   transactions, defendants, and class members that are at issue in this action, *Louis Lim v. Charles*

23   *Schwab & Co., Inc., et al.*, Case No. 3:15-cv-02074, was commenced in the U.S. District Court for the

24   Northern District of California on May 8, 2015 (the "Lim Action").  The Lim Action, along with a

25   related action, were dismissed on January 6, 2016.  Pursuant to *American Pipe & Construction Co. v.*

26   *Utah*, 414 U.S. 538 (1974), the statute of limitations was tolled during the eight-month period of the

27   Lim Action.

28

AMENDED CLASS ACTION COMPLAINT
Case No. 3:16-cv-03938-RS

# XI.   CLASS ACTION ALLEGATIONS

121.   Lead Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(2) and/or (b)(3) of the Federal Rules of Civil Procedure ("Rule") for the purpose of asserting the claims alleged in this Complaint on a common basis.   Lead Plaintiffs bring this action on behalf of themselves and all members of the following class comprised of:

> All clients of Schwab between July 13, 2011 and July 13, 2016 who placed orders that were routed to UBS by Schwab pursuant to the Equities Order Handling Agreement. Excluded from the Class are the officers, directors, and employees of Schwab.

122.   Lead Plaintiffs reserve the right to modify or amend the definitions of the Class after discovery.

123.   *Numerosity.  Rule 23(a)(1).*  The members of the Class are so numerous that their individual joinder is impracticable.  Schwab has over 9.8 million active brokerage accounts.  Lead Plaintiffs are informed and believe that the proposed Class contains at least hundreds of thousands of Defendants' clients who have been damaged by Schwab's conduct as alleged herein.  Schwab retail brokerage account holders and other members of the Class may be identified from records maintained by Schwab and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

124.   *Existence of Common Questions of Law and Fact.  Rule 23(a)(2).*  This action involves common questions of law and fact, which include, but are not limited to, the following:

a.   whether the statements made by Defendants as part of their promises to provide, and assertions that they do provide, best execution of their clients' orders, discussed herein are false, or are reasonably likely to deceive, given the omissions of material fact described above;

b.   whether Defendants made the actionable statements with the requisite scienter;

c.   whether the federal securities laws were violated by Defendants' acts alleged herein;

d.   whether Lead Plaintiffs and other Class members are entitled to damages; and

e.   whether Lead Plaintiffs and the Class are entitled to injunctive relief, restitution, other equitable relief, and/or other relief as may be proper.

125.     *Typicality.  Rule 23(a)(3).*  All members of the Class have been subject to and affected by the same conduct and omissions by Defendants.  The claims alleged herein are based on the same violations by Defendants that harmed Lead Plaintiffs and members of the Class.  By placing orders in connection with which Defendants failed to act upon due consideration to Schwab's duty of best execution, all members of the Class were subjected to the same wrongful conduct.  Lead Plaintiffs' claims are typical of the Class's claims and do not conflict with the interests of any other members of the Class.  Defendants' unlawful, unfair, deceptive, and/or fraudulent actions and breaches of the duty of best execution concern the same business practices described herein irrespective of where they occurred or were experienced.

126.     *Adequacy.  Rule 23(a)(4).*  Lead Plaintiffs will fairly and adequately protect the interests of the Class.  Lead Plaintiffs have retained counsel experienced in complex consumer class action litigation, and intend to prosecute this action vigorously.  Lead Plaintiffs have no interests adverse or antagonistic to the Class.

127.     *Injunctive and Declaratory Relief.  Rule 23(b)(2).*  Defendants' actions regarding the deceptions and omissions relating to its routing of client orders are uniform as to members of the Class.  Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief as requested herein is appropriate respecting the Class as a whole.

128.     *Predominance and Superiority of Class Action.  Rule 23(b)(3).*  Questions of law or fact common to the Class predominate over any questions affecting only individual members and a class action is superior to other methods for the fast and efficient adjudication of this controversy, for at least the following reasons:

a.     Absent a class action, members of the Class as a practical matter will be unable to obtain redress.  Defendants' violations of their legal obligations will continue without remedy, additional clients will be harmed, and Defendants will continue to retain their ill-gotten gains.

b.     It would be a substantial hardship for most individual members of the Class if they were forced to prosecute individual actions.

c.     When the liability of Defendants has been adjudicated, the Court will be able to determine the claims of all members of the Class.

d.      A class action will permit an orderly and expeditious administration of each Class member's claims and foster economies of time, effort, and expense.

e.      A class action regarding the issues in this case does not create any problems of manageability.

f.      Defendants have acted on grounds generally applicable to the members of the Class, making class-wide monetary relief appropriate.

g.      By pursuing a uniform course of conduct of routing their clients without paying due consideration to Schwab's duty of best execution, Defendants failed to provide best execution as a matter of policy and practice to all members of the Class.

h.      As a result of Defendants' order routing policy, each member of the Class suffered damages to an extent within the peculiar knowledge of the Defendants.

129.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in management of this action as a class action.

## XII.    CLAIM FOR RELIEF

### COUNT I

**Violation of Section 10(b) of the Exchange Act and
Rule 10b-5 Promulgated Thereunder (Against All Defendants)**

130.    Lead Plaintiffs repeat and reallege each allegation contained in the above paragraphs as if fully set forth herein.

131.    This Count is asserted against the Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

132.    During the Class Period, Defendants' engaged in a plan, scheme, conspiracy, and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon Lead Plaintiffs and other members of the Class; made various untrue statements of material facts, and omitted to state material

AMENDED CLASS ACTION COMPLAINT
Case No. 3:16-cv-03938-RS

facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes, and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive Defendants' clients, including Lead Plaintiffs and other Class members, as alleged herein; (ii) cause the Class members to engage in a broker-client relationship with Defendants which they otherwise would not have done; (iii) cause the Class members to place orders with Defendants which they otherwise would not have placed; and (iv) deprive the Class members of the best execution of their orders.  Further, Defendants knew that by failing to provide them with best execution of their orders, each member of the Class would, and did, incur economic harm arising from almost all of their orders being routed to just one venue.  In furtherance of this unlawful scheme, plan, and course of conduct, the Defendants' senior managers took the actions set forth herein.

133.    Pursuant to the above plan, scheme, conspiracy, and course of conduct, Defendants participated directly or indirectly in the preparation and/or issuance of public statements and documents described above, including statements on Schwab's website and in its Account Agreement and statements made to the government and the media, that were designed to convince the public, in general, and Defendants' clients, in particular, that Schwab was providing best execution of its clients' orders when, in fact, it was not.  Such statements and documents were materially false and misleading in that they failed to disclose material information concerning Schwab's order routing practices and misrepresented the truth about the same.

134.    Defendants' had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Lead Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to them.  Said acts and omissions were committed willfully or with reckless disregard for the truth.

135.    Defendants are liable both directly and indirectly for the wrongs complained of herein. Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Schwab's routing of its clients' orders.  As a result of the dissemination of the aforementioned public

1  statements and documents, Lead Plaintiffs and other Class members placed orders through Schwab

2  with an expectation of best execution throughout the Class Period.  In ignorance of the adverse facts

3  concerning Defendants' failure to provide best execution, which were concealed by Defendants, and

4  in reliance on Defendants' materially misleading statements and omissions alleged herein, Lead

5  Plaintiffs and the other Class members placed orders through Schwab and were damaged thereby.  By

6  reason of the conduct alleged herein, Defendants, knowingly or with deliberate recklessness, violated

7  Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

8       136.    As a direct and proximate result of the Defendants' wrongful conduct, Lead Plaintiffs

9  and the other members of the Class suffered damages in connection with Defendants' routing of their

10  orders during the Class Period.

11  **XIII.   PRAYER FOR RELIEF**

12       WHEREFORE, Lead Plaintiffs, on behalf of themselves and the Class, request entry of an

13  order as follows:

14       A.    declaring this action to be a class action properly maintained pursuant to Rule 23 of the

15  Federal Rules of Civil Procedure, certifying the Class with Lead Plaintiffs as Class Representatives

16  and Lead Plaintiffs' Counsel as Class Counsel;

17       B.    awarding Lead Plaintiffs and the members of the Class damages and interest thereon;

18       C.    directing Schwab to take all necessary actions to reform and improve its internal

19  procedures to protect Schwab's clients from recurrences of the damaging events described herein;

20       D.    awarding Lead Plaintiffs the costs and disbursements of this action, including

21  reasonable allowance of fees and costs for Lead Plaintiffs' attorneys, experts, and accountants; and

22       E.    granting Lead Plaintiffs such other and further relief as the Court may deem just and

23  proper under the circumstances.

24  **XIV.   JURY DEMAND**

25       Lead Plaintiffs demand a trial by jury.

26

27

28

AMENDED CLASS ACTION COMPLAINT

1

2   DATED:  January 20, 2017              GLANCY PRONGAY & MURRAY LLP

3

4                                        By:  *s/ Joshua L. Crowell*
                                         Lionel Z. Glancy
5                                        Robert V. Prongay
                                         Joshua L. Crowell
6                                        1925 Century Park East, Suite 2100
                                         Los Angeles, California 90067
7                                        Telephone:  (310) 201-9150
                                         Facsimile:  (310) 201-9160
8                                        Email:  jcrowell@glancylaw.com

9
                                         Lawrence P. Eagel
10                                       J. Brandon Walker
                                         Todd H. Henderson
11                                       BRAGAR EAGEL & SQUIRE, P.C.
                                         885 Third Avenue, Suite 3040
12                                       New York, New York 10022
                                         Telephone:     (212) 308-5858
13                                       Facsimile:     (212) 486-0462

14
                                         *Attorneys for Lead Plaintiffs Robert Wolfson and*
15                                       *Frank Pino and Co-Lead Counsel for the Class*

16

17

18

19

20

21

22

23

24

25

26

27

28

AMENDED CLASS ACTION COMPLAINT
Case No. 3:16-cv-03938-RS                                          43

**<u>PROOF OF SERVICE BY ELECTRONIC POSTING</u>**

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old.  On January 20, 2017, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Northern District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on January 20, 2017, at Los Angeles, California.


                                        *s/ Joshua L. Crowell*
                                        Joshua L. Crowell

# Mailing Information for a Case 3:16-cv-03938-RS Crago v. Charles Schwab & Co., Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Joshua L Crowell**
  jcrowell@glancylaw.com

- **Adam Christopher McCall**
  amccall@zlk.com

- **Nicholas Ian Porritt**
  nporritt@zlk.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,info@glancylaw.com,echang@glancylaw.com,bmurray@glancylaw.com

- **Gilbert Ross Serota**
  gilbert.serota@aporter.com,marie.zambrano@aporter.com,SFCalendar@aporter.com,jerome.ferrer@aporter.com

- **John Brandon Walker**
  walker@bespc.com,paralegals@bespc.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)