UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ROBERT CRAGO, et al.,

Plaintiffs,

v.

CHARLES SCHWAB & CO., INC., et al.,

Defendants.

Case No. 16-cv-03938-RS

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS WITH LEAVE TO AMEND**

# I. INTRODUCTION

Defendant Charles Schwab & Co., Inc. ("Schwab") moves to dismiss plaintiffs Robert Wolfson and Frank Pino's putative class action complaint for securities fraud. Because plaintiffs fail to make adequate pleadings of falsity, scienter, economic loss, loss causation, or reliance, their complaint is dismissed with leave to amend.

# II. BACKGROUND[1]

Defendant Schwab is a large retail broker-dealer that places stock trade orders on behalf of clients like plaintiffs Wolfson and Pino. When Schwab receives a trade order from a client, it must route the order to a venue for execution. In so doing, it operates under a duty of best execution, which encompasses, among other things, a duty to use reasonable diligence to secure in any trade the most favorable terms and price possible.

Accordingly, Schwab has made various representations that it is committed to securing best execution for its clients. For instance, it has indicated on its website its intention to provide

---

[1] All factual allegations are drawn from the plaintiffs' complaint and taken as true for the purposes of deciding this motion.

"exceptional execution" and "the best possible execution," and claims to "regularly monitor the execution quality provided by different exchanges and liquidity providers." Compl. ¶ 25. It also asserts in the 2015 Schwab One Account Agreement clients were required to sign:

> Schwab considers a number of factors in evaluating execution quality among market centers, including the execution price and opportunities for price improvement . . . Price improvement occurs when an order is executed at a price more favorable than the displayed national best bid or offer. Schwab regularly monitors the execution quality provided by various market centers to ensure orders are routed to markets and firms that have provided high-quality executions over time.

Compl. ¶ 28.

In 2004, UBS Securities LLC ("UBS") acquired Schwab's capital markets division, and the two companies entered into an Equities Order Handling Agreement whereby Schwab agreed to route at least 95% of its non-directed stock trade orders to UBS. In exchange, UBS would pay Schwab $100 million a year in payment for order flow ("PFOF"). The agreement, which ran until 2012, provided for penalties if Schwab did not meet the 95% threshold. In 2011, Schwab extended the agreement into 2014. Pursuant to the agreement, from 2004 to 2014, Schwab directed at least 95% of its clients' non-directed orders to UBS. For the first quarter of 2012 through the third quarter of 2014, Schwab routed between 93% and 99% of each quarter's non-directed trade orders to UBS. In the first quarter of 2015, Schwab routed 73% of non-directed trade orders to UBS, and from the second quarter of 2015 to the first quarter of 2016, Schwab routed roughly 50% of such orders to UBS. According to plaintiffs, this overwhelming majority of non-directed orders being routed to a single venue was anomalous among retail brokers. In the 2015 Account Agreement, Schwab disclosed:

> Schwab may receive remuneration, such as liquidity or order flow rebates, from a market center to which orders are routed. In addition, part of the consideration received by The Charles Schwab Corporation for the sale of its capital markets business to UBS in 2004 related to an order routing agreement with UBS, which has been extended. Quarterly information regarding the market centers to which we route orders and the remuneration received is available on our website at www.schwab.com or in written form upon request. Information regarding the specific routing destination and execution time of your orders for up to a six-month period is also available upon request.

*Id.* ¶ 29.

Beginning in 2015, Schwab, Fidelity, and Scottrade began disclosing to the Financial Information Forum ("FIF") information including: "(1) average order size; (2) price improvement percentage; (3) average savings per order; and (4) average execution speed." Compl. ¶ 66. The information disclosed pertained to S&P 500 stocks and other exchange-listed stocks, and covered only market orders — orders that execute immediately — as opposed to nonmarketable limit orders, which execute only when a stock price reaches a certain threshold. Based on these disclosures, on July 14, 2015, website KOR Trading published an analysis indicating Schwab's average price improvement lagged substantially behind that of Fidelity, which apparently stopped accepting PFOF in 2014 and routed its orders to a more diverse array of venues than did Schwab.

Plaintiffs point to numerous reasons price improvement would suffer from Schwab's bulk order routing to UBS, including Schwab clients' resulting exposure to "dark pools" and high-frequency traders, and the ability of UBS to become an "internalizer" and profit from a captive retail order flow. In addition to the KOR Trading report, plaintiffs rely on various articles and academic studies indicating PFOF (of the sort Schwab allegedly engaged in) will result in lost price improvement for clients. They also identify statements by SEC officials raising the risk that PFOF creates a conflict of interest and results in lost price improvement.

Plaintiffs allege they have suffered lost price improvement as a result of Schwab's bulk order routing to UBS, and accordingly allege Schwab's statements about its best execution priorities were false. They also allege Schwab fraudulently promulgated the false statements with scienter — knowing they were false or acting with reckless disregard to the truth. Plaintiffs claim certain statements by Schwab Chairman Charles R. Schwab and Schwab CEO Walter Bettinger raise a strong inference of scienter. These statements include: a 2013 statement by Charles Schwab and Bettinger criticizing high frequency trading, and subsequent remarks by Bettinger appearing to walk back that position; a 2000 statement by Schwab to the Senate Banking Committee about the conflicts of interest PFOF creates; and a 2014 statement by Bettinger denying Schwab directed trade orders on the basis of PFOF.

On July 13, 2016, Robert Crago initiated this putative class action by filing a class action complaint. After a contested motion, Wolfson and Pino were appointed lead plaintiffs. The pair claims to have placed thousands of non-directed stock orders during the class period, and hundreds or thousands in each relevant year. They filed an amended class action complaint on January 20, 2017, advancing one claim for relief for Schwab's alleged violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC. The action is brought on behalf of a purported class comprised of: "All clients of Schwab between July 13, 2011 and July 13, 2016 who placed orders that were routed to UBS by Schwab pursuant to the Equities Order Handling Agreement." Compl. ¶ 121. On March 10, Schwab filed this motion to dismiss plaintiffs' amended complaint.[2]

### III. LEGAL STANDARD

"A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." Fed. R. Civ. P. 8(a)(2). "[D]etailed factual allegations" are not required, but a complaint must provide sufficient factual allegations to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. v. Twombly*, 550 U.S. 544, 555, 570 (2007)) (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Federal Rule of Civil Procedure 9(b), meanwhile, requires that, "[i]n alleging fraud or mistake, a party

---

[2] With its opposition to plaintiffs' motion, Schwab requests judicial notice of: the Equities Order Handling Agreement between Schwab and UBS; various 2011-2016 Schwab reports and disclosures issued pursuant to SEC Rules 606 and 607; and Schwab's customer account agreements ("Schwab One Account Agreements") from 2011 to 2014. Schwab argues they are subject to judicial notice under Federal Rule of Evidence 201(b)(2) because they are referenced, quoted or otherwise relied on in plaintiffs' Complaint. *See In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999). Because the authenticity of these documents is not subject to reasonable dispute, *see* Fed. R. Evid. 201(b)(2), and because plaintiffs do not oppose the request, judicial notice will be taken. Notice, however, does not mean the documents will be presumed true. *See Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010) ("Courts may take judicial notice of publications introduced to indicate what was in the public realm at the time, not whether the contents of those articles were in fact true.").

must state with particularity the circumstances constituting fraud or mistake." To satisfy this pleading standard, a plaintiff must allege the "who, what, where, when, and how" of the alleged misconduct. *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir.1997) (citation and internal quotation marks omitted). The Rule 9(b) pleading standard "applies to all elements of a securities fraud action." *Oregon Pub. Employees Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014). In actions governed by the Private Securities Litigation Reform Act ("PSLRA"), such as this one, these pleading standards are subject to further refinement, as discussed in more detail below.

Federal Rule of Civil Procedure 12(b)(6) provides a mechanism to test the legal sufficiency of the averments in a complaint. Dismissal is appropriate when the complaint "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A complaint in whole or in part is subject to dismissal if it lacks a cognizable legal theory or the complaint does not include sufficient facts to support a plausible claim under a cognizable legal theory. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). When evaluating a complaint, the court must accept all its material allegations as true and construe them in the light most favorable to the non-moving party. *Iqbal*, 556 U.S. at 678. When a plaintiff has failed to state a claim upon which relief can be granted, leave to amend should be granted unless "the complaint could not be saved by any amendment." *Gompper v. VISX, Inc.*, 298 F.3d 893, 898 (9th Cir. 2002) (citation and internal quotation marks omitted).

## IV. DISCUSSION

To establish a violation of Rule 10b-5, a plaintiff must demonstrate "(1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1014 (9th Cir.2005). Schwab argues plaintiffs' complaint is deficient in numerous respects: (1) that plaintiffs fail to establish Article III standing because they do not allege concrete injury in fact; (2) that plaintiffs' claim is barred by the statute of limitations; (3) that plaintiffs do not adequately allege falsity and scienter; (4) that plaintiffs do not adequately allege economic loss

and loss causation; and (5) that plaintiffs do not adequately allege reliance.

### A. Article III Standing

To establish Article III standing, a plaintiff must satisfy three requirements: (1) "the plaintiff must have suffered an injury in fact — an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical;" (2) "there must be a causal connection between the injury and the conduct complained of — the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court;" and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (citations and internal quotation marks omitted) (alterations in original). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Id.* at 561.

Schwab asserts plaintiffs fail to aver a particularized "injury in fact" because the complaint does not pinpoint specific trades for which a failure of best execution caused plaintiffs to suffer identifiable losses. Thus, Schwab suggests plaintiffs merely offer allegations of wrongdoing and unjustifiably infer that an injury followed. Schwab also argues plaintiffs fail to establish that Schwab's order routing practices caused their alleged losses.

Plaintiffs, however, sufficiently allege Schwab's bulk routing of trades to UBS deprived them of optimal execution, thereby depriving them of price improvement and causing monetary losses. Plaintiffs' complaint alleges that, during the class period, Schwab routed a majority of its non-directed trades through UBS, including a vast majority (95 to 99%) from 2012 to 2014. Moreover, the complaint provides specific factual allegations indicating Schwab's average price improvement was less than that of competitors who did not accept payment for order flow. Accordingly, plaintiffs advance sufficient allegations of concrete and particularized harm. *See Lim v. Charles Schwab & Co.*, No. 15-CV-02074-RS, 2015 WL 7996475, at *4 (N.D. Cal. Dec. 7, 2015) ("Plaintiffs are injured . . . insofar as they have been denied best execution. . . . [P]laintiffs have adequately demonstrated economic injury sufficient to confer Article III standing.").

Schwab argues, unpersuasively, *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016), compels a contrary conclusion. *Spokeo* emphasized the importance of concreteness to the Article III standing inquiry. *See id.* ("Because the Ninth Circuit failed to fully appreciate the distinction between concreteness and particularization, its standing analysis was incomplete. It did not address . . . whether the particular procedural violations alleged in this case entail a degree of risk sufficient to meet the concreteness requirement."). Plaintiffs' alleged injuries are both particularized and concrete, and are sufficient to establish Article III standing. *See id* at 1548 ("For an injury to be particularized it must affect the plaintiff in a personal and individual way. . . . When we have used the adjective concrete, we have meant to convey the usual meaning of the term — real, and not abstract."). Plaintiffs' case is also unlike *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, which defendants rely on in support of their standing challenge. In *Chapman*, the plaintiff alleged ADA violations by the defendant store, but failed to allege sufficiently injury resulting from those violations. *Id.* at 954-55. Here, plaintiffs adequately allege Article III injury by alleging lost price improvement resulting from Schwab's alleged fraud.

**B. Statute of Limitations**

"[T]he statute of limitations for a claim brought under § 10(b) is two years from the discovery of facts constituting the violation but no more than five years from the date of the violation." *In re Juniper Networks, Inc. Sec. Litig.*, 542 F. Supp. 2d 1037, 1050 (N.D. Cal. 2008) (citing 28 U.S.C. 1658(b)(1)-(2)). "Under federal law, a claim accrues when the plaintiff knows or has reason to know of the injury which is the basis of the action." *TwoRivers v. Lewis*, 174 F.3d 987, 991 (9th Cir. 1999). "Federal law deems the statute [of limitations on § 10(b) fraud claims] to start to run on the date plaintiff discovered the fraud or could have done so in the exercise of reasonable diligence." *Luksch v. Latham*, 675 F. Supp. 1198, 1200 (N.D. Cal. 1987) (citation and internal quotation marks omitted). Schwab asserts plaintiffs' claims are time-barred, because its routing practices with UBS date back to 2004 and have been disclosed ever since, including through the beginning of the putative class period in 2011.

Plaintiffs argue their claim did not accrue until 2015, because until that year they were not

(and could not have been) aware of their injuries. According to plaintiffs, it was the 2015 FIF disclosures and resulting KOR Trading report that finally put them on notice of their alleged injuries: that they were being deprived of optimal price improvement due to Schwab's bulk routing of orders to UBS.

In contrast, Schwab argues plaintiffs' claims are time-barred because plaintiffs have been on notice of its routing practices and on inquiry notice of its execution quality for more than two years. Schwab points to its 2004 8-K filing, and continual Rule 606 and 607 Reports as sources of notice of its routing practices and contract with UBS. It likewise asserts plaintiffs could have reviewed trade execution statistics because such data was available to all customers upon request as mandated by SEC Rule 605, and because since 2011 Schwab issued quarterly reports showing "its effective/quoted ratio . . . compared to the industry average; the percentage of orders receiving price improvement compared to the industry average; the price improvement amount compared to industry average; and the execution speed compared to industry average." Reply at 4. How Schwab's average trade execution compared to industry averages, however, would not necessarily have put plaintiffs on notice of any potential injury, because Schwab's industry peers may have accepted PFOF and/or had routing agreements, or may have otherwise performed sub-optimally relative to Schwab. Schwab's quarterly trade execution reports shed no light on the actual issue, which is how much price improvement Schwab lost out on in trades relative to the price improvement it would have obtained had it *not* accepted PFOF and operated pursuant to a routing agreement. Moreover, Schwab does not explain adequately why plaintiffs should have known to request trade execution statistics for all their trades and run rigorous analyses on those statistics to determine whether Schwab was losing out on price improvement due to accepting PFOF — analyses which may have required plaintiffs to seek and obtain trade execution data from Schwab's competitors. Schwab does not explain why reasonable diligence would have required such efforts of plaintiffs. Accordingly, plaintiffs have adequately pleaded that their claims did not accrue until 2015 and are not barred by the statute of limitations.

### C. Falsity and Scienter

Under the PSLRA, to plead falsity a plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). To plead scienter, a plaintiff "must state with particularity facts giving rise to a strong inference that defendants acted with the intent to deceive or with deliberate recklessness as to the possibility of misleading investors." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008). "To qualify as 'strong' . . . an inference of scienter must be more than merely plausible or reasonable — it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). In determining if a plaintiff has made an adequate pleading of scienter, a court must consider "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23. "Because falsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts, . . . the dual pleading requirements [are treated as] a single inquiry." *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001).

Plaintiffs allege Schwab falsely represented: (1) that it was committed to securing best execution in trades; (2) that it actively monitored trade execution quality; (3) that it considered a variety of factors in evaluating execution quality; and (4) that it ensured orders were routed to the venues providing best execution. Although Schwab's statements to these effects may seem inconsistent with the bulk routing of virtually all non-directed orders to UBS, plaintiffs fail to allege how these statements temporally align with Schwab's routing practices. Most of Schwab's allegedly false statements are attributed to its website, but plaintiffs fail to indicate when they were made; whether during or after the class period. Accordingly, it is not possible to evaluate them for falsity. *See Cooper*, 137 F.3d at 627 (adequate pleading of fraud claims requires the "who, what, where, when, and how" of the alleged misconduct).

The statements in the January 2015 Account Agreement, while from during the class period, are from after the expiration of Schwab's agreement with UBS (which ended in 2014). Although Schwab still routed 76% of non-directed orders to UBS during that quarter, it was not contractually obligated to route order flow to UBS, and the percentage of its orders routed to UBS had fallen substantially. Still, it apparently received over $100 million in PFOF from UBS that year. Yet whether the Account Agreement statement was false cannot, as plaintiffs argue, be inferred from the PFOF revenue and 76% routing figure, because plaintiffs have not pleaded with particularity any facts indicating Schwab's orders at that time were not receiving best execution. This is because plaintiffs do not indicate when the FIF data relied on in the KOR Trading analysis dates from. Although the report itself was published in the second quarter of 2015, if it relied on data prior to the first quarter of 2015, plaintiffs will not be able to show Schwab subordinated best execution to PFOF in contradiction of its best execution statements in the 2015 Account Agreement.

Finally, plaintiffs fail to plead with particularity any facts indicating Schwab failed to monitor trade execution quality. Even if Schwab willingly subordinated best execution to PFOF in bulk routing trades to UBS, doing so would not necessarily be exclusive of continuing to monitor the (suffering) trade execution quality.

Because plaintiffs fail to plead the falsity of Schwab's alleged misrepresentations with requisite particularity, their claim is subject to dismissal. Given this failure, the single inquiry approach to falsity and scienter, *see Ronconi*, 253 F.3d at 429, precludes a determination that plaintiffs have adequately plead scienter.

### D. Economic Loss and Loss Causation

To make an adequate pleading of economic loss and loss causation, a plaintiff must plead "economic losses that misrepresentations actually cause." *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1119 (9th Cir. 2013) (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005)) (internal quotation marks omitted). "Loss causation is simply 'a causal connection between the material misrepresentation and the loss.'" *Id.* (quoting *Dura*

*Pharm.*, 544 U.S. at 342). The concept of loss causation is analogous to the common law concept of "proximate cause." *See id.* at 1118. To plead loss causation adequately, a plaintiff may plead that "the defendant misrepresented or omitted the very facts that were a substantial factor in causing the plaintiff's economic loss." *McCabe v. Ernst & Young, LLP.*, 494 F.3d 418, 425 (3d Cir. 2007).

### *1. Economic Loss*

Plaintiffs allege economic losses in the form of lost price improvement resulting from Schwab failing to seek best execution and instead routing virtually all non-directed trade orders to UBS. Plaintiffs claim their trades benefited from less price improvement compared to trades handled by retail brokers who did not engage in similar bulk order routing for PFOF. Assuming the truth of these allegations (as is required at this stage), it may be likely many of plaintiffs trades were subject to lost price improvement, given that plaintiffs ordered thousands of non-directed trades from 2011 to 2015.[3] Nonetheless, plaintiffs must plead economic loss with *particularity*, *see Apollo Grp.*, 774 F.3d at 605 (applying Rule 9 pleading standards to all elements of a 10b-5 claim), and must plead "actual economic loss," *see Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1119 (9th Cir. 2013) (quoting *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 26 (3d Cir.2007)) (requiring plaintiff to show actual economic loss to satisfy loss causation and prevail on a 10b-5 claim); *see also Ambassador Hotel Co. v. Wei-Chuan Inv.*, 189 F.3d 1017, 1030 (9th Cir. 1999) ("The usual measure of damages for securities fraud claims under Rule 10b-5 is out-of-pocket loss . . . .). Plaintiffs fail to plead actual losses with particularity because they do not indicate any trades on which they actually experienced losses; they point only to the general probability of Schwab's non-directed trade orders to obtain less price improvement than that which would have been obtained but for its bulk routing to UBS.

Plaintiffs naturally disagree, but the authorities upon which they rely do not establish the

---

[3] This is what plaintiffs argue: "[The] large number of [Pino and Wolfson'] transactions makes its very likely that [their] orders were routed to UBS and deprived of best execution." Resp. at 23.

adequacy of their economic loss pleading. They argue economic loss and loss causation are subject only to a plausibility standard to survive a motion to dismiss, *see In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008) ("So long as the complaint alleges facts that, if taken as true, plausibly establish loss causation, a Rule 12(b)(6) dismissal is inappropriate."), but subsequent authority clearly requires the application of Rule 9's particularity standard to all elements of a 10b-5 claim, *see Apollo Grp.*, 774 F.3d at 605 ("Rule 9(b) applies to all elements of a securities fraud action, including loss causation."). Plaintiffs' best authority, which determined a very similar complaint was pleaded adequately, does not change the conclusion here because it required only plausibility pleading for economic loss. *See Zola v. TD Ameritrade, Inc.*, 172 F. Supp. 3d 1055, 1074 (D. Neb. 2016) ("[P]laintiff has plausibly stated that members of the putative class suffered economic loss . . . . He has alleged that he and the putative class members were damaged as a result of TD Ameritrade's self-interested order routing in that orders . . . were filled at a suboptimal price, and high frequency traders were allowed to jump the queue and take advantage of a price benefit that should have gone to the plaintiffs.").

Plaintiffs also attempt to seize on the Second Circuit's statement in *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005) that "plaintiffs were [not] required to allege the precise loss attributable to [defendant] Merrill's fraud" in order to plead adequately a 10b-5 claim. In context, however, this statement clearly meant plaintiffs were not required to make an exact attribution of losses among defendants' alleged fraud and other potential causes:

> We do not suggest that plaintiffs were required to allege the precise loss attributable to Merrill's fraud, or that "systematically overly optimistic" ratings of the type published by the Internet Group are categorically beyond the reach of the securities laws. But where (as here) substantial indicia of the risk that materialized are unambiguously apparent on the face of the disclosures alleged to conceal the very same risk, a plaintiff must allege (i) facts sufficient to support an inference that it was defendant's fraud—rather than other salient factors — that proximately caused plaintiff's loss; or (ii) facts sufficient to apportion the losses between the disclosed and concealed portions of the risk that ultimately destroyed an investment. Plaintiffs have done neither, and thus offer no factual basis to support the allegation that Merrill's misrepresentations and omissions caused the losses flowing from the well-disclosed volatility of securities issued by 24/7 Media and Interliant.

*Id.* There seemed no question in *Lentell* that the plaintiffs could point to actual economic losses; their complaint apparently catalogued stock price movements over the class period. *See id.* at 166-67 ("The stock price gyrated from $45.125 on May 12, 1999, to a high of $64.625, and to a low of $2.9375 at the close of the putative class period. . . . Interliant was trading at $16.375 when Merrill initiated coverage, rose to a high of $55.50, and had plummeted to $4.00 as of February 21, 2001, the day after the putative class period closed.). Although plaintiffs failed to make an adequate loss *causation* pleading by failing to attribute alleged losses to alleged fraud, *see id.* at 177, they did not have anything resembling the economic loss pleading problem here, which is that plaintiffs have not identified any trades on which they lost out on price improvement, and necessarily cannot state the amount of price improvement of which they were deprived. Ultimately, plaintiffs have not identified any authorities supporting the notion that pleading a high likelihood of completely unspecified losses is sufficient to satisfy their duty to plead actual economic losses with particularity. As such, their complaint is subject to dismissal for failure to make an adequate pleading of economic loss.

### 2. *Loss Causation*

Plaintiffs' theory of loss causation, meanwhile, is that Schwab fraudulently mispresented its commitment to best execution, while indiscriminately routing virtually all non-directed trade orders to UBS and foregoing best execution, thereby depriving customers of price improvement, and causing them losses relative to the price improvement they could have enjoyed had Schwab routed orders to venue on the basis of best execution. Although this theory is generally coherent, it relies on a series of questionable assumptions: that Schwab knowingly or recklessly made false statements pertaining to best execution; that plaintiffs relied on those statements; that Schwab did not uphold its duty of best execution; and that plaintiffs suffered identifiable losses in the form of lost price improvement. Each of these assumptions maps onto an element of a 10b-5 claim that plaintiffs have not yet adequately pleaded. *See supra* Parts IV.A-C, *infra* Part IV.E. Accordingly, it is premature to accept as adequately pleaded plaintiffs' theory of loss causation.

### E. Reliance

"Transaction causation is akin to reliance; it focuses on the time of the transaction and refers to the causal link between the defendant's misconduct and the plaintiff's decision to buy or sell securities." *Nuveen*, 730 F.3d at 1118 (citation and internal quotation mark omitted). "Transaction causation constitutes 'actual' or 'but-for' cause." *Id.* (citing *Daou Sys.*, 411 F.3d at 1025). To plead transaction causation adequately, a plaintiff must plead that, "but for the fraud, the plaintiff would not have engaged in the transaction at issue." *See Daou Sys.*, 411 F.3d at 1025. Although Federal Rule of Civil Procedure 9(b) requires fraud claims to be pleaded with particularity, *see supra* Part III, "a presumption of reliance . . . is generally available to plaintiffs alleging violations of section 10(b) based on omissions of material fact." *Binder v. Gillespie*, 184 F.3d 1059, 1063 (9th Cir. 1999) (citing *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153-54 (1972)). This presumption is "confined to cases that *primarily* allege omissions." *Id.* at 1064 (emphasis added). Schwab argues plaintiffs' complaint suffers from a fatal failure to allege plaintiffs actually read and relied upon Schwab's alleged misrepresentations. *See In re Van Wagoner Funds, Inc. Sec. Litig.*, 382 F. Supp. 2d 1173, 1187 (N.D. Cal. 2004) ("[Plaintiffs] only generally allege they relied on [defendant's] statements. . . . [They] make no specific allegations that they read the annual reports or registration statements . . . . Because all averments of fraud must be pled with particularity, the Court finds the . . . general allegations of reliance insufficient.").

Plaintiffs have three responses. First, they point out that the complaint references Schwab's January 2015 account agreement, which provides: "You . . . acknowledge that you have read, understood and agreed to be bound by the terms of: . . . Schwab's brokerage account agreement(s) and any other agreement with Schwab that applies to your Account(s), all as currently in effect and amended from time to time." Compl. Ex. A at 109. Presumably, plaintiffs intend to argue that this provision indicates their reading of (and reliance on) the agreement, which contains alleged misrepresentations about execution quality. Yet whether or not this provision binds plaintiffs to the agreement and puts them on constructive notice of its terms for contract law

purposes, plaintiffs cite no authority supporting the notion that it can stand in for what the PSLRA requires, which is actual reliance. *See Van Wagoner Funds*, 382 F. Supp. 2d at 1187. Unless plaintiffs can state they actually relied on Schwab's alleged misrepresentations, it is not possible to see how they can allege that, "but for the fraud, [they] would not have engaged in the transaction at issue." *Daou Sys.*, 411 F.3d at 1025. Moreover, many of the alleged misrepresentations plaintiffs quote in their complaint are from sources other than the account agreement. Even if the acknowledgement provision could stand in for a pleading of reliance on the account agreement's misrepresentations (and it cannot), it is unclear how it would stand in for a pleading of reliance on other misrepresentations.

Second, plaintiffs argue they are entitled to a presumption of reliance under *Affiliated Ute*. The *Affiliated Ute* presumption, however, is not appropriate here, as plaintiffs' complaint primarily alleges affirmative misrepresentations, not omissions. *See Binder*, 184 F.3d at 1064. Although plaintiffs' complaint does allege certain omissions, all take the form of Schwab's failure to state it was not upholding certain guarantees pertaining to execution quality. For instance, plaintiffs cite as false this representation from the Schwab account agreement: "Schwab considers a number of factors in evaluating execution quality among markets and firms . . . ." Compl. ¶ 103. Then, plaintiffs allege "Schwab omitted to state that it was not actually considering the various factors 'in evaluating execution quality among markets and firms.'" Compl. ¶ 104(a). This recasting of misrepresentations as omissions of the truth does not entitle plaintiffs to the *Affiliated Ute* presumption:

> In many instances, an omission to state a material fact relates back to an earlier statement, and if it is reasonable to think that that prior statement still stands, then the omission may also be termed a misrepresentation. The labels by themselves, therefore, are of little help. What is important is to understand the rationale for a presumption of causation in fact in cases like *Affiliated Ute*, *in which no positive statements exist*: reliance as a practical matter is impossible to prove.

*Wilson v. Comtech Telecommunications Corp.*, 648 F.2d 88, 93 (2d Cir. 1981) (emphasis added). This is not a case in which a lack of positive statements necessitates a presumption of reliance;

plaintiffs identify multiple alleged misrepresentations.

Third, plaintiffs argue they are entitled to common-sense inferences of reliance from circumstantial evidence, but they cite no authorities supporting the notion that the PSLRA and Rule 9(b) permit an inference of reliance where a plaintiff has failed to plead reliance adequately. Accordingly, plaintiffs' have not advanced a compelling reason their failure to plead reliance adequately should be excused, and their claims are subject to dismissal for that pleading deficiency.

## V. CONCLUSION

Plaintiffs have not adequately pleaded falsity, scienter, economic loss, loss causation, or reliance. Accordingly, Schwab's motion to dismiss is granted with leave to amend. Plaintiffs shall have 30 days from the issuance of this order to file an amended complaint seeking to repair the deficiencies identified herein.

**IT IS SO ORDERED**.

Dated: June 12, 2017

RICHARD SEEBORG
United States District Judge