United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ROBERT CRAGO, et al.,

Plaintiffs,

v.

CHARLES SCHWAB & CO., INC., et al.,

Defendants.

Case No. 16-cv-03938-RS

**ORDER DENYING MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT**

## I. INTRODUCTION

Defendant Charles Schwab & Co., Inc. ("Schwab") moves to dismiss plaintiffs Robert Wolfson and Frank Pino's putative second amended putative class action complaint ("SAC") for securities fraud. The prior operative complaint was dismissed for failure to plead the falsity of Schwab's alleged misrepresentations with requisite particularity, failure to identify specific transactions that incurred an economic loss, and failure to allege reliance. Because plaintiffs' amended complaint alleges facts sufficient to state a claim for relief, the motion to dismiss is denied.

## II. BACKGROUND[1]

This is a securities class action on behalf of all Schwab brokerage customers who between

[1] The factual background is based on the averments in the SAC, which must be taken as true for purposes of this motion.

July 13, 2011, and December 31, 2014 (the "Class Period"), placed trade orders that were routed to UBS Securities LLC ("UBS") in a manner allegedly inconsistent with Schwab's duty of best execution. Defendant Schwab is a large retail broker-dealer that places stock trade orders on behalf of clients like plaintiffs Wolfson and Pino. When Schwab receives a trade order from a client, it must route the order to a venue for execution. In so doing, it operates under a duty of best execution, which encompasses, among other things, a duty to use reasonable diligence to secure in any trade the most favorable terms and price possible.

Accordingly, Schwab has made various representations that it is committed to securing best execution for its clients. For instance, it has indicated on its website its intention to provide "exceptional execution" and "the best possible execution," and claims to "regularly monitor the execution quality provided by different exchanges and liquidity providers." SAC ¶ 40.

Pursuant to an Equities Order Handling Agreement ("EOHA"), from 2004 to 2014, Schwab directed at least 95% of its clients' non-directed orders to UBS Securities LLC ("UBS"). In exchange, UBS agreed to pay Schwab $100 million a year in payment for order flow ("PFOF"). The agreement provided for penalties if Schwab did not meet the 95% threshold. For the first quarter of 2012 through the third quarter of 2014, Schwab routed between 93% and 99% of each quarter's non-directed trade orders to UBS. According to plaintiffs, this overwhelming majority of non-directed orders being routed to a single venue was anomalous among retail brokers.

Beginning in 2015, Schwab, Fidelity, and Scottrade began disclosing to the Financial Information Forum ("FIF") information including: "(1) average order size; (2) price improvement percentage; (3) average savings per order; and (4) average execution speed." SAC ¶ 99. The information disclosed pertained to S&P 500 stocks and other exchange-listed stocks, and covered only market orders — orders that execute immediately — as opposed to nonmarketable limit orders, which execute only when a stock price reaches a certain threshold. Based on these disclosures, on July 14, 2015, the website Kor Trading published an analysis indicating Schwab's average price improvement lagged substantially behind that of Fidelity, which apparently stopped accepting PFOF in 2014 and routed its orders to a more diverse array of venues than did Schwab.

United States District Court
Northern District of California

Plaintiffs point to numerous reasons price improvement would suffer from Schwab's bulk order routing to UBS, including Schwab clients' resulting exposure to "dark pools" and high-frequency traders, and the ability of UBS to become an "internalizer" and profit from a captive retail order flow. In addition to the Kor Trading report, plaintiffs rely on various articles and academic studies indicating PFOF (of the sort Schwab allegedly engaged in) will result in lost price improvement for clients. They also identify statements by SEC officials raising the risk that PFOF creates a conflict of interest and results in lost price improvement.

Plaintiffs allege they have suffered lost price improvement as a result of Schwab's bulk order routing to UBS, and accordingly allege Schwab's statements about its best execution priorities were false. They also allege Schwab fraudulently promulgated the false statements with scienter — knowing they were false or acting with reckless disregard to the truth. Plaintiffs claim certain statements by Schwab Chairman Charles R. Schwab and Schwab CEO Walter Bettinger raise a strong inference of scienter. These statements include: an April 3, 2014, joint statement by Charles Schwab and Bettinger criticizing high frequency trading, and subsequent remarks by Bettinger appearing to walk back that position; a 2000 statement by Schwab to the Senate Banking Committee about the conflicts of interest PFOF creates; and a 2014 statement by Bettinger denying Schwab directed trade orders on the basis of PFOF.

On July 13, 2016, Robert Crago initiated this putative class action by filing a class action complaint. After a contested motion, Wolfson and Pino were appointed lead plaintiffs. The pair claims to have placed thousands of non-directed stock orders during the class period, and hundreds or thousands each relevant year. They filed an amended class action complaint on January 20, 2017, advancing one claim for relief for Schwab's alleged violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC. The amended complaint was dismissed with leave to amend for failure to make adequate pleadings of falsity, scienter, economic loss, loss causation, or reliance. On August 14, 2017, plaintiffs filed this second amended class action complaint, shortening the class period and pleading economic loss with respect to three specific trades by plaintiff Scott Posson. Schwab moves again to

dismiss.[2]

## III. LEGAL STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While "detailed factual allegations are not required," a complaint must have sufficient factual allegations to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009) (citing *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This standard asks for "more than a sheer possibility that a defendant acted unlawfully." *Id.* The determination is a context-specific task requiring the court "to draw on its judicial experience and common sense." *Id.* at 679. Federal Rule of Civil Procedure 9(b), meanwhile, requires that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." To satisfy this pleading standard, a plaintiff must allege the "who, what, where, when, and how" of the alleged misconduct. *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir.1997) (citation and internal quotation marks omitted). The Rule 9(b) pleading standard "applies to all elements of a securities fraud action." *Oregon Pub. Employees Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014). In actions governed by the Private Securities Litigation Reform Act ("PSLRA"), such as this one, these pleading standards are subject to further refinement, as discussed in more detail below.

A motion to dismiss a complaint under FRCP Rule 12(b)(6) tests the legal sufficiency of the claims alleged in the complaint. *See Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). Dismissal under Rule 12(b)(6) may be based on either the "lack of a cognizable

---

[2] With its moving papers, Schwab requests judicial notice of trade confirmations and order file records relating to the three trades by Posson that are discussed in the SAC. Dkt. Nos. 94-96. Plaintiffs oppose this request and have moved to strike the documents and those portions of Schwab's moving papers and reply that rely upon them. Because the SAC does not refer to or explicitly rely upon the documents in question, the request for judicial notice is denied. The motion to strike is granted insofar as Schwab's factual assertions premised on the documents will not be considered for the purposes of ruling on the motion to dismiss.

legal theory" or on "the absence of sufficient facts alleged under a cognizable legal theory." *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1014 (9th Cir. 2013). When evaluating such a motion, the Court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005). When a plaintiff has failed to state a claim upon which relief can be granted, leave to amend should be granted unless "the complaint could not be saved by any amendment." *Gompper v. VISX, Inc.*, 298 F.3d 893, 898 (9th Cir. 2002) (citation and internal quotation marks omitted).

## IV. DISCUSSION

To establish a violation of Rule 10b-5, a plaintiff must demonstrate "(1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1014 (9th Cir. 2005). Schwab argues that plaintiffs' complaint as amended fails to overcome prior shortcomings, which include failure to make adequate allegations of falsity and scienter, economic loss and loss causation, or reliance.

### A. Falsity and Scienter

Under the PSLRA, to plead falsity a plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). To plead scienter, a plaintiff "must state with particularity facts giving rise to a strong inference that defendants acted with the intent to deceive or with deliberate recklessness as to the possibility of misleading investors." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008). To qualify as 'strong . . . an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). In determining if a plaintiff has made an adequate pleading of scienter, a court must consider "whether *all* of the facts alleged, taken collectively,

United States District Court
Northern District of California

give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23. "Because falsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts, . . . the dual pleading requirements [are treated as] a single inquiry." *Roncini v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001).

Plaintiffs claim that during the Class Period,[3] Schwab's website stated that "[i]n order to provide exceptional execution, there are a number of factors to be considered, including: execution price, opportunities for price improvement, market depth, order size, the type of security, speed, accuracy, and system availability." At the same time, Schwab further claimed that it worked "diligently to meet and exceed" the best execution criteria established by the SEC in 2001, and to work toward its clients' best interests. During the Class Period, Schwab's statements regarding best execution appeared in its customer agreements, which were incorporated into applications that individual clients were required to fill out and sign in order to open a Schwab brokerage account.

The customer agreements in turn incorporated the Schwab One Account Agreement ("Account Agreement"). The 2013 and 2014 versions of the Account Agreements, under the heading "Order Routing and Execution," named UBS as one of several venues to which Schwab may route customer orders and represented that "Schwab also routes orders directly to all major exchanges and alternative trading systems, including Electronic Communication Networks (ECNs)." The 2013 and 2014 Account Agreements provided that Schwab routes orders only after considering execution quality metrics, as required by FINRA Rule 5310. The Account Agreements also referenced an "order routing agreement with UBS" that formed partial consideration for the sale of Schwab's capital markets business in 2004. Plaintiffs argue that Schwab did not disclose that it was giving priority to the EOHA, to the detriment of true execution

[3] Plaintiffs utilize the internet archive service "Wayback Machine" to demonstrate that Schwab's representations on its website were as alleged during the Class Period.



United States District Court
Northern District of California

quality metrics, such that Schwab's promises to adhere to its duty of best execution were misleading.

Schwab argues that plaintiffs have failed to allege the EOHA caused a decline in execution quality or to identify a factual dispute as to the accuracy of Schwab's trade routing and execution quality disclosures. Plaintiffs rely heavily on academic and institutional authorities that merely establish the hypothetical possibility that Schwab's routing practices caused its customers to be subject to decreased execution quality.[4] The study by Robert Battalio, Shane A. Corwin, and Robert Jennings appears to be the only authority that is probative of whether the plaintiffs in this case experienced a decline in execution quality during the relevant Class Period. That study analyzed data from the fourth quarter of 2012, using data sets that included Schwab's own SEC Rule 606 reports. Plaintiffs allege that UBS routinely routed orders placed by Schwab's clients to exchanges offering the highest rebate to liquidity-providing orders, without regard for the impact on execution quality. Even though inverted venues offer superior execution quality, UBS allegedly routed orders to high take-fee venues such as EDGX so that UBS would receive the maximum liquidity rebate, even if it meant slower fills, lesser fill-rate, and inferior post-execution performance for Schwab's customers. The Battalio study concluded that "the decision of some national brokerages to route all nonmarketable limit orders to a single exchange paying the highest rebate is not consistent with the broker's responsibility to obtain best execution." A more specific allegation that execution quality actually declined for Schwab's clients during the Class Period is unlikely to be obtained absent discovery.

Plaintiffs also advance documentation of the percentage of non-directed trades for stocks trading on each of the major exchanges that Schwab routed to UBS during the Class Period as compared to afterwards. *See* SAC ¶ 48. The data reflects that the percentage of non-directed trades

---

[4] The CFA Institute study is based on U.K. market data from 2010 to 2014. The Kor Trading study, as explained in this Court's prior order on Schwab's motion to dismiss, analyzes comparative statistics from outside the Class Period, at a time when Schwab was no longer contractually obligated to route between 94% and 99% of non-directed orders to UBS.

United States District Court
Northern District of California

routed to UBS dropped precipitously when the EOHA expired, from a consistent 93.50% - 99.90% range during the Class Period to 75.40% - 77.40% the quarter immediately following, and down to 18.70% - 19.70% by the second quarter of 2017. The data pattern is consistent with plaintiffs' theory that absent an agreement to route trades to UBS, Schwab's duty of best execution would have prevented bulk routing to a single broker. Therefore, at the pleading stage plaintiffs have made allegations sufficient to support an inference that Schwab was not providing best execution during the Class Period as a result of its EOHA obligations, contrary to representations made in its customer agreements.[5]

Schwab insists that the information plaintiffs identify as being "omitted" is drawn directly from Schwab's public disclosures and customer communications. While Schwab's customer agreement—which states that "UBS manages the execution of most types of orders for which customers have not provided specific instructions (non-directed orders)"—is arguably vague, Serota Decl. Ex. F, precise routing statistics are readily available from Schwab's customer disclosures. *See* Serota Decl. Ex. B. Schwab also points out that order flow payments were expressly disclosed in its Section 606 reports. *Id.* The liquidated damages provision (which would kick in if less than 95% of non-directed trades were not routed to UBS) was disclosed in the EOHA filed with the SEC in 2004. Citing *Provenz v. Miler*, 102 F.3d 1478, 1492-93 (9th Cir. 1996), plaintiffs contend that retail clients such as themselves cannot be charged with knowledge of statements included only in SEC filings. Although *Provenz* held that a defendant cannot raise a truth-on-the-market defense unless the relevant information has been effectively transmitted to the public, it did not categorically state that SEC filings were insufficient to meet that standard. Nonetheless, plaintiffs have alleged facts showing that Schwab's description of the UBS

---

[5] Plaintiffs also accuse Schwab of concealing the fact that UBS "disavowed" any duties to Schwab customers, including the duty of best execution. SAC ¶ 50. According to plaintiffs, this disavowal is evident from Section 2.5(b)(ii) of the EOHA, which provides that customers whose orders are executed by UBS remain customers of Schwab. Plaintiffs take the position that this statement allowed UBS to evade their obligations to Schwab clients. That reading is not evident from the language quoted in the SAC, which neither mentions nor implies any reference to allocation of duties to the client. As such, this is not a material omission.

United States District Court
Northern District of California

relationship in its customer agreement was itself misleading, because the wording does not make clear that the routing of nearly all trades to UBS was the product of Schwab's contractual obligations. This information is relevant to plaintiffs' theory that Schwab misrepresented whether they considered various factors in making routing decisions on best execution principles.

Plaintiffs also argue that the 2012 Account Agreement is misleading because it contains no indication that UBS profited from operating a dark pool to which Schwab's clients' orders would be routed. Schwab counters that these alleged omissions are not actionable because (1) the SAC fails to allege with particularity any negative effect on execution quality if such vehicles were involved in trade execution or that routing to any alternative venues or market makers would have avoided HFT or dark pools, and (2) plaintiffs do not identify any rule or regulation that requires Schwab to make any such disclosure. Schwab's argument here is unavailing. First, compliance with existing rules and regulations does not by itself indicate adherence to the duty of best execution. Second, plaintiffs offer sufficient allegations of harm to retail clients from exposure to dark pools to indicate that knowledge of such exposure is relevant to whether Schwab accurately represented its commitment to best execution.

Defendants assert that even if plaintiffs successfully allege fraud, neither executive compensation nor a business's desire to generate revenue is independently sufficient to establish scienter. *See* Mot. Dismiss at 10-11. Plaintiffs respond that the SAC articulates several other bases for a finding of scienter, which taken together give rise to a strong inference. The SAC alleges that Schwab's own senior executives made public statements indicating that they were concerned about conflict of interest problems inherent in PFOF, the risk of harm to Schwab's customers from being exposed to HFTs in dark pools, and knowledge that UBS specifically ran a dark pool. Plaintiffs assert that Schwab executives were forced to walk back these statements once it became public knowledge that UBS, to which Schwab routed almost all its customers' non-directed trades, was being investigated by the SEC over its dark pools. Moreover, plaintiffs point to the changing language of Schwab's Account Agreements during the period that the EOHA was in operation, which allegedly reflects Schwab's evolving awareness that their omissions were material in regard

to Schwab's duty of best execution.

Plaintiffs suggest as persuasive *Zola v. TD Ameritrade, Inc.*, 172 F. Supp. 3d 1055, 1074 (D. Neb. 2016), in which a district court concluded that plaintiffs alleged a strong inference of scienter based on TD Ameritrade's motive to generate substantial PFOF revenue, the timing of the changes in its routing practices, allegations that a venue to which the broker had a relationship had undergone a regulatory investigation in connection with its order routing practices, and the broker's failure to present a credible, nonculpable explanation. *Id.* at 1073-74. Pointing to a similar situation here, plaintiffs note the EOHA represented substantial PFOF revenue to Schwab, UBS settled an SEC action charging securities violations related to the operation of one of UBS's dark pools, and Schwab fails to present a credible, nonculpable explanation for Schwab's failure to inform its clients adequately about the EOHA.

While a close question, considering the complaint in its entirety and construing as true the facts alleged therein, plaintiffs have pleaded facts giving rise to a "strong inference" of scienter that is at least as "cogent and compelling" as opposing inferences. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). Although the SAC's allegations regarding Schwab's self-interested motives with respect to the EOHA are themselves insufficient to support a finding of scienter, those allegations viewed together with Schwab's changing public representations during the Class Period satisfy the scienter requirement at the pleading stage.

**B. Economic Loss and Loss Causation**

To make an adequate pleading of economic loss and loss causation, a plaintiff must plead "economic losses that misrepresentations actually cause." *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1119 (9th Cir. 2013) (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005)) (internal quotation marks omitted). To plead loss causation adequately, a plaintiff may plead that "the defendant misrepresented or omitted the very facts that were a substantial factor in causing the plaintiff's economic loss." *McCabe v. Ernst & Young, LLP.*, 494 F.3d 418, 425 (3d Cir. 2007).

1. Economic Loss

United States District Court
Northern District of California

Plaintiffs allege economic losses in the form of lost price improvement resulting from Schwab failing to seek best execution and instead routing virtually all non-directed trade orders to UBS. Plaintiffs claim their trades benefited from less price improvement compared to trades handled by retail brokers who did not engage in similar bulk order routing for PFOF. Lead plaintiffs allege that they placed thousands of non-directed trade orders during the Class Period, resulting in a substantial likelihood that they were deprived of best execution of their orders. They, however, claim to be unable to quantify their losses with particularity because they did not discover they were being harmed until after the Class Period ended, and were unable to request information regarding specific trades that took place during the Class Period. Schwab only provides clients with trade information during the six-month period after the trade in question.

Instead, lead plaintiffs offer analysis regarding damages sustained by plaintiff Posson, which was conducted by comparing information Schwab disclosed about his trades to market data. In summary, plaintiffs allege that on January 16, 2014, Posson placed a limit order to buy 6,666 shares of Novavax, Inc. at $6.08, which was executed on a dark venue at $6.08. According to plaintiffs, the dark venue (which is assumed to be UBS) held onto the order until the lit[6] exchanges had been depleted of liquidity, then executed the order in unfavorable conditions resulting in an immediate one tick adverse price change, from $6.08 to $6.07. The delay in filling this order cost Posson the opportunity to exit his position in advance of an adverse market movement, resulting in a loss of $66.66. Next, plaintiffs allege that on July 11, 2014, Posson was harmed when he sent a nonmarketable limit order to buy 777 shares of Eldorado Gold Corporation, Inc., at $7.61, which was routed to a high rebate exchange "almost certainly" by UBS, and forced to the back of the queue. Plaintiffs claim that had Posson's order been routed to an inverted exchange, or even to an exchange that charged a lesser take fee, he would have had an extra two seconds to exit his position in advance of a pending market sweep event. As a result, he was forced to realize the adverse impact of the $.01 downward tick that resulted from the sweep

---

[6] A lit venue is one where quotes are viewable by the general public.

event, resulting in a loss of $7.77. Finally, plaintiffs allege that Posson placed a nonmarketable limit order to sell 2,297 shares of Chesapeake Energy Corporation at $18.27, which was also routed to a high rebate exchange. Posson's order was not executed until a sweep event had filled all posted liquidity. According to plaintiffs, had Posson's order been routed to an inverted exchange or one with a lesser take fee, he would have had the opportunity to exit his sell position in advance of the pending market sweep event that drove the market upwards. Instead, he was forced to realize the adverse impact of the $.01 upward tick resulting from the sweep event, resulting in a loss of $22.97.

Schwab attempts to counter plaintiffs' allegations of harm to Posson by arguing that Posson actually profited on the trades in question. Even if true, this allegation fails to rebut Posson's claim that he suffered damages. That Posson made money in his aggregate trading does not defeat Posson's claim that he would have made more money had his orders been routed to venues where they would have been the first to fill. Plaintiffs's argument is that Posson's orders were routed in a manner that was more likely to produce adverse fills, and also provided slower fills, denying him time to assert new positions based on movements in the market. Therefore, plaintiffs have adequately pleaded economic loss.

2. Loss Causation

Plaintiffs' theory of loss causation is that Schwab fraudulently misrepresented its commitment to best execution, while indiscriminately routing virtually all non-directed trade orders to UBS and foregoing best execution, thereby depriving customers of price improvement, and causing them losses relative to the price improvement they could have enjoyed had Schwab routed orders to venues based on best execution. At this stage in the pleadings, plaintiffs have sufficiently alleged that Schwab's routing policies resulted in delayed fills on at least one proposed class member's trades, consistent with their theory that bulk routing results in less than best execution for Schwab customers.

**C. Reliance**

As explained in this Court's June 12, 2017, order dismissing the complaint, to plead transaction causation adequately, a plaintiff must plead that, "but for the fraud, the plaintiff would not have engaged in the transaction at issue." *See Daou Sys.*, 411 F.3d at 1025. Although Federal Rule of Civil Procedure 9(b) requires fraud claims to be pleaded with particularity, *see supra* Part III, "a presumption of reliance . . . is generally available to plaintiffs alleging violations of section 10(b) based on omissions of material fact." *Binder v. Gillespie*, 184 F.3d 1059, 1063 (9th Cir. 1999) (citing *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153-54 (1972)). This presumption is "confined to cases that *primarily* allege omissions." *Id.* at 1064 (emphasis added). Schwab argues the SAC suffers from the same fatal failure as the prior operative complaint: it does not allege plaintiffs actually read and relied upon Schwab's alleged misrepresentations. *See In re Van Wagoner Funds, Inc. Sec. Litig.*, 382 F. Supp. 2d 1173, 1187 (N.D. Cal. 2004) ("[Plaintiffs] only generally allege they relied on [defendant's] statements. . . . [They] make no specific allegations that they read the annual reports or registration statements . . . . Because all averments of fraud must be pled with particularity, the Court finds the . . . general allegations of reliance insufficient.").

Plaintiffs do not put forth any argument regarding the SAC's demonstration of actual reliance, as required by the PSLRA. *See Van Wagoner Funds*, 382 F. Supp. 2d at 1187. Instead, plaintiff reiterate their position, first articulated in their opposition to an earlier motion to dismiss, that they are entitled to a presumption of reliance under *Affiliated Ute* because this case primarily involves a failure to disclose and because they are entitled to presume that Schwab was following its legal duty. Relying upon *In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42, 47 (S.D.N.Y. 2010), plaintiffs assert that in securities fraud cases, the "distinction between misstatements and omissions is often illusory." As such, the proper focus is not categorizing misrepresentations but on the pragmatic reasons underlying the *Affiliated Ute* presumption. *Id.* Although the plaintiff there identified misleading statements made by defendants, the court determined that they were misleading mainly due to "what they did not say." 290 F.R.D. at 48 ("While investors could potentially rely on the disclosures that CTB and First Data performed certain functions, they could

not know—and therefore could not rely on—the fact that this arrangement was implemented to generate profits for Citigroup at the Funds' expense.").

Similarly, plaintiffs argue that they could not have known that Schwab executed their trades in a way inconsistent with the duty of best execution and could not have relied upon that omitted fact. Plaintiffs point to a number of "stand-alone omissions" alleged in the SAC:

- Schwab mechanically routed more than 955 of its retail trade orders to a single vendor, UBS;
- UBS paid Schwab approximately $100 million per year for the right to receive Schwab's retail orders flow;
- UBS disavowed any obligation to exercise the duty of best execution in implementing the orders Schwab sent to it, but instead only to comply with certain minimum standards that were never disclosed to Schwab's clients; and
- UBS profited from Schwab's retail order flow, and damaged Schwab's clients, by:
  - Internalizing the trade, i.e., matching the order internally without providing best execution by routing the transaction to a different venue with a better price, thereby depriving Schwab's clients of the better price;
  - Placing the trade in a UBS "dark pool," where HFTs would trade against Schwab's clients' orders preventing them from getting the most favorable price; or
  - Re-routing the trade in a manner to maximize UBS's ability to obtain a liquidity rebate from a third party, resulting in Schwab's clients being harmed by inferior execution.

SAC ¶ 5. Plaintiffs take the view that Schwab's statements that it complied with its duty of best execution merely frames how the alleged omissions were material. *See In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 2017 WL 305856314 at *14-15 (N.D. Cal. July 19, 2017).

According to Schwab, because none of the SAC's alleged "omissions," standing alone, gives rise to a claim for relief, they remain closely tied to Schwab's affirmative statements concerning its execution and trade routing practices, its relationship with UBS, its account agreement disclosures, and the EOHA. Thus, Schwab makes a strong argument that at base the SAC is premised on misrepresentations regarding best execution as opposed to omissions, and that accordingly specific averments of reliance, which are nowhere to be found, doom the action.



United States District Court
Northern District of California

Mindful, though of the often "illusory" distinction between what constitutes an omission as opposed to a misrepresentation in securities fraud cases, it would not be appropriate to terminate this case at the pleading stage for want of a reliance averment but instead to allow the development of the record on that question through discovery.

## V. CONCLUSION

For the reasons set forth above, defendants' motion to dismiss the Second Amended Complaint is denied.

**IT IS SO ORDERED**.

Dated: December 5, 2017

RICHARD SEEBORG
United States District Judge

United States District Court
Northern District of California