MELISSA A. FORTUNATO (#319767)
 fortunato@bespc.com
BRAGAR EAGEL & SQUIRE, P.C.
580 California Street, Suite 1200
San Francisco, CA 94104
Telephone: (415) 568-2124
Facsimile: (212) 486-0462

LAWRENCE P. EAGEL (*pro hac vice*)
 eagel@bespc.com
BRAGAR EAGEL & SQUIRE, P.C.
810 Seventh Avenue, Suite 620
New York, New York 10019
Telephone: (212) 308-5858
Facsimile: (212) 486-0462

LIONEL Z. GLANCY (#134180)
 lglancy@glancylaw.com
JONATHAN ROTTER (#234137)
 jrotter@glancylaw.com
GARTH SPENCER (#335424)
 gspencer@glancylaw.com
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Attorneys for Lead Plaintiff Robert Wolfson and
Co-Lead Counsel for the Class*

[Additional Counsel on Signature Block]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| ROBERT CRAGO, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>CHARLES SCHWAB & CO., INC., and THE CHARLES SCHWAB CORPORATION,<br><br>Defendants. | Case No. 3:16-cv-03938-RS<br><br><u>CLASS ACTION</u><br><br>**NOTICE OF MOTION AND PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION; AND MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date:     December 1, 2022<br>Time:     1:30 pm<br>Crtrm.:   3, 17th Floor<br><br>Honorable Richard G. Seeborg |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

    **PLEASE TAKE NOTICE** that, on December 1, 2022 at 1:30 p.m., before the Honorable Richard G. Seeborg, in Courtroom 3, 17th Floor, located at the Phillip Burton Federal Building & United States Courthouse, 450 Golden Gate Avenue, San Francisco, CA 94102, Lead Plaintiff Robert Wolfson ("Wolfson") and named plaintiff K. Scott Posson ("Posson" and, together, "Plaintiffs") will move under Fed. R. Civ. P. 23(a), 23(b)(3), 23(c)(4) and 23(g), for an Order:

    1.    Certifying the following Class:

> All clients of Charles Schwab & Co., Inc. or The Charles Schwab Corporation (together, "Schwab") between July 13, 2011 and December 31, 2014 who placed one or more non-directed equity orders during the Class Period that were routed to UBS Securities, LLC ("UBS") by Schwab pursuant to the Equities Order Handling Agreement. Excluded from the Class are the officers, directors, and employees of Schwab.

    With respect to the following issues:

      a)  Whether Schwab omitted to disclose material facts and/or misrepresented material facts regarding its receipt of money from UBS in exchange for routing Schwab customer orders to UBS, and/or regarding Schwab's compliance with the duty of best execution.

      b)  Whether Schwab engaged in a plan, scheme, conspiracy, and course of conduct, whereby they employed devices, schemes, and artifices to defraud in connection with the purchase and sale of securities (the "Scheme").

      c)  Whether Schwab knowingly or recklessly (i) omitted and/or misrepresented material facts and/or (ii) committed a deceptive or manipulative act in furtherance of the Scheme.

    2.    Appointing Plaintiffs Wolfson and Posson as Class Representatives;

    3.    Appointing Lead Counsel Glancy Prongay & Murray LLP and Bragar Eagel & Squire, P.C., and counsel for Plaintiff Posson, Levi & Korsinsky, LLP, as Class Counsel; and

    4.    Granting such other and further relief the Court may deem just and proper.

    Class certification, the appointment of Plaintiffs as Class Representatives, and the appointment of Class Counsel are proper, where, as here, the Class is so numerous that joinder is impracticable, common questions of law and fact predominate regarding the issues to be certified,

Plaintiffs' claims are typical of the Class's claims, Plaintiffs and their counsel will fairly and adequately represent the Class, and a class action is superior to individual actions.

This Motion is made pursuant to the Court's August 29, 2022 Minute Entry Order (ECF No. 201) and the parties' September 8, 2022 Stipulated Briefing Schedule For Renewed Motion For Class Certification And Motion To Compel Arbitration (ECF No. 202). This Motion is based on the Memorandum of Points and Authorities below, the pleadings and other filings in this action, such further argument as the Court may allow at the hearing on this motion, and any other evidence and argument that may be presented to the Court.

## <u>TABLE OF CONTENTS</u>

ISSUES TO BE DECIDED ........................................................................................... 1

PRELIMINARY STATEMENT AND BACKGROUND ........................................... 1

ARGUMENT .............................................................................................................. 3

    I.    Schwab Knowingly or Recklessly Misled Its Customers on a Class-Wide
Basis ...................................................................................................... 4

        A.    Schwab Violated Its Duty of Best Execution on a Class-Wide Basis ........... 4

            1.    Schwab Evaluated Its Own Execution Quality on a Company-
Wide Basis ...................................................................................... 4

            2.    The EOHA's Terms and Schwab's Order Routing
Technology Contributed to Class-Wide Failures of Best
Execution .......................................................................................... 6

            3.    Schwab Uniformly Failed to Compare Price Disimprovement
for Marketable Orders Across Market Centers ................................. 6

            4.    Schwab Uniformly Failed to Compare the Likelihood of
Execution of Limit Orders Across Different Venues ...................... 8

            5.    Schwab Uniformly Failed to Compare Execution Quality
Across All Relevant Market Centers ................................................. 9

            6.    Schwab Uniformly Failed to Perform a Security-by-Security,
Type-of-Order Analysis of Execution Quality ................................ 9

            7.    Schwab Uniformly Failed to Obtain More Accurate Time
Data From UBS to Perform Its Execution Quality Analysis .......... 10

            8.    Despite Evidence of UBS's Inferior Executions, Schwab
Uniformly Failed to Seek Improved Executions or to Justify
Continued Routing .......................................................................... 11

            9.    Schwab Recognized the Conflicts of Interest Inherent in Its
Relationship With UBS and Their Potential to Harm All
Schwab Customers .......................................................................... 13

        B.    Schwab Fraudulently Omitted to Disclose Material Facts Regarding
Its Best Execution Failures on a Class-Wide Basis .................................... 15

    II.    Legal Standard For Class Certification ................................................ 15

    III.    Certification of the Class With Respect to the Falsity Issue, the Scheme Issue,
and the Scienter Issue Is Appropriate Under Rule 23(c)(4) .................... 18

Notice of Motion and Plaintiffs' Renewed Motion for Class Certification; and Memorandum Points & Authorities
Case No. 3:16-cv-03938-RS

i

  A. This Case Meets the Standards for Issue Classes........................................ 18

  B. Falsity, Scheme, and Scienter Are Common Issues Ripe for Certification............................................................................................... 19

IV. The Proposed Class Satisfies Rule 23(a) With Respect to Falsity, Scheme, and Scienter ..................................................................................................... 21

  A. Numerosity ..................................................................................... 21

  B. Commonality ................................................................................... 22

  C. Typicality ....................................................................................... 23

  D. Adequacy......................................................................................... 24

V. The Proposed Class Also Satisfies Rule 23(b)(1) ................................................. 25

VI. CONCLUSION ................................................................................................ 25

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Alcantar v. Hobart Services*,
  800 F.3d 1047, 1052 (9th Cir. 2015) .......................................................................... 22

*Amador v. Baca*,
  No. 10-CV-1649-SVW, 2016 WL 8904537 (C.D. Cal. Nov. 18, 2016) .................................. 19

*Amchem Products, Inc. v. Windsor*,
  521 U.S. 591 (1997) ........................................................................................ 17

*Amgen Inc. v. Connecticut Retirement Plans & Trust Funds*,
  568 U.S. 455 (2013) ........................................................................................ 15

*Arthur Young & Company v. United States District Court*,
  549 F.2d 686 (9th Cir. 1977) ................................................................................ 19

*Bennett v. Spear*,
  520 U.S. 154 (1997) ........................................................................................ 17

*Bernstein v. Virgin America, Inc.*,
  No. 15-cv-02277-JST, 2018 U.S. Dist. LEXIS 114721 (N.D. Cal. July 9, 2018) .................... 18

*Blackie v. Barrack*,
  524 F.2d 891 (9th Cir. 1975) ................................................................................ 18

*Briseno v. ConAgra Foods, Inc.*,
  844 F.3d 1121 (9th Cir. 2017) ............................................................................... 21

*Central Wesleyan College v. W.R. Grace & Company*,
  6 F.3d 177 (4th Cir. 1993) .................................................................................. 17

*Chalk v. T-Mobile USA, Inc.*,
  560 F.3d 1087 (9th Cir. 2009) ............................................................................... 17

*Charrons v. Pinnacle Group New York LLC*,
  269 F.R.D. 221 (S.D.N.Y. 2010) ............................................................................. 20

*Chinitz v. Intero Real Estate Services*,
  No. 18-cv-05623-BLF, 2020 U.S. Dist. LEXIS 247921 (N.D. Cal. July 22, 2020) .................. 22

*Des Roches v. California Physicians' Services*,
  320 F.R.D. 486 (N.D. Cal. 2017) ............................................................................ 25

*Diaz v. Albertson's LLC*,
  No. CV 16-00257 DSF (JEMx), 2016 WL 8904415 (C.D. Cal. Dec. 20, 2016) ...................... 18

*Erica P. John Fund, Inc. v. Halliburton Company*,
  563 U.S. 804 (2011) ......................................................................................... 4

*Fleming v. Matco Tools Corporation*,
  No. 19-cv-00463-WHO, 2021 U.S. Dist. LEXIS 33513 (N.D. Cal. Feb. 21, 2021) ................ 21

*General Telephone Company of the Southwest v. Falcon*,
  457 U.S. 147 (1982) ........................................................................................ 17

*Gonzales v. Arrow Financial Services LLC*,
  489 F. Supp. 2d 1140 (S.D. Cal. 2007) ................................................................ 15

*Gunnells v. Healthplan Services, Inc.*,
  348 F.3d 417 (4th Cir. 2003) .............................................................................. 20

*Hanlon v. Chrysler Corporation*,
  150 F.3d 1011 (9th Cir. 1998) ........................................................................ 23, 24

*Hanon v. Dataproducts Corporation*,
  976 F.2d 497 (9th Cir. 1992) .............................................................................. 23

*Huntsman v. Southwest Airlines Company*,
  No. 19-cv-00083-PJH, 2021 U.S. Dist. LEXIS 20856 (N.D. Cal. Feb. 3, 2021) .................... 16

*In re Activision Securities Litigation*,
  621 F. Supp. 415 (N.D. Cal. 1985) ...................................................................... 18

*In re Cooper Companies Securities Litigation*,
  254 F.R.D. 628 (C.D. Cal. 2009) ......................................................................... 15

*In re Facebook, Inc., PPC Advertising Litigation*,
  282 F.R.D. 446 (N.D. Cal. 2012) ......................................................................... 21

*In re Motor Fuel Temperature Sales Practices Litigation*,
  292 F.R.D. 652 (D. Kan. 2013) ........................................................................... 16

*In re Nassau County Strip Search Cases*,
  461 F.3d 219 (2d Cir. 2006) .............................................................................. 17

*In re Rubber Chemicals Antitrust Litigation*,
  232 F.R.D. 346 (N.D. Cal. 2005) ......................................................................... 21

*Jacob v. Duane Reade, Inc.*,
  293 F.R.D. 578, (S.D.N.Y. 2013), *aff'd*, 602 F. App'x 3 (2d Cir. 2015) ...................... 16

*Jimenez v. Allstate Insurance Company*,
  765 F.3d 1161 (9th Cir. 2014) ........................................................................... 19

*Jordan v. County of Los Angeles*,
  699 F.2d 1311 (9th Cir. 1982) ........................................................................... 21

*Klein v. TD Ameritrade, et al.*,
  C.A. No. 8:14-00369-JFN-SMB, 2022 U.S. Dist. LEXIS 170023
  (D. Neb. Sept. 20, 2022) .................................................................................. 2

*Lee v. State of Oregon*,
  107 F.3d 1382 (9th Cir. 1997) ........................................................................... 17

*Loritz v. Exide Technologies*,
  No. 2:13-cv-02607-SVW-E, 2015 U.S. Dist. LEXIS 100471 (C.D. Cal. July 21, 2015) ......... 16

*Mace v. Van Ru Credit Corporation*,
  109 F.3d 338 (1997) ...................................................................................... 17

*MadKudu Inc. v. United States Citizenship & Immigration Services*,
  No. 20-cv-02653-SVK, 2020 U.S. Dist. LEXIS 219184 (N.D. Cal. Nov. 17, 2020) ........... 21

*Martin v. Behr Dayton Thermal Products LLC*,
  896 F.3d 405 (6th Cir. 2018) .......................................................................... 20

*Petersen v. Costco Wholesale Company*,
  312 F.R.D. 565 (C.D. Cal. 2016) .................................................................... 19

*Rahman v. Mott's LLP*,
  693 F. App'x 578, (9th Cir. 2017) .................................................................. 16

*Robinson v. Metro–North Commuter Railroad Company*,
  267 F.3d 147 (2d Cir. 2001) ........................................................................... 20

*Saavedra v. Eli Lilly and Company*,
  No. 2:12-cv-9366-SVW (MANx), 2014 U.S. Dist. LEXIS 179088
  (C.D. Cal. Dec. 18, 2014) ............................................................................... 17

*Tasion Communications, Inc. v. Ubiquiti Networks Inc.*,
  308 F.R.D. 630 (N.D. Cal. 2015) .................................................................... 17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ........................................................................................ 15

*Torres v. Mercer Canyons Inc.*,
  835 F.3d 1125, (9th Cir. 2016) ....................................................................... 22

*Valentino v. Carter-Wallace, Inc.*,
  97 F.3d 1227 (9th Cir. 1996) ............................................................... 16, 18, 20

*Villalpando v. Exel Direct Inc.*,
  303 F.R.D. 588 (N.D. Cal. 2014) .................................................................... 21

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) .................................................................................. 22, 23

*Walters v. Target Corporation*,
  No. 3:16-cv-1678-L-MDD, 2020 U.S. Dist. LEXIS 198765 (9th Cir. Oct. 26, 2020) ............ 23

*Williams v. PillPack LLC*,
  No. C19-5282 TSZ, 2021 U.S. Dist. LEXIS 27496 (W.D. Wash. Feb. 12, 2021) ................. 21

*Wolin v. Jaguar Land Rover North America, LLC*,
  617 F.3d 1168 (9th Cir. 2010) ........................................................................ 20

*Wood v. Granite Construction Company*,
  No. CIV-S-03-2592 DFL PAN, 2005 U.S. Dist. LEXIS 55541
  (E.D. Cal. Mar. 11, 2005) ............................................................................... 21

*Zeisel v. Diamond Foods, Inc.*,
  No. C 10-01192 JSW, 2011 U.S. Dist. LEXIS 60608 (N.D. Cal. June 7, 2011) ............... 15

**Other Authorities**

2 William B. Rubenstein, Newberg & Rubenstein on Class Actions § 4:92
  (6th ed. June 2022 update) ....................................................................... 16, 17

5 *Moore's Federal Practice* § 23.48[1] (1997) .......................................................... 20

FINRA, Rule 5310(a)(1)(C) (2014) ......................................................................... 9

FINRA, Rule 5310.02 (2012).................................................................................... 9

FINRA, Rule 5310.09(a) (2014) ....................................................................... 5, 8, 9

FINRA, Rule 5310.09(b) (2014) .............................................................................
7, 8, 10, 11

Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*,84 N.Y.U. L.
Rev. 97 (2009)........................................................................................................ 22

**Rules**

Fed. R. Civ. P. 23 ................................................................................................... 16

Fed. R. Civ. P. 23(a)(4) .......................................................................................... 24

Fed. R. Civ. P. 23(b)(1)(A) ..................................................................................... 25

Fed. R. Civ. P. 23(c)(4) .......................................................................................... 16

**Regulations**

17 C.F.R. § 240.10b-5 .............................................................................................. 3

**ISSUES TO BE DECIDED**

1.      Whether the following Class should be certified:

All clients of Charles Schwab & Co., Inc. or The Charles Schwab Corporation (together, "Schwab" or "Defendants"), between July 13, 2011 and December 31, 2014 (the "Class Period"), who placed one or more non-directed equity orders during the Class Period that were routed to UBS Securities, LLC ("UBS") by Schwab pursuant to the Equities Order Handling Agreement ("EOHA"). Excluded from the Class are the officers, directors, and employees of Schwab.

With respect to the following issues:

a)  Whether Schwab omitted to disclose material facts and/or misrepresented material facts regarding its receipt of money from UBS in exchange for routing Schwab customer orders to UBS, and/or regarding Schwab's compliance with the duty of best execution (the "Falsity Issue").

b)  Whether Schwab engaged in a plan, scheme, conspiracy, and course of conduct, whereby they employed devices, schemes, and artifices to defraud in connection with the purchase and sale of securities (the "Scheme" and the "Scheme Issue").

c)  Whether Schwab knowingly or recklessly (i) omitted and/or misrepresented material facts and/or (ii) committed a deceptive or manipulative act in furtherance of the Scheme.(the "Scienter Issue").

2.      Whether Plaintiffs Robert Wolfson ("Wolfson") and K. Scott Posson ("Posson" and, together, "Plaintiffs") should be appointed as Class Representatives.[1]

3.      Whether Glancy Prongay & Murray LLP ("Glancy"), Bragar Eagel & Squire, P.C. ("BES"), and Levi & Korsinsky, LLP ("LK") should be appointed as Class Counsel.

**PRELIMINARY STATEMENT AND BACKGROUND**

Plaintiffs' renewed motion for class certification directly addresses and overcomes the concerns that caused the Court to deny Plaintiffs' original class certification motion, where the Court held that no presumption of reliance applies, and so commonality and predominance were lacking. Plaintiffs' present motion does not seek the certification of a class for which reliance must be proven class-wide. Instead, Plaintiffs seek certification of a class under Fed. R. Civ. P. 23(c)(4) ("Rule 23")

---

[1] While Lead Plaintiff Pino was named as a proposed class representative in Plaintiffs' prior class certification motion, he has since passed away and therefore is not proposed as a class representative in the instant motion. Lead Counsel reserve all rights to pursue Mr. Pino's claims against Defendants in consultation with and for the benefit of his estate, heirs, and/or executors.

solely with respect to the issues of falsity, scienter, and the presence of a scheme. Because those issues focus exclusively on Schwab's uniform conduct identically affecting all Class members, they can be proven by common evidence, and easily satisfy the Rule 23(a) factors. Issue certification will substantially further the resolution of this litigation and Class members' claims against Schwab. As recently noted by the court in *Klein v. TD Ameritrade, et al.*, C.A. No. 8:14-00369-JFN-SMB, 2022 U.S. Dist. LEXIS 170023 (D. Neb. Sept. 20, 2022) when certifying the class under Rule 23(b)(3) in a similar duty of best execution case:

> [I]f certification under Rule 23(b)(3) were not appropriate, the Court would certify an issues class under Rule 23(c)(4) to determine the issue of liability on the merits on the question of whether TD Ameritrade complied with the duty of best execution and knowingly misrepresented its compliance with its duty of best execution during the class period. If TD Ameritrade would prevail on that issue, the claims of all the class members would be resolved. If the plaintiff proved that TD Ameritrade was violating Rule 10b-5 by making its representations during the class period, any individual trials or determinations would be greatly simplified.

*Klein*, at *18 n.7.

This is also a duty of best execution case, this one arising out of Schwab's failure to disclose to its customers that it routed almost all of its customers' non-directed equity orders to UBS pursuant to the EOHA regardless of whether doing so was consistent with Schwab's duty of best execution. *See* ¶47.[2] Schwab directed 95% or more of its clients' non-directed equity orders to UBS, in exchange for tens of millions of dollars a year from UBS. *See id.* At the same time it omitted to state those key facts, Schwab stated on its website and elsewhere its intention to provide "exceptional execution," and "the best possible execution," and that it "regularly monitor[ed] the execution quality provided by different exchanges and liquidity providers." *See* ¶40.[3]

Schwab's automatic routing of its customers' orders to UBS allowed UBS to handle Schwab's customers' orders in ways that were harmful to Schwab's customers, including pursuing UBS's self-interest by trading against those orders for UBS's own account, allowing UBS customers

---

[2] Citations to the Second Amended Class Action Complaint for Violations of Federal Securities Laws [ECF No. 81] (the "Complaint") are in the form "¶__."

[3] Plaintiffs preserve their position that Schwab's omissions were central here, but in light of the Court's prior class certification order, this motion also discusses Schwab's affirmative representations.

to trade against those orders, or simply routing them onward to other destinations that would pay UBS for providing the orders, regardless of whether that destination would provide best execution. *See* ¶54. These practices resulted in inferior executions for Schwab customers. *See* ¶8.

Schwab profited handsomely from allowing UBS to harm Schwab's customers' orders. In 2004, Schwab sold its capital markets division to UBS for $265 million. As an integral part of that transaction, Schwab and UBS entered into the EOHA, which contractually required Schwab to route the vast majority of its non-directed customer equity orders to UBS. *See* ¶¶44, 47. Beginning in November 2012, pursuant to amendments to the EOHA, Schwab received payment for order flow ("PFOF") from UBS, whereby UBS made periodic payments to Schwab based on the volume of orders Schwab routed to UBS, totaling tens of millions of dollars per year. *See* ¶52.

## ARGUMENT

Plaintiffs assert claims on behalf of the Class under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and U.S. Securities and Exchange Commission Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. Rule 10b-5 provides as follows:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

The Complaint alleges that Schwab's failure to disclose the truth to its customers regarding Schwab's order routing decisions and the operation of the EOHA violated Rule 10b-5.

To prove a claim under Rule 10b-5, Plaintiffs must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase and sale of a security; (4) reliance on the misrepresentation or omission;

(5) economic loss; and (6) loss causation. *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809-10 (2011).

The elements of falsity, scienter, and scheme participation focus exclusively on Schwab's conduct, which was uniform as to all Class members, and so can be proven by common evidence. Plaintiffs will prove that Schwab violated Rule 10b-5 by failing to disclose that it would route almost all non-directed equity orders to UBS without regard to Schwab's admitted duty to provide best execution, all to maximize Schwab's profits at the Class members' expense. Schwab's own records demonstrate its adherence to the EOHA and evidence the millions of Class member trades routed pursuant to that agreement. That evidence will demonstrate that Schwab failed to take reasonable steps to achieve the best price for the Class members' trades, thereby breaching its duty of best execution. The evidence of Defendants' scienter, demonstrating what Defendants knew and intended, is also common to the Class. Once the key elements of falsity and scienter are established on a Class-wide basis, the elements of reliance, economic loss, and loss causation will be established by Class members on an individual basis.

**I.      Schwab Knowingly or Recklessly Misled Its Customers on a Class-Wide Basis**

**A.      Schwab Violated Its Duty of Best Execution on a Class-Wide Basis**

Schwab violated its duty of best execution by failing to evaluate adequately the execution quality that its customers would obtain from UBS for orders routed pursuant to the EOHA. Schwab also failed to take steps to improve UBS's deficient execution quality. These were company-wide failures relating to Schwab's policies and procedures with respect to all customer orders routed to UBS during the Class Period and, therefore, impacting all Class members. UBS took advantage of Schwab's indifference to execution quality and harmed Schwab's customers' orders for UBS's own financial gain—which is why UBS was willing to pay Schwab millions of dollars per year to obtain the vast majority of Schwab's customers' orders.

**1.      Schwab Evaluated Its Own Execution Quality on a Company-Wide Basis**

Schwab cannot contest that noncompliance with its duty of best execution can be determined on a Class-wide basis, because that is how Schwab itself (insufficiently) evaluated best execution. Pursuant to FINRA Rule 5310, "[n]o member can transfer to another person its obligation to provide

best execution to its customers' orders." FINRA Rule 5310 Supplementary Material at .09(a).  As such, even when routing its orders to another broker-dealer for execution on an automated, non-discretionary basis, a broker must satisfy its duty of best execution either by performing an order-by-order review or "periodically conduct[ing] regular and rigorous reviews of the quality of the executions of its customers' orders." *Id.* Schwab did not conduct an order-by-order review of the hundreds of thousands of customer orders it received each day. Rather, Schwab purports to have conducted **aggregate** "regular and rigorous reviews" of execution quality sufficient to satisfy its duty of best execution.

According to Schwab's representative, "'best execution' refers to the obligation of firms to execute clients' transactions . . . on [a] favorable basis **in the aggregate given the circumstances at the time**," and is a "process looking at **the overall aggregate order book not on an order-by-order basis**." *See* Spencer Decl. Ex. 8, Deposition transcript of Schwab's Fed. R. Civ. P. 30(b)(6) witness, Jeffrey Starr, dated July 29, 2020 ("Starr Tr."), at 25:7-26:2 (emphasis added).[4] Schwab's order routing committee ("ORC") was responsible for overseeing Schwab's order routing practices and execution quality. *Id.* at 33:16-21; 55:21-56:1. The ORC did not review each Schwab customer order one-by-one, but instead reviewed aggregate statistical reports relating to execution quality for all Schwab customers. *Id.* at 60:1-8. Schwab's trade execution quality team received periodic reports, which likewise presented aggregate statistics for all customers. *See, e.g.*, *id.* at 75:4-14; 121:19-122:2.

Therefore, Schwab's practice was to evaluate its own execution quality with respect to all Schwab customers as a whole, demonstrating that Schwab's compliance (or lack thereof) with the duty of best execution is well-suited to class-wide analysis.

---

[4] References herein to the "Spencer Decl." are to the Declaration Of Garth Spencer In Support Of Plaintiffs' Motion For Class Certification dated April 30, 2021 (previously filed at ECF No. 163-2), and its accompanying exhibits.

### 2. The EOHA's Terms and Schwab's Order Routing Technology Contributed to Class-Wide Failures of Best Execution

The terms of the EOHA encompassed all non-directed Schwab customer equity orders, and therefore the EOHA's deficient execution quality practices and procedures laid the foundation for best execution failures to occur on a Class-wide basis. For example, pursuant to the EOHA, Schwab was required to initially route over 99%, and later 93%, of non-directed customer equity orders to UBS, or face severe financial penalties. *See* Spencer Decl. Ex. 9, EOHA dated Oct. 29, 2004 at SCH-CRAGO-00000907-08; *id.* at SCH-CRAGO-00000919; Spencer Decl. Ex. 10, EOHA Amendment No. 4 dated Mar. 18, 2011 at SCH-CRAGO-00000869. The EOHA's limited execution quality metrics were aggregate statistics derived from data on all Schwab customer orders. *See* Starr Tr. at 110:19-111:3. The EOHA did not contemplate individualized routing or execution quality review of hundreds of thousands of orders per day.

In addition, during the Class Period, most Schwab customer orders were automatically processed by Schwab's simplistic order routing technology, which treated all orders similarly according to its pre-programmed logic. Schwab's order router did not consider price or quote information in determining where to route a given trade. Rather, Schwab's customer orders were for the most part automatically routed to pre-determined venues (almost always UBS). *See id.* at 92:1-93:14. As Schwab's representative stated, "We didn't have [a] requirement to route to multiple firms. So we didn't have as advanced an order router in terms of the ability to go to multiple -- multiple destinations. We were relying on UBS's technology and their order routing capabilities to do that for us." *Id.* at 86:19-24.

Because routing and execution quality for all relevant orders were governed by a single contract and because all relevant orders were processed by the simple, automated logic of Schwab's order router, Schwab routed Class member orders to UBS in a uniform manner and evaluated UBS's execution quality with respect to all Class members in a uniform manner.

### 3. Schwab Uniformly Failed to Compare Price Disimprovement for Marketable Orders Across Market Centers

As part of a broker's regular and rigorous review of execution quality, "[i]n reviewing and comparing the execution quality of its current order routing and execution arrangements to the

execution quality of other markets," a broker should consider factors including "differences in price disimprovement." FINRA Rule 5310 Supplementary Material at .09(b).

"Price disimprovement" is when a trade is executed at a price that is worse for the customer than the reference National Best Bid/Offer ("NBBO") price. Schwab's representative testified that he was "not sure" whether any of Schwab's analyses compared differences in price disimprovement across different venues. *See* Starr Tr. at 78:13-16. There is no indication in Schwab's documents that Schwab did so. Although Schwab's monthly flash reports regarding UBS's execution of Schwab customer orders reflected, for various order categories, the overall percentage of executed shares that received price disimprovement, they did not contain venue-specific price disimprovement information or any other information sufficient to compare price disimprovement across different venues. *See id.* at 125:23-126:12; Spencer Decl. Ex. 11, Starr Tr. Ex. 2 ("Monthly Flash Report").

Further, although Schwab's daily exception reports contained information for some individual trades reflecting venue and price disimprovement, they did not contain aggregate comparisons across different markets. *See, e.g.*, Spencer Decl. Ex. 12, Starr Tr. Ex. 3 ("Daily Exception Report"). And, Schwab so narrowly limited the trades that appeared on the exception reports that they excluded the vast majority of price disimproved trades and so would be of no use in any attempt to compare aggregate price disimprovement levels across different venues. Among the many limitations Schwab placed on these reports, any trades that Schwab concluded were harmed by less than $50 were not included. *See* Starr Tr. at 129:7-22; *id.* at 130:12-22. The combined effect of such limitations was dramatic. For example, although Schwab's February 2014 monthly flash report shows that well over 1.4 million shares were part of trades executed with price disimprovement on February 3, 2014, Schwab's exception report for that day includes trades routed to UBS totaling fewer than 3,000 shares. *See* Starr Tr. at 127:5-13; *id.* at 136:4-16; Monthly Flash Report at SCH-CRAGO-00045807; Daily Exception Report at SCH-CRAGO-00001450-55.

Although Schwab knew from monthly flash reports that its customers frequently received price disimprovement on trades routed to UBS, Schwab failed to conduct the required comparison

of price disimprovement among different market centers. This violated Schwab's duty of best execution to all Class members.

### 4. Schwab Uniformly Failed to Compare the Likelihood of Execution of Limit Orders Across Different Venues

As part of a broker's regular and rigorous review of execution quality, "[i]n reviewing and comparing the execution quality of its current order routing and execution arrangements to the execution quality of other markets," a broker should consider factors including "the likelihood of execution of limit orders." FINRA Rule 5310 Supplementary Material at .09(b).

Schwab's representative did not recall any processes Schwab used to evaluate the likelihood of execution of limit orders at different venues before 2014. Starr Tr. at 185:1-9. A presentation for Schwab's May 27, 2014 ORC meeting confirms that, as of that time, Schwab did not use execution quality metrics relating to limit orders and the execution quality analyses generated by its third-party vendor did not include information on fill rates. *See* Spencer Decl. Ex. 13, Starr Tr. Ex. 9 at SCH-CRAGO-00001294. Similarly, a July 2014 internal email stated: "We don't have data on fill rates. We are working with our 3rd party providers to add this functionality." *See* Spencer Decl. Ex. 14; Starr Tr. Ex. 13 at SCH-CRAGO-00088834.

According to Schwab's representative, at annual due diligence meetings, UBS gave Schwab a verbal overview of fill rates UBS was seeing at different venues. However, he admitted that there are no written records of these meetings and that he did not know what, if anything, Schwab did to verify the fill rates ostensibly reported by UBS. *See* Starr Tr. at 181:1-17. In any event, such a once-per-year verbal summary is not a "regular and rigorous review" sufficient to satisfy the duty of best execution with respect to non-marketable orders, because, "[a]t a minimum, a member must conduct such reviews on a quarterly basis." FINRA Rule 5310 Supplementary Material at .09(a).

Schwab made almost no attempt to compare the likelihood of execution of limit orders across different venues for most or all of the Class Period, and so violated its duty of best execution to all Class members.

### 5. Schwab Uniformly Failed to Compare Execution Quality Across All Relevant Market Centers

At all relevant times, FINRA Rule 5310 required a broker to "use reasonable diligence to ascertain the best market for the subject security and buy or sell in such market so that the resultant price to the customer is as favorable as possible under prevailing market conditions" and provided that a factor to be considered in assessing a broker's reasonable diligence is "the number of markets checked." FINRA Rule 5310(a)(1)(C). Revisions to Rule 5310 effective May 31, 2012, contained Supplementary Material, which provided in part:

> the term "market" . . . is to be construed broadly, and it encompasses a variety of different venues, including, but not limited to, market centers that are trading a particular security. This expansive interpretation is meant to . . . inform broker-dealers as to the breadth of the scope of venues that must be considered in the furtherance of their best execution obligations.

FINRA Rule 5310 Supplementary Material at .02.

Under the terms of the EOHA, Schwab was required to route the vast majority of orders to a single venue, UBS. Furthermore, even when performing after-the-fact comparisons of execution quality, Schwab's ORC only compared UBS's execution quality to a small set of handpicked comparison venues. *See* Starr Tr. at 65:16-22; Spencer Decl. Ex 15, Charles Schwab Execution Quality Update ORC Meeting June 8, 2012 ("ORC Presentation") at SCH-CRAGO-00000701. Similarly, the two quantitative EOHA metrics used by Schwab to assess UBS's execution quality were only calculated with respect to particular groups of comparison venues that excluded many potentially relevant market centers. *See* Starr Tr. at 114:2-9; Spencer Decl. Ex. 16, EOHA Amendment No. 3 dated Mar. 21, 2011.

As such, Schwab failed to compare execution quality across all relevant market centers and so violated its duty of best execution to all Class members.

### 6. Schwab Uniformly Failed to Perform a Security-by-Security, Type-of-Order Analysis of Execution Quality

FINRA rules require that where a broker routes almost all orders to a single destination on an automated basis, as Schwab did, its "regular and rigorous" review of execution quality "must be conducted on a security-by-security, type-of-order basis (e.g., limit order, market order, and market on open order)." FINRA Rule 5310 Supplementary Material at .09(a). Schwab failed to comply.

Schwab's ORC did not analyze execution quality on a security-by-security basis, but instead looked at a handful of "buckets" (*e.g.*, orders for NASDAQ 100 stocks for order sizes from 100 to 2,000 shares, or orders for all NASDAQ stocks for order sizes of 2,000 to 10,000 shares). *See* Starr Tr. at 61:16-62:15; ORC Presentation at SCH-CRAGO-00000701. Similarly, Schwab's daily flash reports did not analyze execution quality on a security-by-security basis, but instead looked at the same broad groupings of stocks. *See* Starr Tr. at 75:15-18; Spencer Decl. Ex. 17, TEQ Flash Report Email dated Feb. 4, 2014, at SCH-CRAGO-00046019. Schwab's two quantitative EOHA execution quality metrics were also calculated for these same buckets and not on a security-by-security basis. *See* Starr Tr. at 110:19-111:14. Nor do Schwab's other documents reveal any security-by-security review of execution quality for each of the thousands of equity securities publicly traded in the United States. And, for most or all of the Class Period, Schwab's core execution quality documents likewise provide no indication that Schwab even attempted any substantive assessment of execution quality for any order types other than marketable orders.

Schwab failed to conduct the required security-by-security, type-of-order analysis of execution quality, and this failure applied uniformly to all Class members.

**7.    Schwab Uniformly Failed to Obtain More Accurate Time Data From UBS to Perform Its Execution Quality Analysis**

Many of the factors required to be considered by a broker as part of its regular and rigorous review of execution quality are dependent on trade timing. *See* FINRA Rule 5310 Supplementary Material at .09(b) (listing factors for consideration including speed of execution, and price improvement or disimprovement as calculated based on quotes at the time the order is received by the market). Therefore time-related order and execution data is a key input to execution quality analysis, and the accuracy of such data significantly affects the accuracy of the analysis.

For most or all of the Class Period, Schwab apparently did not obtain millisecond level data regarding UBS's handling of Schwab customers' orders, although it could have done so. Schwab's representative did not know what level of resolution was contained in the order data provided by UBS to Schwab. *See* Starr Tr. at 167:5-14. An August 2011 email chain between Schwab, UBS, and Schwab's third-party data analysis vendor indicates that Schwab and UBS were calculating different

execution quality statistics for the same orders, because UBS had millisecond level data and Schwab did not. *See* Spencer Decl. Ex. 18; Starr Tr. Ex. 7. Despite knowing that UBS had access to more accurate data, Schwab apparently made no attempt to obtain it until at least mid-2014. In a June 2014 email chain, a Schwab employee wrote to a UBS employee: "Looks like you guys are capturing time stamps at the millisecond level (as you expected) but that the files you create for us and send to VistaOne do not contain that level of precision." *See* Spencer Decl. Ex. 19, Starr Tr. Ex. 8.

Schwab's failure to obtain millisecond level data from UBS for most of the Class Period, which it knew UBS possessed, significantly limited Schwab's ability to perform accurate execution quality analyses. Like Schwab's other best execution deficiencies, this failure affected all Class members because it resulted from Schwab's generally applicable policies and procedures.

### 8. Despite Evidence of UBS's Inferior Executions, Schwab Uniformly Failed to Seek Improved Executions or to Justify Continued Routing

In conducting its regular and rigorous review of execution quality, a broker "must determine whether any material differences in execution quality exist among the markets trading the security and, if so, modify the member's routing arrangements or justify why it is not modifying its routing arrangements." FINRA Rule 5310 Supplementary Material at .09(b).

Throughout the Class Period, Schwab's ORC performed quarterly execution quality comparisons of execution quality for UBS and certain other market centers. Despite their many deficiencies, these analyses often showed that other venues outperformed UBS. For example, a June 8, 2012 ORC presentation shows that for the first quarter of 2012, for market orders in listed stocks for order sizes between 100 and 9,999 shares, several venues delivered significantly better execution than UBS delivered for Schwab's customers, as measured by both effective/quoted ratio and aggregate price improvement. *See* ORC Presentation at SCH-CRAGO-00000701. This presentation shows that the average market maker delivered better execution quality on these metrics than UBS delivered for Schwab customers. *See id.* The presentation also shows that UBS's publicly reported execution quality data for all orders handled by UBS reflected superior execution quality on these metrics as compared to UBS's performance for only Schwab customers (indicating that on average, UBS gave worse execution quality to Schwab orders than to those of UBS's other customers). *See*

*id.* However, despite these results reflecting inferior execution quality, the presentation's conclusion merely stated "UBS . . . EQ [execution quality] performance has been consistently within . . . targets and remains competitive with major market centers." *See id.* at SCH-CRAGO-00000713. Similarly, the draft minutes for that ORC meeting reflect no concern and no follow-up regarding UBS's inferior reported execution quality for Schwab customers. *See* Spencer Decl. Ex. 20, Charles Schwab & UBS Execution Quality Update ORC Meeting Minutes – Draft for Committee Review dated June 8, 2012. On many occasions over the Class Period, ORC materials similarly reflect UBS's execution quality for Schwab orders lagging behind other venues, market maker averages, or UBS's own performance for non-Schwab customers.

Schwab also knew from other sources that UBS was not providing Schwab customers with the best execution quality that UBS was capable of obtaining. The two quantitative EOHA execution quality targets varied from time to time based on the execution data reported by the selected comparison market centers. *See* Starr Tr. at 112:6-9. Schwab knew that UBS was able to adjust its execution quality for Schwab customer orders to meet revised targets, including by improving its results on the effective/quoted ratio metric. *See id.* at 113:2-25. And, Schwab knew that it could obtain superior execution quality by diversifying its routing to induce competition among different market centers for Schwab customer orders. A March 2012 internal Schwab email summarizing a discussion among employees states, "[b]y having multiple relationships, Schwab has more control over the client experience as associated with execution quality because vendors are competing for the order flow," and "[m]ultiple venues allow leverage to negotiate better experience for clients and push for new opportunities in marketplace such as price improvement." Spencer Decl. Ex. 21, Starr Tr. Ex. 10 at SCH-CRAGO-00093032. Similarly, a November 2012 internal Schwab email states: "[h]aving the ability to route to multiple venues induces competition among the execution venues. This competition for order flow should result in improved execution quality for our clients." Spencer Decl. Ex. 22, Starr Tr. Ex. 11 at SCH-CRAGO-00053723. However, Schwab's representative did not know of any instance when Schwab considered routing more orders away from UBS to improve execution quality through increased competition among market centers for Schwab's orders. *See* Starr Tr. at 206:1-21.

Therefore, Schwab knew that UBS's execution quality for Schwab customers frequently underperformed other market centers and UBS's executions for non-Schwab clients. Schwab knew that it could obtain better execution quality upon request to UBS or by diversifying routing away from UBS to other venues. Schwab's failure to fix its deficient routing practices or to justify its continued routing to UBS violated Schwab's duty of best execution to all Class members.

**9.     Schwab Recognized the Conflicts of Interest Inherent in Its Relationship With UBS and Their Potential to Harm All Schwab Customers**

Throughout the Class Period Schwab knew of, but largely ignored, systemic conflicts of interest between Schwab, UBS, and Schwab customers, as each tried to maximize their own benefit from Schwab customer orders.

The EOHA allowed UBS to trade against Schwab orders for its own account, a process known as "internalizing" the order. This creates an unavoidable conflict of interest between the customer and the internalizer because they are on opposite sides of the same trade. Schwab recognized this conflict. For example, an April 2013 Schwab internal email states: "We will not internalize customer order flow—avoid conflict of interest." Spencer Decl. Ex. 23, Starr Tr. Ex. 15 at SCH-CRAGO-00070748 ("April 2013 Email"). Schwab's representative acknowledged the potential conflict of interest in internalizing orders and that "Schwab doesn't want to be seen as trading against its clients or with its clients in – in any way, shape or form." Starr Tr. at 228:3-24.[5] Although Schwab knew that UBS internalized Schwab customer orders, Schwab's representative did not know what proportion of such orders UBS internalized during the Class Period and could not identify any instance where UBS disclosed that information to Schwab. *See id.* at 97:4-98:16. And Schwab did not know in real time which of its customer orders UBS was internalizing. *See id.* at 230:18-21. Therefore, Schwab allowed UBS to internalize Schwab customer orders despite the obvious conflict of interest and despite Schwab's lack of visibility into the extent to which UBS internalized those orders.

---

[5] The witness claimed that UBS internalizing Schwab customer orders did not give rise to a conflict of interest, but this was based on his implausible assumption that UBS would only do what was best for Schwab customers, although he admitted he did not know if UBS had ever made such a representation to Schwab. *Id.* at 229:3-230:3.

Schwab also recognized the conflict of interest inherent in PFOF. If a market maker has to provide better execution quality for a broker's orders, those orders are less profitable for the market maker to trade against or provide to its own paying customers. Therefore, there is a direct trade-off between PFOF and execution quality. Schwab had first-hand experience of this trade-off based on its own negotiations with UBS. In early 2011, Schwab and UBS were negotiating amendments to the EOHA. *See* Spencer Decl. Ex. 24, Starr Tr. Ex. 14. In January 2011, UBS offered Schwab a certain rate of PFOF, but then substantially reduced this offer in March 2011, "as a result of revised targets for listed EQ [execution quality] . . . resulting in a discount of their [UBS's] economics." *See id.* at SCH-CRAGO-00184837. That is, Schwab and UBS negotiated regarding amounts of PFOF and execution quality, and an increase in one led directly to a decrease in the other. Schwab's understanding of this trade-off is likewise confirmed by other internal documents. For example, in the April 2013 Email, a Schwab employee set out his thoughts on business strategy and listed among, "Things I think we will need to consider" the first bullet point "Competitive vs. best in class trade execution (PFOF trade off)." *See* April 2013 Email at SCH-CRAGO-00070748. And minutes for a February 27, 2015 meeting of Schwab's ORC state: "Competing broker/dealers have reduced or stopped receiving payment for order flow and redirected the benefits into execution quality." Spencer Decl. Ex. 25, Starr Tr. Ex. 16 at SCH-CRAGO-00001270.

Despite knowing of the trade-off between PFOF and execution quality, Schwab sought and received tens of millions of dollars of PFOF from UBS annually at increasing rates over the November 2012 to December 2014 period. During this period Schwab received PFOF from UBS of between $20 million to $36 million annually. *See* Starr Tr. 118:10-21. UBS began to pay Schwab for order flow in 2012, increased its payment rates in 2013 and 2014, and at no time in this period did UBS decrease its rates of PFOF to Schwab. *See id.* at 241:15-242:2. Schwab's representative was unaware of any instance in this period when Schwab offered to eliminate PFOF from UBS in exchange for better execution quality for its customers, or any instance where Schwab even considered making such an offer. *See id.* at 242:3-12.

1  Despite recognizing UBS's conflicts of interest, Schwab largely ignored them (UBS's

2  internalizing orders) or exacerbated them (Schwab seeking increased PFOF rates). Schwab's failure

3  to address these conflicts violated Schwab's duty of best execution to all Class members.

4        **B.**     **Schwab Fraudulently Omitted to Disclose Material Facts**
                  **Regarding Its Best Execution Failures on a Class-Wide Basis**

5

6  Schwab published to each Class member uniform information concerning Schwab's

7  practices regarding order routing and best execution, which information suffered from uniform

8  material omissions. To open a Schwab brokerage account, Schwab required customers to fill out

9  and sign an application, which incorporated the terms of the Schwab One Account Agreement, as

10  amended. ¶¶41-42. The terms of the Schwab One Account Agreement did not vary from customer

11  to customer, but were standardized in all respects, including concerning disclosures regarding order

12  routing and the duty of best execution. *See* ¶¶42-46. Similarly, Schwab's website disclosures

13  relating to best execution and order routing were uniform as to all Schwab customers. *See* ¶¶32, 40.

14  Therefore, Schwab's failure to disclose that it prioritized its own financial self-interest and

   adherence to the EOHA over its duty of best execution was uniform as to all Class members.

15  **II.**    **Legal Standard For Class Certification**

16  The Supreme Court has repeatedly recognized the importance of class actions in redressing

17  wrongs committed under the federal securities laws. *See, e.g.*, *Amgen Inc. v. Conn. Ret. Plans & Tr.*

18  *Funds*, 568 U.S. 455, 478 (2013) ("Congress, the Executive Branch, and this Court . . . have

19  'recognized that meritorious private actions to enforce federal antifraud securities laws are an

20  essential supplement to criminal prosecutions and civil enforcement actions . . . .'"); *Tellabs, Inc. v.*

21  *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313-14, 320 (2007) (same). "[D]oubts regarding the

22  propriety of class certification generally should be resolved in favor of certification." *Zeisel v.*

23  *Diamond Foods, Inc.*, No. C 10-01192 JSW, 2011 U.S. Dist. LEXIS 60608, at * 19 (N.D. Cal. June

24  7, 2011) (quoting *Gonzales v. Arrow Fin. Servs. LLC*, 489 F. Supp. 2d 1140, 1154 (S.D. Cal. 2007)).

25  "District courts have consistently recognized that the common liability issues involved in securities

26  fraud cases are ideally suited for resolution by way of a class action." *In re Cooper Cos. Sec. Litig.*,

27  254 F.R.D. 628, 641 (C.D. Cal. 2009).

28

Under Rule 23(a), one or more members of a class may sue or be sued as representative parties on behalf of all members if: (1) the class is so numerous that joinder of all members is impracticable ("numerosity"); (2) there are questions of law or fact common to the class ("commonality"); (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class ("typicality"); and (4) the representative parties will fairly and adequately protect the interests of the class ("adequacy of representation"). Fed. R. Civ. P. 23; *Huntsman v. Sw. Airlines Co.*, No. 19-cv-00083-PJH, 2021 U.S. Dist. LEXIS 20856, at *4-5 (N.D. Cal. Feb. 3, 2021).

While class certification is often granted under Rule 23(b)(3), the Ninth Circuit has repeatedly recognized that Rule 23(c)(4) provides an alternative means of maintaining a class action by creating issue classes: "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." Fed. R. Civ. P. 23(c)(4). Under Rule 23(c)(4), litigants may receive class certification on certain issues while the remaining issues continue on an individual basis. *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996) (noting that Rule 23 allows courts to "isolate the common issues under 23(c)(4)(A) and proceed with class treatment of these particular issues"); *see also Loritz v. Exide Techs.*, No. 2:13-cv-02607-SVW-E, 2015 U.S. Dist. LEXIS 100471, at *72 (C.D. Cal. July 21, 2015) (granting plaintiff's motion to certify an issue class and holding "where the only bar to certification is the failure to present a damages model, the Court may certify a liability-only class"). Certification of issue classes under Rule 23(c)(4) is "appropriate" if it "would significantly advance the resolution of the underlying case, thereby achieving judicial economy and efficiency." *Valentino,* 97 F.3d at 1229–30; *see Jacob v. Duane Reade, Inc.*, 293 F.R.D. 578, 589 (S.D.N.Y. 2013), *aff'd*, 602 F. App'x 3 (2d Cir. 2015) ("Courts should use Rule 23(c)(4) [ ] only 'where resolution of the particular common issues would materially advance the disposition of the litigation as a whole.'") (quoting *In re Motor Fuel Temperature Sales Practices Litig.*, 292 F.R.D. 652 (D. Kan. 2013)); *see also Rules governing certification of issue classes*, 2 Newberg and Rubenstein on Class Actions § 4:92 (6th ed.) (citing *Rahman v. Mott's LLP*, 693 F. App'x 578, 579 (9th Cir. 2017)).

For issues to be certified under Rule 23(c)(4), the particular issues must meet the requirements of Rule 23(a). *Tasion Commc'ns, Inc. v. Ubiquiti Networks Inc.*, 308 F.R.D. 630, 633

(N.D. Cal. 2015); *see also Cent. Wesleyan Coll. v. W.R. Grace & Co.*, 6 F.3d 177, 189 (4th Cir. 1993) ("district courts may separate and certify certain issues for class treatment," but every subclass on each issue must meet Rule 23(a) and at least one of the categories in 23(b)).

The particular issues must also meet Rule 23(b), except for the predominance requirement. *Valentino*, 97 F.3d at 1234 ("Even if the common questions do not predominate over the individual questions so that class certification of the entire action is warranted, Rule 23 authorizes the district court in appropriate cases to isolate the common issues under Rule 23(c)(4)(A) and proceed with class treatment of these particular issues."); *see also Saavedra v. Eli Lilly and Co.*, No. 2:12-cv-9366-SVW (MANx), 2014 U.S. Dist. LEXIS 179088, at *31 (C.D. Cal. Dec. 18, 2014) ("refusing to certify any issue class under Rule 23(c)(4) unless the predominance requirement was met would render Rule 23(c)(4) a nullity") (citing *In re Nassau Cty. Strip Search Cases*, 461 F.3d 219, 226 (2d Cir. 2006)); *Rules governing certification of issue classes*, 2 Newberg and Rubenstein on Class Actions § 4:92 (6th ed.) (in a standard money damages class action, the "proponent does *not* have to demonstrate that common issues predominate in the entire cause of action or case, solely as to the issue proposed for aggregate litigation).

"[A] class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 156 (1982); *see also Lee v. State of Or.*, 107 F.3d 1382, 1390 (9th Cir. 1997) (explaining that standing is a jurisdictional element that the plaintiff must satisfy before class certification). The burden of establishing standing falls upon the plaintiff. *Bennett v. Spear*, 520 U.S. 154, 167-68 (1997) ("each element of Article III standing 'must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation'").

Here, the Class's claims are particularly well-suited for issue class treatment. "The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997) (quoting *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (1997)); *Chalk v. T-Mobile USA, Inc.*, 560 F.3d 1087, 1095 (9th Cir. 2009); *Bernstein v.*

*Virgin Am., Inc.*, No. 15-cv-02277-JST, 2018 U.S. Dist. LEXIS 114721, at *19 (N.D. Cal. July 9, 2018). "The availability of the class action to redress [securities] frauds has been consistently upheld, in large part because of the substantial role that the deterrent effect of class actions plays in accomplishing the objectives of the securities laws." *Blackie v. Barrack*, 524 F.2d 891, 903 (9th Cir. 1975) (internal citations omitted).

Here, Schwab profited by at least tens of millions of dollars while failing to honor what it advertised: its duty of best execution to its customers. Despite the massive aggregate harm Schwab inflicted on Class members, given the nature of Schwab's fraud, most of the Class members likely incurred modest amounts of harm individually, so establishing the issues presented for certification will materially advance their ability to obtain individual recoveries. Accordingly, class treatment of these claims is especially appropriate.

**III.   Certification of the Class With Respect to the Falsity Issue, the Scheme Issue, and the Scienter Issue Is Appropriate Under Rule 23(c)(4)**

**A.   This Case Meets the Standards for Issue Classes**

Plaintiffs seek to certify the Class "with respect to particular issues," namely the Falsity Issue, the Scheme Issue, and the Scienter Issue. As noted, Rule 23(c)(4) may be used whenever resolution of the particular common issues would materially advance the disposition of the litigation as a whole. *See Diaz v. Albertson's LLC*, No. CV 16-00257 DSF (JEMx), 2016 WL 8904415, at *6 (C.D. Cal. Dec. 20, 2016) (exercising "its discretion pursuant to Fed. R. Civ. P. Rule 23(c)(4)" and certifying because such certification "will materially advance the litigation."). This is even so when only a single common issue warrants Rule 23(c)(4) certification. *See id.* (certifying a class solely on one liability issue); *In re Activision Sec. Litig.,* 621 F. Supp. 415, 438 (N.D. Cal. 1985) (finding "it both appropriate and desirable to certify a [] single issue under § 12(2) of material misrepresentations and omissions in the offering materials").

Because the Ninth Circuit has approved the use of issue classes where certification under Rule 23(b)(3) would not be proper because common questions do not predominate, s*ee Valentino*, 97 F.3d at 1234, certification of certain issues is proper even if reliance, causation, or other issues cannot be determined on a class-wide basis; *see Arthur Young & Co. v. U.S. Dist. Ct.,* 549 F.2d 686,

697 (9th Cir. 1977). *See also* 7A Wright & Miller, *Federal Practice and Procedure: Civil* §1790 (3d ed) ("Courts have applied subdivision (c)(4)(A) to allow a partial class action to go forward, leaving questions of reliance, damages, and other issues to be adjudicated on an individual basis."); *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1168 (9th Cir. 2014) ("So long as the plaintiffs were harmed by the same conduct, disparities in how or by how much they were harmed did not defeat class certification."); *Petersen v. Costco Wholesale Co.*, 312 F.R.D. 565, 584 (C.D. Cal. 2016) ("As the Ninth Circuit has repeatedly made clear, 'damage calculations alone cannot defeat certification.'").

### B.    Falsity, Scheme, and Scienter Are Common Issues Ripe for Certification

The Court should certify the proposed Class on one or more of the common issues presented in this litigation: (1) whether Schwab's order routing policy during the Class Period violated its duty of best execution; (2) whether the order routing policies constituted a deceptive scheme to defraud Schwab's customers; and (3) whether Schwab knowingly or recklessly engaged in its representations or omissions or scheme. "[T]he efficiency of a single liability determination" of these core common issues would further the goal of advancing the litigation. *See Amador v. Baca*, No. 10-CV-1649-SVW, 2016 WL 8904537, at *6 (C.D. Cal. Nov. 18, 2016).

A finding of whether Schwab's failure to monitor the execution quality of the UBS routed orders complies with the duty of best execution will apply to all Schwab's customers. The same is also true for the issues of whether Schwab's order routing policies to UBS constituted a deceptive scheme or device and whether Defendants possessed the requisite level of scienter.

Similarly, in opposing Plaintiffs' initial motion for class certification, Defendants did not argue that there were any individualized inquiries regarding the issues of the omissions and misrepresentations made by Defendants during the Class Period, whether Defendants acted with scienter, or whether Schwab's routing practices constituted a deceptive device or scheme. *See* ECF No. 172. It is patently more efficient and economical to undertake this analysis once, in the context of a class action, even if individual suits relating to reliance and damages are then required. The alternative is that the proof of Schwab's and UBS's routing practices and Schwab's monitoring of UBS's execution quality will have to be undertaken and presented thousands of times in the context

of individual actions by each Schwab customer. This would be a substantial waste of judicial resources. A class-wide resolution of this issue would be both economical and superior to individual trials on this issue. *See Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) ("Where recovery on an individual basis would be dwarfed by the cost of litigating on an individual basis, this factor weighs in favor of class certification."); *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 426 (4th Cir. 2003) ("First, it appears likely that in the absence of class certification, very few claims would be brought against TPCM, making 'the adjudication of [the] matter through a class action . . . superior to no adjudication of the matter at all.'" (quoting 5 *Moore's Federal Practice* § 23.48[1] (1997)).

Similarly, questions concerning Defendants' scienter when making public disclosures and omissions about their order routing practices during the Class Period are also subject to common proof and would be more efficiently litigated on a class-wide basis rather than repeated in hundreds or thousands of individual suits. Even though resolution of the particular issues of misrepresentations and omissions, compliance with the duty of best execution, scheme liability, and scienter will not entirely resolve the question of Defendants' liability to the Class, resolving these issues "will go a long way toward doing so, and this is the most efficient way of resolving [the particular issues]." *Martin v. Behr Dayton Thermal Prods. LLC*, 896 F.3d 405, 416 (6th Cir. 2018).

Although the Rule 23(b)(3) requirements of predominance and superiority do not apply in this context, even if they did apply, the question of predominance in a Rule 23(c)(4) class need only be satisfied with regard to the specific issue or issues to be certified. *See Valentino*, 97 F.3d at 1234; *Martin*, 896 F.3d at 413; *Gunnells*, 348 F.3d at 444 (citing *Robinson v. Metro–North Commuter R.R. Co.*, 267 F.3d 147, 167 n.12 (2d Cir. 2001)). In such an event, they are satisfied here because the certification of only three common issues necessarily means that common issues predominate. *See, e.g.*, *Charrons v. Pinnacle Grp. N.Y. LLC*, 269 F.R.D. 221, 241, 244 (S.D.N.Y. 2010) (certifying, *inter alia*, a Rule 23(b)(3) liability class pursuant to Rule 23(c)(4) limited to resolving the issues of whether the alleged scheme violated applicable law and noting that if plaintiffs prove the scheme that "the Court will consider its options for resolving individual damages issues" at that time).

## IV.   The Proposed Class Satisfies Rule 23(a) With Respect to Falsity, Scheme, and Scienter

### A.   Numerosity

Rule 23(a)(1) requires that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "The sheer size of the class is the most important factor in determining whether a class is so numerous that joinder is impracticable." *Wood v. Granite Constr. Co.*, No. CIV-S-03-2592 DFL PAN, 2005 U.S. Dist. LEXIS 55541, at *4 (E.D. Cal. Mar. 11, 2005) (citing *Jordan v. Cty. of L.A.*, 699 F.2d 1311, 1319 (9th Cir. 1982)).  The party seeking certification "do[es] not need to state the exact number of potential class members, nor is a specific number of members required for numerosity." *Fleming v. Matco Tools Corp.*, No. 19-cv-00463-WHO, 2021 U.S. Dist. LEXIS 33513, at *8 (N.D. Cal. Feb. 21, 2021); *In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346, 350 (N.D. Cal. 2005). However, courts within the Ninth Circuit generally agree that numerosity is satisfied if the class includes forty or more members. *Fleming*, 2021 U.S. Dist. LEXIS 33513, at *8; *Villalpando v. Exel Direct Inc.*, 303 F.R.D. 588, 605-06 (N.D. Cal. 2014); *In re Facebook, Inc., PPC Advert. Litig.*, 282 F.R.D. 446, 452 (N.D. Cal. 2012).

The proposed Class easily satisfies this factor. During the Class Period, Schwab had approximately 9 million active brokerage accounts.[6] Schwab's customers placed hundreds of thousands of equity orders per day, substantial proportions of which were non-directed and were routed automatically to UBS pursuant to the EOHA.

The Ninth Circuit has rejected any requirement that a plaintiff demonstrate an "administratively feasible" way to identify class members. *MadKudu Inc. v. United States Citizenship & Immigration Servs.*, No. 20-cv-02653-SVK, 2020 U.S. Dist. LEXIS 219184, at *15 (N.D. Cal. Nov. 17, 2020) (citing *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1124 n.4, 1126 (9th Cir. 2017); *Williams v. PillPack LLC*, No. C19-5282 TSZ, 2021 U.S. Dist. LEXIS 27496, at *6 n.5 (W.D. Wash. Feb. 12, 2021). Ascertainability is not a "threshold requirement" for class certification, and it is relevant "only to the extent it is implicated by Rule 23's enumerated requirements." *MadKudu*, 2020 U.S. Dist. LEXIS 219184, at *15. A class is ascertainable if the

---

[6]   *See* Schwab 2014 Annual Report at 13, available at https://content.schwab.com/web/retail/public/about-schwab/schw_annual_report_2014.pdf.

court can determine whether an individual is a member "before trial, and by reference to 'objective criteria.'" *Chinitz v. Intero Real Estate Servs.*, No. 18-cv-05623-BLF, 2020 U.S. Dist. LEXIS 247921, at *22 (N.D. Cal. July 22, 2020). Here, Class members will be identified based upon objective criteria including Schwab's and UBS's Class Period trading data. Schwab's records will identify the customers associated with those trades.

## B. Commonality

"What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1133 (9th Cir. 2016) (emphasis in original) (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)). To satisfy Rule 23(a)(2) commonality, "'[e]ven a single [common] question' will do." *Torres*, 835 F.3d at 1133 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)). But because "'[a]ny competently crafted class complaint literally raises common questions,' courts should look for a 'common contention' in determining whether putative class members' claims can be litigated together." *Alcantar v. Hobart Serv.*, 800 F.3d 1047, 1052 (9th Cir. 2015) (internal citations omitted) (citing *Wal-Mart*, 564 U.S. at 349 (alteration in original) (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. REV. at 131-32 (2009))). "That common contention, moreover, must be of such a nature that it is capable of class-wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Alcantar*, 800 F.3d at 1052 (citing *Wal-Mart*, 564 U.S. at 349).

The Falsity Issue, Scheme Issue, and Scienter Issue raise numerous questions of law and fact common to the Class that are central to the validity of the claims, including:

- Whether Schwab omitted to disclose material information concerning the EOHA, Schwab's relationship with UBS, and Schwab's compliance with the duty of best execution to the Class;

- Whether Schwab's representations to the Class concerning trade execution and best execution were false and misleading in light of the material omissions;

- Whether Schwab acted with scienter;

- Whether Schwab's decision to enter into the EOHA and its amendments was motivated by a desire to maximize profits at the expense of a duty it owed to the Class;

- Whether Schwab's routing of non-directed equity orders pursuant to the EOHA was non-compliant with common law, regulatory, and statutory duties;

- Whether Schwab knew that its routing of non-directed equity orders pursuant to the EOHA failed to obtain best execution and was non-compliant; and

- Whether Schwab failed to take reasonable steps to achieve best execution for the Class members.

The answers to these questions will drive the resolution of this action. *Wal-Mart*, 564 U.S. at 350. The Class claims with respect to the Falsity Issue and the Scienter Issue arise from common conduct by Schwab directed at the Class, and each Class member suffered the same manner of harm.

Although the Court, in ruling on Plaintiffs' original class certification motion, held that Rule 23(a) was not satisfied because individualized issues of reliance defeated the requirement of commonality (*see* ECF No. 192 at 8-9), Plaintiffs' instant motion overcomes this concern by seeking to certify the Class solely for purposes of the Scienter Issue, Scheme Issue, and the Falsity Issue.

### C. Typicality

The typicality requirement focuses on the relationship of facts and issues between the class and its representatives. *Walters v. Target Corp.*, No. 3:16-cv-1678-L-MDD, 2020 U.S. Dist. LEXIS 198765, at *9 (9th Cir. Oct. 26, 2020). "[R]epresentative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Id.* at *10 (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)) (internal citations and quotation marks omitted). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Walters*, 2020 U.S. Dist. LEXIS 198765, at *10 (citing *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)) (internal citations and quotation marks omitted).

Here, Plaintiffs are typical of the Class they seek to represent. Schwab applied its trade routing policy under the EOHA uniformly among the Class throughout the Class Period. Further,

Plaintiffs and the Class members received substantively similar disclosures from Schwab that suffered from the same material omissions. Their non-directed trades were all subject to the EOHA.

### D. Adequacy

To serve as a class representative, one must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon*, 150 F.3d at 1020 (citation omitted).

There is no question that the proposed Class representatives and their counsel are adequate. Plaintiffs are committed to prosecuting this action on behalf of the Class through a verdict and to achieve the best results for the Class. Plaintiffs have demonstrated their willingness to commit time and effort to this litigation by searching for and producing documents in response to Schwab's discovery demands, sitting for depositions, reviewing pleadings, and actively monitoring counsel. *See* Fortunato Ex. A; Wolfson Decl. ¶6; Fortunato Decl. Ex. B, Posson Decl. ¶6. Plaintiffs understand that they owe fiduciary duties to all Class members, and they are committed to vigorously prosecuting the action in a manner that is fair and beneficial to the Class. Wolfson Decl. ¶¶4-5, 9-10; Posson Decl. ¶¶4-5, 9-10.

Plaintiffs have also retained qualified counsel who have extensive experience litigating complex securities class actions and other matters. *See* Spencer Decl. Exs. 5-7 (law firm resumes). Class counsel has devoted significant time and financial investment to date in investigating, preparing, and prosecuting this action, including investigating the facts and law applicable to the Class's claims, preparing and filing the complaints; opposing Defendants' motions to dismiss, engaging in discovery including complex expert discovery, and pursuing class certification, including the filing of a Rule 23(f) petition with the Ninth Circuit.

There are no conflicts between Plaintiffs or their counsel and the other Class members. Each of the Plaintiffs sustained losses due to the same wrongful conduct on Schwab's part as the rest of the Class. Plaintiffs' interests are fully aligned with those of the Class.

## V.      The Proposed Class Also Satisfies Rule 23(b)(1)

"The Court can certify a Rule 23(b)(1)(A) class if 'prosecuting separate actions by or against individual class members would create a risk of [] inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class.'" *Des Roches v. Cal. Physicians' Serv.*, 320 F.R.D. 486, 506 (N.D. Cal. 2017) (quoting Fed. R. Civ. P. 23(b)(1)(A)).

The Court can certify the Class under Rule 23(b)(1) because prosecuting separate actions would create the risk of inconsistent verdicts and varying adjudications. In the event Schwab truly wished to litigate hundreds of thousands of claims concerning its failure to fulfill its duty of best execution, different courts and different juries can reach different conclusions as to the scope of Schwab's duties and a host of other disputed issues. These inconsistent verdicts could render Schwab subject to various conflicting obligations to its customers and the Class members.

## VI.     CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request entry of an order certifying this action as a class action on behalf of the Class with respect to the Scienter Issue, the Scheme Issue, and the Falsity Issue, appointing Plaintiffs Wolfson and Posson as Class Representatives, and appointing Glancy, BES, and LK as Class Counsel.

Dated: September 23, 2022

**BRAGAR EAGEL & SQUIRE, P.C.**

By:   */s/ Melissa A. Fortunato*
Melissa A. Fortunato (#319767)
  fortunato@bespc.com
580 California Street, Suite 1200
San Francisco, CA 94104
Telephone: (415) 568-2124
Facsimile: (212) 486-0462

-and-

Lawrence P. Eagel
  eagel@bespc.com
810 Seventh Avenue, Suite 620
New York, New York 10019
Telephone: (212) 308-5858
Facsimile: (212) 486-0462

**GLANCY PRONGAY & MURRAY LLP**
Jonathan Rotter (#234137)
  jrotter@glancylaw.com
Lionel Glancy (#134180)
  lglancy@glancylaw.com
Garth Spencer (#335424)
  gspencer@glancylaw.com
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Attorneys for Lead Plaintiff Robert Wolfson and*
*Co-Lead Counsel for the Class*

**LEVI & KORSINSKY, LLP**
Eduard Korsinsky (*pro hac vice to be submitted*)
  ekorsinsky@zlk.com
55 Broadway, 10th Floor
New York, NY 10006
Telephone: (212) 363-7500
Facsimile: (212) 363-7171

-and-

Nicholas I. Porritt (admitted *pro hac vice*)
  nporritt@zlk.com
Alexander A. Krot III (admitted *pro hac vice*)
  akrot@zlk.com
1101 30th Street, NW
Suite 115
Washington, DC 20007
Telephone: (202) 524-4290
Facsimile: (212) 363-7171

*Attorneys for Plaintiff K. Scott Posson*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>PROOF OF SERVICE BY ELECTRONIC POSTING</u>**

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old. On September 23, 2022, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Northern District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on September 23, 2022, at San Francisco, California.

*s/ Melissa A. Fortunato*
Melissa A. Fortunato

Plaintiffs' Renewed Motion for Class Certification
Case No. 3:16-cv-03938-RS